Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
Zachary W. Gussin, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Abbas Kazerounian (SBN: 249203)
ak@kazlg.com
Kazerouni Law Group, APC
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
(800) 400-6808, Fax (800) 520-5523

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| PAMELA DELPAPA, SAMARA GREEN, BRETT JACOB, CHARLES JOHNSON, AND RENRICK AND VIVIAN ROBINSON, and all others similarly situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO & CO.,<br><br>                              Defendants. | No. 3:20-cv-06009-JD<br><br>**FIRST AMENDED COMPLAINT CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Pamela Delpapa, Samara Green, Brett Jacob, Charles Johnson, and Renrick and Vivian Robinson, individually and on behalf of all others similarly situated, bring this class action lawsuit against Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo & Co. ("WFC") (collectively, "Wells Fargo" or "Defendants,") and allege as follows:

## I.    INTRODUCTION

1.    In March 2020, following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security ("CARES") Act to, among other things, provide relief to millions of American homeowners struggling to make their mortgage payments as a result of the economic difficulties caused by the pandemic.

2.    The CARES Act instructed mortgagees and servicers to create mortgage forbearance provisions for all federally-backed mortgages, which includes loans serviced by Defendants on behalf of Government Sponsored Enterprises ("GSEs") that acquire, securitize and insure repayment of the majority of consumer mortgage loans in America.

3.    The CARES Act makes clear that participation in a COVID-19 mortgage forbearance program is entirely voluntary; that is, a mortgagor must be informed of the various terms and conditions of the program and then affirmatively decide to enter the program.

4.    According to the Consumer Financial Protection Bureau ("CFPB"), before a bank servicing a loan can grant forbearance, it must receive a request for such relief and an attestation of a COVID-19-related financial hardship from the borrower:

> REQUIREMENTS FOR SERVICERS.— (1) IN GENERAL.— ***Upon receiving a request for forbearance from a borrower under subsection (b), the servicer shall with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID–19 emergency*** and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provide the forbearance for up to 180 days, which may be extended for an additional period of up to 180 days at the request of the borrower, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, either the initial or extended period of forbearance may be shortened.[1]

---

[1] https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (last visited December 23, 2020) (emphasis added).

5.      As detailed herein, Wells Fargo—without requesting or receiving any request or financial hardship attestation—opted unwitting clients into its COVID-19 mortgage forbearance program.

6.      Instead of waiting for customers to request that Wells Fargo place their loans in forbearance, Wells Fargo forced customers into forbearance without their knowledge or consent. As Plaintiffs' experiences demonstrate, many borrowers received no notice that Wells Fargo had placed their mortgages into forbearance. They only found out about Wells Fargo's actions—if they found out at all—when they attempted to apply for credit (including the refinancing of their mortgage) and were denied, saw the forbearance noted on a credit report, or tried, but were unable, to make a regularly scheduled mortgage payment with Wells Fargo.

7.      And when Wells Fargo did send their customers a template notice informing them that Wells Fargo had placed their loans into forbearance, the notice was both insufficient and inaccurate.

8.      Some borrowers who initially wanted a forbearance later sought to end their forbearance plan upon learning more about the risks associated with forbearances. As Mr. Johnson's circumstances demonstrate, Wells Fargo not only failed to comply with the CARES Act's requirement that borrowers be allowed to end their forbearance at any time, but they unlawfully extended the period of forbearance after Mr. Johnson requested for his loan to be removed from the program.

9.      In addition, Wells Fargo put through secondary requests for forbearance on behalf of homeowners who had asked to participate in the program initially but who did not ask for extensions and no longer wanted to be in the forbearance program.

10.     Numerous media reports suggest that these practices, including the complete lack of documentation, are not limited to a few persons.

11.     Since the onset of COVID-19, approximately 5.5 million homeowners have participated in a mortgage forbearance program, either knowingly or unknowingly.  Upon information and belief,

Wells Fargo has deferred approximately 2.5 million payments, many of whom never made a request for such forbearance.[2]

12.    Congress's requirement of a volitional act on the part of mortgagor to opt into forbearance is intentional, because mortgage forbearance has serious consequences for homeowners, including an inability to obtain additional credit and/or to refinance any existing loans.

13.    As a result, those homeowners, including Plaintiffs, suffered damages, including, but not limited to, an inability to access credit, to refinance to lower interest rates (and with particular mortgage servicers instead of Wells Fargo), and in dealing with the difficult situation of removing their mortgages from a program they did not want.

14.    Wells Fargo benefitted by unilaterally opting unwitting homeowners into its forbearance program in several ways, including by retaining borrowers who might otherwise refinance their mortgages with other institutions.

15.    Interest rates are at all-time lows and many homeowners are seeking to take advantage of these historically low rates by refinancing. If an account is placed into a forbearance program, those borrowers cannot typically refinance for many months, if not years, even after bringing the account current.

16.    Defendants' actions are, unfortunately, yet another example of Wells Fargo opportunistic and illegal actions that seem to only benefit it financially without any regard for the needs of its customers even in the throes of a catastrophic pandemic.

17.    Defendants recently agreed to pay $3 Billion to resolve their potential criminal and civil liability stemming from their practice of pressuring employees to meet unrealistic sales goal that led

---

[2] *See, e.g.*, https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610 (last visited December 23, 2020).

thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities.[3]

18.     This is not the first time Wells Fargo has acted without their customers' consent and taken actions that have harmed those customers. It is instead part of a well-established pattern. Most notably, Wells Fargo opened an estimated 3.5 million debit or credit accounts without customer consent, as alleged in a class action complaint in this District and resolved by a $142 million settlement finally approved by the Hon. Vince Chhabria.

19.     The recent revelations regarding Defendants' practice of involuntarily putting homeowners in the unwanted forbearance program without proper documentation prompted the following statement from Senator Sherrod Brown of Ohio, the ranking Democrat on the Banking Committee:

> Once again it seems that Wells Fargo's sloppy service and shoddy management are hurting consumers. Wells Fargo should immediately address each of these complaints and make changes to ensure that no borrower finds themselves worse off from actions that their servicer takes without their consent or notice.[4]

20.     In addition to Senator Brown's public statement, Senators Elizabeth Warren of Massachusetts and Brian Schatz of Hawaii recently wrote a letter to the Chief Executive Officer of Wells Fargo seeking information regarding its now well-documented practice of putting mortgagors into forbearance programs without their consent.[5]

21.     The senators' July 29, 2020 letter stated that Wells Fargo "appears to be incapable of

---

[3] https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited December 23, 2020).

[4] https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610 (last visited December 23, 2020).

[5] https://www.warren.senate.gov/imo/media/doc/2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.pdf (last visited December 22, 2020).

self-governance," and noted that reports of borrowers being placed in forbearance programs they did

not want "raise even more questions about the inability of Wells Fargo and its leadership team to

comply with the law and the needs of its customers."

22.     The letter proclaimed that "if these reports are true, they represent one more addition to

a long list of inexcusable actions by Wells Fargo at customers' expense" because such conduct can

affect borrowers' credit by suggesting that they are not making payments even when they are and can

prevent them from refinancing their home loans to take advantage of rock-bottom interest rates.

23.     Wells Fargo, for its part, has not denied these allegations; through its spokesperson Tom

Goyda, Wells Fargo states that "[i]n the spirit of providing assistance, [it] may have misinterpreted

customers' intentions in a small number of cases."[6]

24.     Although Wells Fargo did not identify the complete number of borrowers who were

unwillingly placed into forbearance program, it reported having received 1,600 complaints of

unwanted forbearances.[7]

25.     In sum, Wells Fargo so badly mismanaged this CARES Act program that the bank

ended up hurting the very people Congress intended to help. And it did so at the worst possible time.

Many customers, like Ms. Delpapa and Mr. Jacob, sought to refinance at more favorable rates or

secure additional lines of credit, and were unable to do so because they had been placed in forbearance.

Some, like Mr. Johnson, noticed decreases in their credit scores. Others, like Ms. Green and Mr.

Johnson, attempted to make payments, unaware that they were in forbearance, only to have Wells

Fargo unlawfully retain those payments without crediting them towards the outstanding mortgage

balance.

---

[6] https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/ (last visited August 14, 2020).

[7] https://www.nbcnews.com/business/personal-finance/1-600-customers-say-wells-fargo-paused-their-mortgage-payments-n1241620

26.     Plaintiffs allege as follows upon personal knowledge as to themselves and their own experiences and, as to all other matters, upon information and belief including due investigation conducted by their attorneys.

## II.     JURISDICTION AND VENUE

27.     The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud); the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601, as implemented through Regulation Z; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 22601, as implemented through Regulation X; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.

28.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

29.     The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

30.     This Court has general personal jurisdiction over Wells Fargo & Co. because it has its principal place of business in San Francisco, California.

31.     This Court has specific personal jurisdiction over Wells Fargo Bank, N.A. because a substantial part of the actions or omissions giving rise to one of the Plaintiff's claims occurred in this District.

32.     The exercise of specific personal jurisdiction over Wells Fargo Bank, N.A. is consistent with due process, as Wells Fargo Bank regularly conducts and/or solicits business in, engages in other

persistent courses of conduct in, and derives substantial revenue from services provided to, persons in this District and in California.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants and Defendants have sufficient contacts with this District and California.

34.     Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

## III.     INTRADISTRICT ASSIGNMENT

35.     This case is properly brought in the San Francisco Division of the Northern District of California. Under Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred."

36.     Because WFC maintains its headquarters in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the Northern District of California.

## IV.     PARTIES

### A.     Representative Plaintiffs

37.     Plaintiff Pamela Delpapa is a resident and citizen of Riverside County, California. Her property is encumbered by a loan backed by the Fair Housing Administration, and her loan is serviced by Wells Fargo.

38.     Plaintiff Samara Green is a resident and citizen of Rockdale County, Georgia, whose mortgage is serviced by Wells Fargo.

39.     Plaintiff Charles Johnson is a resident and citizen of Riverside County, California, whose mortgage is serviced by Wells Fargo.

40.     Plaintiff Brett Jacob is a resident and citizen of Nassau County, New York, whose mortgage is serviced by Wells Fargo.

41.     Plaintiffs Renrick and Vivian Robinson, and the martial community formed thereof, are citizens and residents of Grand Prairie, Texas. Their property is encumbered by a Veterans Administration Loan, which loan was originated by, refinanced by, and is serviced by, Wells Fargo.

**B.     Defendants**

42.     Defendant Wells Fargo & Co. ("WFC") is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

43.     WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein.

44.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank provides WFC personal and commercial banking services, is the successor by merger of Wells Fargo Home Mortgage, Inc., and is WFC's principal subsidiary.

## V.     FACTUAL ALLEGATIONS

**A.     The Federal Government Passes the CARES Act to Help with the Economic Harm Caused by the COVID-19 Pandemic**

45.     On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

46.     On March 13, 2020, the President issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the COVID-19 pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

47.     The economic fallout from COVID-19 was immediate and continues to be considerable.

48.     On March 25, 2020, in response to the economic damage beginning to be felt by Americans throughout the country, the United States Senate passed the Coronavirus Aid, Relief and Economic Security ("CARES") Act.

49.     The CARES Act was passed by the House of Representatives the following day and signed into law on March 27, 2020. See generally CARES Act, Public Law No. 116-136.

50.     The CARES Act is the single-largest economic stimulus bill in the United States' history, allocating approximately $2.2 trillion of support to individuals and business affected by the COVID-19 pandemic.

**B.     The CARES Act Provides Relief to American Homeowners with Government-backed Mortgages**

51.     A substantial part of the coronavirus aid package was designed to assist American homeowners with federally backed mortgages who were in distress as a result of the COVID-19 pandemic.

52.     First, the CARES Act assisted American homeowners with GSE backed mortgages by prohibiting their lenders and mortgage services from beginning a judicial or non-judicial foreclosure or from finalizing a foreclosure judgment or sale through at least August 31, 2020.

53.     Second, and most relevant to this action, the CARES Act provided homeowners with GSE-backed loans experiencing financial hardships because of COVID-19 with the option to request up to 180 days of forbearance on their mortgage.

54.     Specifically, Section 4022(b) provides, in relevant part, that:

(1)  IN GENERAL.—During the covered period [beginning February 15, 2020 and ending on June 30, 2020], a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency *may request* forbearance on the Federally backed mortgage loan, regardless of delinquency status, by—

> (A) submitting a request to the borrower's servicer and

> (B) affirming that the borrower is experiencing a financial hardship during the COVID-19 emergency.

(2)    DURATION OF FORBEARANCE.—***Upon a request by a borrower for forbearance*** under paragraph (1), such forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*See* CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT, PL 116-136, March 27, 2020, 134 Stat. 281, § 4022(b) (emphasis added).

55.    Section 4022(c) provides, in relevant part, that:

> ***Upon receiving a request for forbearance from a borrower under subsection (b),*** the servicer shall ***with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID-19 emergency*** and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provided the forbearance up to 180 days, which may be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***the borrower's request for an extension*** is made during the covered period, and, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*Id.*, § 4022(c) (emphasis added).

56.    These provisions make it abundantly clear that participation in a mortgagee's or servicer's mortgage COVID-19 forbearance program is voluntary and to be initiated only at the request of the mortgagor clients. As the April 27, 2020 U.S. Department of Housing and Urban Development's Inspector General report explained, "[t]he borrower also has the option at any time to shorten the

forbearance period and resume payments." (emphasis added).[8]

57.    As explained by the CFPB, a forbearance is "when [] mortgage servicer[s] or lender[s]
allow [mortgagors] to pause (suspend), or reduce [their] mortgage payments for a limited period of
time while [they] regain [their] financial footing."[9]

58.    Notably, while "the CARES Act provides many homeowners with the right to have all
mortgage payments completely paused for a period of time," "[f]orbearance doesn't mean
[mortgagors'] payments are forgiven or erased.  [Rather, mortgagors] are still required to repay any
missed or reduced payments in the future, which in most cases may be repaid over time."[10]

59.    The CARES Act provided for an extension of the forbearance period (for a total of up to
360 days) for homeowners that continued to have trouble paying their mortgages once their initial 180-
day term expired.[11]

60.    For mortgagors to avail themselves of the COVID-19 mortgage forbearance option,
they were instructed to contact their loan servicer to obtain information and, if appropriate, request
forbearance.[12]

---

[8] https://www.hudoig.gov/sites/default/files/2020-
04/Single%20Family%20Mortgage%20Forbearance%20Brief.pdf (last visited December 21, 2020).

[9] https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/mortgage-relief/
(last visited August 14, 2020).

[10] *Id.*

[11] https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/after-you-receive-
relief/ (stating that "[i] f you still face financial hardship, you can request a forbearance extension**.**
Under the CARES Act, if you have a federally or GSE-backed mortgage, you also can request and
obtain an extension of the forbearance for up to an additional 180 days) (last visited August 14,
2020).

[12] *See* https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/request-
forbearance-or-mortgage-relief/ (last visited August 14, 2020).

1

2

**C.      Implementation of the CARES Act Is Met with Confusion & Uncertainty**

3        61.     While the CARES Act was passed quickly and with laudable intentions, there has been

4    a tremendous amount of consumer confusion around many aspects of the Act including the forbearance

5    program.

6        62.     Some of the terms are relatively straightforward in that lenders are not permitted to

7    report forborne payments to the credit bureaus, which means that borrowers who request forbearance

8    are not supposed to see any impact on their credit scores as a result of their participation in forbearance

9    programs.

10       63.     Additionally, the initial term of the mortgage forbearance program was designed to be

11   180 days and, after that term expires, lenders were instructed to work with borrowers to—upon request

12   by the homeowners—extend the forbearance or establish a repayment plan.[13]

13       64.     Leaving aside the issue of whether mortgagors are even aware that they are in a

14   mortgage forbearance program, the provision that has caused the most confusion is that participating

15   mortgagors often do not know if they have to get their mortgage current at the conclusion of the

16   forbearance period or how their lender and/or servicer will treat the deferred payments.

17       65.     When a mortgage servicer like Wells Fargo places a loan in forbearance, it permits

18   borrowers to suspend or reduce mortgage payments for a limited time. However, those payments are

19   not forgiven. They are just delayed. The borrower must still repay the missed payments in the future.

20   Some borrowers may be eligible for deferment, which adds the missed payments to the end of loan.

21   Others, however, may be required to pay them more rapidly. Moreover, during forbearance, interest

22

23

24

25   ------------------------------------------------

[13] *See* https://benefits.va.gov/homeloans/cares-act-frequently-asked-questions.asp#FAQ5 (stating that
26   "[f]orbearance in the CARES Act is broken down into two pieces; an *initial* period and
     an *additional* period.  For the initial period, you may notify your mortgage servicer that you are
27   financially affected by the COVID-19 emergency and request up to 180 days of forbearance. For the
     additional period, you may notify your mortgage servicer that you are still financially affected by the
28   COVID-19 emergency and request up to 180 additional days of forbearance.") (last visited August
     14, 2020).

continues to accrue even though the principal is not being paid down.

66.     Fannie Mae and Freddie Mac attempted to address the confusion attendant to the post-CARES Act forbearance loss mitigation landscape when they introduced the "COVID-19 Payment Deferral" option with Lender Letter (LL-2020-07) and Bulletin 2020-15.[14]

67.     The COVID-19 Payment Deferral instructs that all forborne payments (up to 12 months) are to be placed into a non-interest-bearing balance to be paid back at the end of the loan term.

68.     The COVID-19 Payment Deferral brought Fannie Mae and Freddie Mac in line with the United States Department of Housing and Urban Development's ("HUD") COVID-19 National Emergency Standalone Partial Claim option, which provides borrowers with a junior mortgage (zero additional interest, no fees) not payable until the mortgage is paid off, comprised of the total amount of payments missed during a CARES Act forbearance period.[15]

69.     Although various government entities attempted to clarify the law, the mortgagees and servicers fail to comply as evidenced by, among other things, a report published (in late April) by HUD's Office of Inspector General ("OIG"), which conducted a study of the top 30 mortgage servicers 22 days after the CARES Act was enacted.

70.     That study, entitled Some Mortgage Loan Servicers' Websites Offer Information about CARES Act Loan Forbearance That Is Incomplete, Inconsistent, Dated, and Unclear, analyzed the information that mortgagees and servicers were providing to borrowers regarding forbearance.[16]

---

[14] Lender Letter 2020-07 is available here: https://singlefamily.fanniemae.com/media/22916/display and Bulletin 2020-15 is available here: https://guide.freddiemac.com/app/guide/bulletin/2020-15 (last visited August 14, 2020).

[15] HUD's Mortgagee Letter 2020-06 is available here: https://www.hud.gov/sites/dfiles/OCHCO/documents/20-06hsngml.pdf (last visited August 14, 2020).

[16] The report is available here: https://www.hudoig.gov/sites/default/files/2020-04/Single%20Family%20Mortgage%20Forbearance%20Brief.pdf (last visited August 14, 2020).

71.     HUD's OIG ultimately concluded that information from mortgagees and servicers was "incomplete, inconsistent, dated, and unclear" because, among other things, not all mortgage servicer websites provided readily accessible information, the information about the duration of forbearance was inconsistent; the information was not brought up to date to meet the mandates of the final CARES Act; and/or the servicer "gave the impression" that a lump sum payment was necessary at the end of the forbearance.

72.     The CFPB's May 2020 Complaint Bulletin, covering complaints mentioning coronavirus keywords, echoed HUD OIG findings and the House Financial Services Committee's criticisms, observing, among common complaints, that consumers were unable to reach customer service representatives and faced long hold times, and were informed by their mortgage servicers that they would have to repay 90-day forbearances in a lump sum at the end of the 90-day period.[17]

73.     Forbearance plans can help people experiencing temporary hardships due to COVID-19. But a survey by LendingTree found that 70% of homeowners who have gone into forbearance did not need the relief.[18]

74.     Because forbearance does not forgive the missed payments and is an important financial decision, mortgage servicers are obligated to provide accurate notices to borrowers who are deciding whether a forbearance is right for them.

75.     As Fannie Mae directed in an "FAQ" for loan servicers: "It is important that the

---

[17] The CFPB's May Bulletin is accessible here: https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-consumer-complaint-bulletin/ and the Report, entitled *Complaint Bulletin, Complaints Mentioning Coronavirus Keywords*, is accessible here: https://files.consumerfinance.gov/f/documents/cfpb_complaint-bulletin_coronavirus-complaints.pdf (last visited August 14, 2020).

[18] https://www.lendingtree.com/home/mortgage/majority-of-homeowners-approved-for-mortgage-forbearance-may-not-have-needed-one-study/ (last visited on December 23, 2020); see also https://www.forbes.com/sites/alyyale/2020/05/19/70-of-homeowners-seeking-mortgage-relief-dont-actually-need-the-help/?sh=b52a98052a54 (last visited on December 23, 2020).

borrower go into the forbearance plan understanding that at the end of the forbearance period the forborne payments must be accounted for. Borrowers should not be left with the impression that the missed payments are forgiven."[19]

76.     Servicers like Wells Fargo are required to make sure that borrowers like Plaintiffs are fully informed about the downsides to a forbearance, and provided with an appropriate Evaluation Notice.  As stated in the Fannie Mae, July 15 Lending Letter 2020-02:

> Servicers must inform the borrower that the payments which are the subject of a forbearance plan have only been delayed or reduced, not forgiven, and that once the forbearance plan is complete, one of the following must occur:
>
> (1) the mortgage loan must be brought current through a reinstatement,
>
> (2) the borrower is approved for another workout option,
>
> (3) the mortgage loan is paid in full, or
>
> (4) the servicer refers the mortgage loan to foreclosure in accordance with applicable law.
>
> The servicer must also inform the borrower that he or she may shorten a forbearance plan term at any time to reduce the amount of payments which are being delayed or reduced. As stated in the Servicing Guide D2-3.2-01, Forbearance Plan, the forbearance plan terms must be provided to the borrower using the appropriate Evaluation Notice, which must be revised in accordance with applicable law. In addition, the servicer must document in the individual mortgage loan file the borrower's request for forbearance and attestation as to a financial hardship caused by the COVID-19 emergency, and the terms of the initial and any extended forbearance, including the duration of the forbearance period.[20]

77.     The template Evaluation Notice, provided in the Servicing Guide D2-3.2-01, contains the following warnings to borrowers contemplating forbearance :

---

[19] Fannie Mae, *COVID-19 Frequently Asked Questions - Servicing,* last updated Oct. 14, 2020, https://singlefamily.fanniemae.com/media/22361/display#:~:text=It%20is%20important%20that%20the,the%20missed%20payments%20are%20forgiven

[20] https://singlefamily.fanniemae.com/media/22261/display

We will not pursue foreclosure during the forbearance plan term.  However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and:

### Additional Forbearance Plan Information and Legal Notices

**Credit Reporting**:
- We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
- **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK.  HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

78.     Being placed in a forbearance is an important financial decision, which a loan servicer cannot unilaterally make on behalf of a borrower. Even if a borrower needs the help or is fully informed of the consequences, lenders may not put a loan in forbearance without a customer requesting it. As the Consumer Financial Protection Bureau explains, "You must contact your loan servicer **to request** this forbearance." Banks may not institute it automatically. But that's exactly what Wells Fargo did.

**D.      Approximately 4.58 Million Homeowners with Federally-backed Loans Are in a Forbearance Program, Many of them Unwittingly.**

79.     As of June 30, 4.58 million homeowners are in COVID-19 related forbearance plans, representing 8.6% of all active mortgages.[21]

80.     Some 6.8% of all GSE-backed loans and 12.3% of all FHA/VA loans are currently in forbearance plans.[22]

---

[21] *See* https://www.cnbc.com/2020/07/03/loans-in-coronavirus-mortgage-bailouts-see-largest-weekly-decline-yet.html (last visited August 14, 2020).

[22] *See* https://www.blackknightinc.com/blog-posts/forbearance-volumes-reverse-course-for-largest-decline-yet/ (last visited August 14, 2020).

81.     Federally backed mortgages (including GSEs Freddie Mac and Fannie Mae) constitute 62 percent of all first lien mortgages.[23]

82.     Mortgages owned by private lenders, such as banks, are not included in the relief proscribed by the CARES Act.

83.     About 30%, or roughly 14.5 million U.S. mortgages, are privately owned and not backed by any federal agency.[24]

84.     Approximately 11% of these privately-held mortgages remain in some type of forbearance or deferment program.



85.     Wells Fargo has stated publicly that it has deferred 2.5 million payments for consumer and small business customers since the start of the pandemic.[25]

---

[23] *See* https://www.americanactionforum.org/insight/the-cares-act-and-mortgage-servicers/#ixzz6SxUvL79W (last visited August 14, 2020).

[24] *See* https://www.cnbc.com/2020/07/15/privately-held-mortgage-forbearance-may-be-difficult-for-americans-to-navigate.html (last visited August 14, 2020).

[25] *See* https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/ (last visited August 14, 2020).

**E.    Wells Fargo Unilaterally Opted Homeowners into Forbearance Program and Extended Homeowners' Forbearance Without Their Consent.**

86.    Since the passage of the CARES Act in late March, millions of homeowners across the country have attempted to obtain information from their mortgage servicers and lenders as to the specifics of their COVID-19 forbearance program.[26]

87.    As numerous media reports have detailed, some servicers unilaterally put borrowers into their mortgage forbearance programs despite no clear indication of consent.[27]

88.    Thousands of homeowners were put into mortgage forbearance programs they did not request or had their forbearance period extended for an additional period of time without their consent, causing substantial problems for those homeowners.

89.    Being in forbearance prevents those homeowners from taking out new home loans or refinancing their existing mortgages (not to mention obtaining any additional credit).

90.    As told by a Wells Fargo mortgage servicer client, it is virtually impossible to obtain any form of credit for up to a year after a forbearance program has concluded:

> the note on his credit report saying the loan is in forbearance makes it impossible for him to refinance. Fannie Mae and Freddie Mac, which, along with the Federal Housing Administration and the Department of Veterans Affairs, fund or insure the vast majority of mortgages from lenders, do not allow borrowers with a loan in forbearance to either refinance or obtain a new loan until one year after the loan payments are up to date again.[28]

---

[26] *Homeowners are getting mortgage relief they didn't want*, Anna Bahney, May 2020 (https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html (last visited August 14, 2020).

[27] *See* https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html (last visited August 14, 2020).

[28] *See* https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html (last visited August 14, 2020) (stating that "It also puts barriers in front of homeowners who could really benefit now from refinancing and saving on their monthly payments. Servicers are swamped with those requests as well. Applications to refinance a home loan are

91.     When reached for comment, Wells Fargo stated: "[w]e encourage customers to continue making their payments if they can but are granting an immediate three-month payment suspension for any Wells Fargo Home Lending mortgage or home equity customer who requests assistance. For customers who contact us to take advantage of a payment suspension, we won't report past-due status to the consumer reporting agencies or charge late fees during the suspension period."[29]

92.     Wells Fargo continued by stating that "[c]ustomers who reach us by telephone will get an immediate verbal confirmation of their three-month payment suspension. Because our contact centers are experiencing significant call volumes, we encourage mortgage customers to log into their account on WellsFargo.com and click on the banner in the mortgage account, follow the easy steps to submit request for payment relief, and receive immediate confirmation. In either case, customers will receive a confirmation letter within 7-10 days after our initial response."[30]

93.     Wells Fargo has acknowledged that merely inquiring about forbearance options should not result in a borrower's unwitting entry into the program.

94.     Specifically, Tom Goyda, a Wells Fargo consumer lending spokesperson admitted that, "[j]ust asking about a forbearance should not result in a forbearance being applied."[31]

95.     Despite these public statements, Wells Fargo has publicly acknowledged unilaterally opting Chapter 13 debtors into its COVID-19 mortgage forbearance program.

---

currently up more than 200% from a year ago").

[29] *See* https://www.forbes.com/sites/dimawilliams/2020/04/03/borrowers-seeking-mortgage-forbearance-hit-ambiguity-snafus/#7e6d2be8edc5 (last visited August 14, 2020).

[30] *See* https://www.forbes.com/sites/dimawilliams/2020/04/03/borrowers-seeking-mortgage-forbearance-hit-ambiguity-snafus/#7e6d2be8edc5 (last visited August 14, 2020).

[31] *See* https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html (last visited August 14, 2020).

96.     According to a recent media report, Wells Fargo monitored the Chapter 13 bankruptcy dockets of its debtor clients and unilaterally opted them into its mortgage forbearance program.[32]

97.     That article, entitled *Troy Harlow has always made sure to pay his mortgage on time Wells Fargo had other plans for him*, details the plight of numerous borrowers who had been unwittingly enrolled in Wells Fargo's mortgage forbearance program:

> None of the borrowers in the lawsuit who were contacted by NBC News told the bank that they'd been affected by COVID-19, and **none had requested the bank's assistance because of it. Nor had they requested loan modifications when Wells Fargo claimed they wanted forbearance.** In addition, none of the borrowers or their attorneys say they were contacted by Wells Fargo.
>
> Asked about the discrepancies, Wells Fargo said that because it had seen references to COVID-19 in the borrowers' court filings, it provided forbearance.[33]

98.     When reached for comment, Wells Fargo did not deny the practice of unilaterally enrolling unwitting persons to its mortgage forbearance program:

> During this unprecedented time, we've focused on ensuring that our customers who need assistance receive the benefits of available relief programs, the statement said.
>
> In the early days of the pandemic, we provided immediate payment relief to customers in bankruptcy if a review of their court filings indicated they were impacted by COVID-19 or if they had a loan modification review in process.
>
> In those cases, we notified the customers or their attorneys and filed a notice with the court. We followed up with customers in these circumstances after some raised questions and, in the majority of cases,

---

[32] *See* https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635 (last visited August 14, 2020).

[33] *See* https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635 (last visited August 14, 2020) (emphasis added).

those we have contacted wanted the payment relief. If a customer does not want a forbearance, we remove it and notify the bankruptcy courts.[34]

99.     The Wells Fargo spokeswoman declined to say whether the bank has benefited financially from making unrequested forbearance filings.[35]

100.    But, upon information and belief, Wells Fargo is compensated financially by the various federal agencies on whose behalf it services borrowers' loans when it files forbearance notices and when it completes loan retention workout options with borrowers whose loans have been placed into forbearance pursuant to the CARES Act.

101.    Upon information and belief, for each loan placed into forbearance that Wells Fargo subsequently modifies in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of up to $1,500.[36]

102.    Upon information and belief, for each loan placed into forbearance for which Wells Fargo subsequently defers repayment of some or all of the forborne payments until loan maturity in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of $500.

103.    Upon information and belief, for each loan placed into forbearance for which Wells Fargo enters into a completed repayment plan in accordance with Fannie Mae and Freddie Mac's matrix for loan retention options, Wells Fargo receives an incentive fee of $500.[37]

104.    Upon information and belief, Wells Fargo also receives servicing income for the loans it services, and Plaintiffs are informed and believe and therefore allege that Wells Fargo is incentivized

---

[34] *Id.* (emphasis added).

[35] *Id.*

[36] *See* https://www.forbes.com/sites/dimawilliams/2020/04/03/borrowers-seeking-mortgage-forbearance-hit-ambiguity-snafus/#73c99373edc5 (last visited August 14, 2020).

[37] *Id.*

to modify its customers' mortgage loans following a CARES Act forbearance in a way that extends the loan's term and lowers the borrower's monthly mortgage payment in order to prevent "run off" of loan servicing rights, which occurs when borrowers sell their homes or refinance their mortgages.

105.    Implementing forbearance plans without customer approval is reminiscent of other troubling practices at Wells Fargo in recent years.[38]

106.    Starting next month, Fannie Mae has new rules benefiting loan servicers like Wells Fargo whose customers are in forbearance.[39] Normally, banks handling home loans held by Fannie Mae must continue forwarding borrowers' mortgage payments to the government entity, even when they stop paying.[40]

107.    But under the new rules, banks can stop advancing Fannie Mae borrowers' mortgage payments after four months if the borrowers have stopped paying because they are in forbearance programs.[41]

**F.    Consumers Nationwide Have Complained About Wells Fargo's Faulty Forbearance Program.**

108.    As experienced by Plaintiffs, and as attested to in consumer complaints from across the nation, Wells Fargo automatically placed borrowers in forbearance when they contacted the bank by phone or online to merely inquire about their options.

109.    As one consumer told the Consumer Financial Protection Bureau, a Wells Fargo employee admitted "that the system is like a 'hair trigger'" automatically placing loans into

---

[38] *See* https://www.nbcnews.com/news/all/wells-fargo-pay-3-billion-over-fake-account-scandal-n1140541 (last visited August 14, 2020).

[39] https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635 (last visited August 14, 2020).

[40] *Id.*

[41] *Id.*

forbearance, "even though I did nothing to start a forbearance."[42]

110.    Wells Fargo has conceded in a statement to the press that it "may have misinterpreted customers' intentions."

111.    That "misinterpretation" was widespread. The Consumer Financial Protection Bureau's database of consumer complaints lists numerous examples of similar complaints. This is a sample:

112.    "Due to a job loss, I reached out to Wells Fargo and asked for information on their Covid-19 mortgage relief program. To clarify, I only asked for information on the program. The representative on the phone stated that an information packet would be mailed to me. About a week later, a letter arrived from Wells Fargo stating that they are 'confirming short term payment relief for the account.' This was not what I had requested. In addition, the letter states 'We won't report this account to consumer reporting agencies.' It has now come to light that Wells Fargo has put a forbearance on the mortgage, preventing any ability to refinance."[43]

113.    "Wells Fargo put my account in forbearance when I didn't request it. After talking to multiple individuals on the phone I was told that if you click the 'more info' button on the site that you will be automatically enrolled without asking."

114.    "Wells Fargo will NOT allow us to end our forbearance. We have spent over 7 hours trying to reach them to resolve this."

115.    "[W]e started getting email about COVID-19 relief from Wells Fargo, regarding mortgage assistance. I sent them an email for more information. . .  I tried to pay my house note on the WF app, as I have always done. The app advised me that I did not have an active account, that's when

---

[42] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3658898 (last visited December 23, 2020).

[43] *Id.*

we called to make the payment. We were told that our loan was in forbearance and we could make a payment, but it would not post to the loan until after the forbearance period was over."

116.    "I contacted my mortgage company WELLS FARGO to inquire about what types of services were available IF my renter's were unable to make their payment due to covid. It was for an inquiry purpose and I was told that I would receive a letter regarding any programs available. . . . I did in fact receive a letter and in that letter it stated my mortgage was placed in forbearance! I did not request any forbearance. Recently I was notified by a lender that it showed on my credit report and have been trying to have it removed since then."

117.    "Wells Fargo put me into CARES act forbearance without my consent. I was unable to make a payment online like I usually do. I called and was on hold for an hour but finally was able to talk to a rep, …. I told them they put me into forbearance without my consent. He apologized and said that the system is like a 'hair trigger' even though I did nothing to start a forbearance, I've never missed a payment, have no reason to apply for forbearance and am able to make payments."

118.    "Wells Fargo has placed or enrolled me in forbearance without my permission. This has negatively impacted me as [redacted] has placed my home equity mortgage application in denial status because of this."

119.    "I did not sign anything to agree to forbearance and subsequent calls to them I stressed that Im paying my mortgage and dont want a forbearance. Instead they listed it on my credit without authorization. When I called them they said it was an error n they are working on it. They ruined my wife and my credit."

120.    "I called Wells Fargo, and asked what relief they could provide due to Covid-19. . . . I am very familiar with how a forbearance versus a deferment works. I was adamant if all they could offer me was a forbearance that I was not interested and I was assured by the Wells Fargo rep that they would just put the 3 payments at the back end of the loan and it was not a forbearance so I agreed.

Yesterday . . . I received a notice from Wells Fargo asking If I need to extend my forbearance or discuss repayment options for the missed payments. I am livid!"

121.    Wells Fargo's blunder is not an inconsequential administrative glitch. Forbearance can have grave impacts on a borrower's credit history or access to credit. As Sen. Elizabeth Warren (D-Mass.) and Sen. Brian Schatz (D-Hawaii) wrote in a letter to Wells Fargo CEO Charles Scharf, the bank was "putting consumers at risk of greater financial hardship amidst one of the worst economic downturns in our country's history."

122.    The COVID-19 forbearance provisions of the CARES Act were intended to benefit borrowers, by providing the option of requesting a temporary forbearance if a borrower was experiencing financial hardship due to COVID-19. Wells Fargo & Co., Wells Fargo Bank N.A., and third-party vendors, including Black Knight Inc., distorted the CARES Act by unilaterally placing borrowers into forbearance without their knowledge, let alone consent.

123.    The actions taken by Defendants were in direct contravention of the CARES Act requirements that forbearances be provided in response to the request of the borrower, and with an attestation of hardship due to COVID-19. In many instances, the borrowers received no notice that they had been placed in forbearance at all, and in those instances in which the borrowers received some notice, it was woefully insufficient under the requirements of RESPA, 12 U.S.C. §§ 2601 et seq.

124.    Many borrowers, unaware that they were in forbearance, attempted to continue to make payments on their loans. Wells Fargo failed to timely credit those payments to borrowers' mortgage loans, instead holding those payments in separate "unapplied funds" accounts without notifying the borrowers. For those borrowers whose loans were owned by Wells Fargo, this failure to timely credit payments constituted an actionable violation of the Truth in Lending Act, 15 U.S.C. § 1601, as detailed *infra*.

125.    Some individuals, such as and Mr. Jacob, noticed that their mortgages had been noted as "in forbearance" despite never having requested that relief and that their credit scores had declined as a result of Wells Fargo's illegal actions. When these borrowers submitted notices of dispute to the credit reporting agencies, Wells Fargo was obligated under FCRA, 15 U.S.C. § 1681a, to adequately investigate and correct the matter. Wells Fargo did not, violating FCRA § 1681a(b).

126.    Many borrowers were in the process of seeking a HAMP loan modification. In an article by Pulitzer Prize winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[44] By placing borrowers into forbearance, Wells Fargo rendered them ineligible for the HAMP loan modifications that they would otherwise have been eligible for.

**G.    Wells Fargo Placed Plaintiffs' Loans in Forbearance Without Their Consent**

**a.    Pamela Delpapa, a California resident.**

127.    One of the many victims of Wells Fargo's Faulty Forbearance Program is Plaintiff Pamela Delpapa. Ms. Delpapa lost her job at a nail salon due to COVID-19.

128.    Concerned about whether she would be able to make her mortgage payments, she called Wells Fargo—her mortgage servicer—to learn about her options.

129.    At that point, she was paid in advance for five months; in fact, the Wells Fargo representative she spoke to said she would *not* be a candidate for assistance at this time, but should feel free to call back in five months. She relied on this misrepresentation to her detriment.

---

[44] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him.* NBCNews, July 16, 2020, https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

130.    Unbeknownst to her, after that call Wells Fargo placed her loan in forbearance anyway. She only found out when she called her mortgage broker to refinance her home. Her mortgage broker told her she could not refinance because her loan was in forbearance. She was understandably shocked.

131.    When she called Wells Fargo to complain, a Wells Fargo employee told her that when a borrower calls the bank and pushes the button directing them to information on COVID mortgage options, the bank automatically places those accounts in forbearance.

132.    Ms. Delpapa never requested that her mortgage be placed in forbearance. In a June letter to her, Wells Fargo admitted it placed her mortgage in forbearance without her consent and without discussing it with her "in detail":

> We found that On March 17, 2020, your account was set up for the 90-day forbearance option that was being offered to our customers. After listening to the phone call between you and our representative, we discovered that you never requested to be placed on the plan nor was the plan discussed with you in detail. On May 21, 2020, we updated the account and removed your account from the forbearance plan as you requested. Additionally we updated our reporting to ensure the forbearance comment was removed.

133.    The bank's letter also conceded that by reporting her mortgage as in forbearance, Wells Fargo may have damaged Ms. Delpapa's ability to get consumer credit, as she experienced firsthand:

> The credit bureaus have independent credit score models. We cannot speculate how any of their proprietary models account for this; however, we do know, generally, those are not used for underwriting of credit. If you apply for credit while on a forbearance plan, however, the lender will see the "account in forbearance" comment on your credit report, and the fact that your account is in forbearance may impact your ability to qualify for new credit or refinance.

**b.    Charles Johnson, a California resident.**

134.    Plaintiff Charles Johnson has a mortgage serviced by Wells Fargo.

135.    Wells Fargo collects payments and performs services for Mr. Johnson, the borrower.

136.    At the end of March 2020, Mr. Johnson called Wells Fargo and asked to be placed into the forbearance program, to receive short-term payment relief for his mortgage account.

137.    Per his request, Mr. Johnson's forbearance period was to last three months, from April

through June 2020.

138.    Mr. Johnson received a letter from Wells Fargo dated April 6, 2020 confirming that they had "suspended [his] obligation to make monthly mortgage payments for three months" and that Mr. Johnson needed to resume his "regular mortgage payment schedule beginning on July 1, 2020."

139.    Wells Fargo sent Mr. Johnson a letter dated May 26, 2020 informing him that his account was due for two payments "for the month(s) of April 1, 2020 through May 26, 2020."

140.    Concerned by this correspondence, Mr. Johnson called Wells Fargo and spoke to a customer representative and asked specifically to be removed from the program when his three-month period ended.

141.    He also asked about the process of resuming payments when his forbearance period ended on July 1, 2020.

142.    Mr. Johnson did not ask that his forbearance period be extended; in fact, he requested the exact opposite.

143.    Despite this conversation, Mr. Johnson received a letter from Wells Fargo dated June 17, 2020, asking Mr. Johnson if he wished to extend his period of forbearance for another three months.

144.    Mr. Johnson did not request that the period of forbearance be extended, and since he already called Wells Fargo he expected that he would be taken out of the forbearance program.

145.    However, in a letter from Wells Fargo dated July 8, 2020, Mr. Johnson was informed that Wells Fargo had yet again "suspended [his] mortgage payments for an additional three months." Mr. Johnson was told that he would not need to resume his mortgage payments until October 1, 2020.

146.    At no point did Mr. Johnson provide any financial attestation or other documentation as to his financial hardship or inability to make his mortgage payments to Wells Fargo.

147.    Mr. Johnson made a $1,446.80 mortgage payment on or about July 1, 2020 which Wells Fargo accepted.

148.    However, Wells Fargo failed to apply Mr. Johnson's July 1, 2020 payment to his mortgage account.

149.    Mr. Johnson made a $1,446.80 mortgage payment on or about August 1, 2020 which Wells Fargo accepted.

150.    However, Wells Fargo failed to apply Mr. Johnson's August 1, 2020 payment to his mortgage account, and decrease his principal and interest.

151.    Mr. Johnson called Wells Fargo on or about July 16, 2020, told a customer service representative that he never requested that his forbearance period be extended, and requested to be removed from the forbearance program.

152.    Wells Fargo did not provide Mr. Johnson with answers to his questions nor was he told that he was removed from the forbearance program.

153.    Instead, Mr. Johnson was told to not make a payment on his mortgage and that he would be receiving further correspondence.

154.    Mr. Johnson did not receive any further correspondence regarding the status of his mortgage account.

155.    Mr. Johnson called Wells Fargo three additional times—on or about August 6th, 7th, and 11th—but Wells Fargo was not able to tell Mr. Johnson that he had been removed from the forbearance program.

156.    Because Mr. Johnson's mortgage was placed in an extended forbearance program without his consent and without his knowledge, Wells Fargo incorrectly reported to the credit reporting agencies that his mortgage was in forbearance after July 1, 2020 and until October 1, 2020.

157.    Mr. Johnson's credit score dropped by 13 points after July 1, 2020 as a result of Wells Fargo's incorrectly reporting to the credit reporting agencies that his mortgage was in forbearance.

158.    Wells Fargo placed Mr. Johnson's loan in forbearance without his consent, and incorrectly reported this to credit reporting agencies such that it appears on Mr. Johnson's credit report.

159.    Wells Fargo also incorrectly reported the total balance of Mr. Johnson's mortgage, failing to account for the payments made for the months of April 2020 and May 2020.

160.    Further, despite placing Mr. Johnson unwillingly into forbearance during these months and taking Mr. Johnson's payments, Wells Fargo reported to the credit reporting agencies that Mr. Johnson's mortgage balance increased from $141,175 in April 2020 to $143,288 in June 2020.

161.    As such, Mr. Johnson suffered damages to his credit and reputation.

162.    Further, Wells Fargo's incorrect placement of Mr. Johnson's account into forbearance without his request, failure to account for the payments he made, incorrect reporting to the credit bureaus, and to date failure to remedy the issues, are continuously causing Mr. Johnson mental anguish, embarrassment, and stress.

**c.    Samara Green, a Georgia resident.**

163.    Plaintiff Samara Green has a mortgage serviced by Wells Fargo.

164.    On or about June 15, 2020, a representative from Wells Fargo called Ms. Green to address concerns Ms. Green had about her escrow payments.  During this call, the Wells Fargo representative talked to Ms. Green about the option of placing her mortgage in forbearance.

165.    Ms. Green told the Wells Fargo representative that she was not interested in Wells Fargo's forbearance program.

166.    Prior to the June 15, 2020 phone call, Ms. Green had already made a mortgage payment to Wells Fargo on June 12, 2020.

167.     However, unbeknownst to Ms. Green, her June 12, 2020 payment was never applied to her mortgage or her escrow account because Wells Fargo placed her mortgage in forbearance without her knowledge or consent.

168.     On or around June 26, 2020 Ms. Green called Wells Fargo again to further inquire about fees and the application of escrow payments.  During this phone call, the Wells Fargo representative informed Ms. Green that her mortgage had been placed in forbearance.

169.     Ms. Green informed the representative that she had never requested nor consented to a forbearance on her mortgage, that Wells Fargo had acted without her knowledge or consent, and demanded that her account be taken out of forbearance.

170.     Ms. Green received a letter from Wells Fargo dated July 1, 2020 which memorialized this conversation.  As the letter recounted, Wells Fargo placed Ms. Green's mortgage into forbearance though she "did not request this."

171.     Wells Fargo admits in the letter that though Ms. Green called Wells Fargo to discuss suspending her late payments, Wells Fargo instead suspended all her mortgage payments.

172.     Wells Fargo never informed Ms. Green, either on the June 26, 2020 phone call or in the July 1, 2020 letter, that Wells Fargo failed to apply her June 12, 2020 payment to her mortgage.

173.     On or about July 15, 2020, Ms. Green went to a Wells Fargo bank branch in order to make another mortgage payment to Wells Fargo.

174.     However, when Ms. Green spoke with the Wells Fargo representative at the bank branch, she was told that the amount due on her mortgage was over $3,500, that her prior June payment had not been applied to her mortgage or her escrow, and that her mortgage had been placed in forbearance.

175.     After Ms. Green's visit to the Wells Fargo branch, she immediately called Wells Fargo and spoke to a representative.  The Wells Fargo representative confirmed that Ms. Green's mortgage

payment had not been applied to her mortgage or her escrow because she had been placed in forbearance. The Wells Fargo representative told Ms. Green that her payment had been placed in an "unapplied fund" and that those payments would be reversed because they could not be applied to her mortgage or escrow while she was in forbearance.

176.    Wells Fargo placed Ms. Green's loan in forbearance without her consent, and incorrectly reported this to credit reporting agencies.

177.    Because Wells Fargo failed to properly apply her June 12, 2020 payment, Wells Fargo reported to the Credit Reporting Agencies that Ms. Green was 30 days late on her mortgage for the month of June 2020.

178.    Ms. Green did not request a forbearance of her mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and she did not—and does not—want a forbearance of her mortgage payment obligations.

### d.    Brett Jacob, a New York resident.

179.    Plaintiff Brett Jacob has a mortgage serviced by Wells Fargo.

180.    Wells Fargo collects payments and performs services for Mr. Jacob, the borrower.

181.    On or about March 16, 2020, Mr. Jacob called Wells Fargo and asked that his mortgage payments no longer be automatically debited from his bank account.

182.    Mr. Jacob requested that he be permitted to make payments at a time and in a manner of his own choosing. Wells Fargo honored Mr. Jacob's request and, a few days later, Mr. Jacob received a letter from Wells Fargo dated March 20, 2020 confirming that Wells Fargo had "completed your request to suspend your automatic mortgage payments."

183.    However, approximately one week later, Mr. Jacob received a second letter from Wells Fargo dated March 26, 2020. This letter informed Mr. Jacob, much to his surprise, that Wells Fargo had placed his mortgage into forbearance for six months. The letter stated that his monthly mortgage

obligations had been suspended until October 1, 2020.

184.   Mr. Jacob never requested that Wells Fargo place his mortgage into forbearance.

185.   Since being placed in forbearance, Mr. Jacob has tried to make mortgage payments, but Wells Fargo suspended his online payment option.

186.   Further, though Wells Fargo assures its customers otherwise, the forbearance that he did not request is reflected on his credit report.  Mr. Jacob filed a written notice of dispute with Experian on September 9, 2020.

187.   After Wells Fargo placed him in forbearance, Mr. Jacob attempted to secure a small-business loan but was denied, at least in part because the lender pulled his credit report and saw that his mortgage had been placed in forbearance.

188.   In addition, Mr. Jacob's attempt to refinance his mortgage and to obtain a lower interest rate on his mortgage was denied because Wells Fargo placed his mortgage into forbearance without his consent.

189.   In short, Mr. Jacob did not request a forbearance of his mortgage loan payment obligations, did not contact Wells Fargo about a forbearance and did not—and does not—want a forbearance of his mortgage payment obligations.

190.   Wells Fargo placed Mr. Jacob's loan in forbearance without his consent, and incorrectly reported this to credit reporting agencies such that it appears on Mr. Jacob's credit report.

   e.   **Renrick and Vivian Robinson, Texas residents.**

191.   The Robinsons' residence, in Grand Prairie, Texas, is encumbered by a Veterans Administration mortgage, which on information and belief was originated by Wells Fargo, refinanced by Wells Fargo, and is serviced by Wells Fargo.

192.   On March 20, 2020, Ms. Robinson called Wells Fargo to discuss a potential refinance, to take advantage of the historically low interest rates. The Wells Fargo representative told her about

the forbearance program, and asked if she wanted to receive some literature on forbearance relief. Ms. Robinson agreed to accept the literature, but expressly stated that she was not accepting forbearance.

193.    As Wells Fargo explained in a letter sent to the Robinsons months later, the customer service representative added the coding on the Robinsons' loan to have the informational packet sent, however, this also placed their mortgage into forbearance.

194.    When the Robinsons received the information, they reviewed it together. They decided that they did not want or need a forbearance, and threw away the notice. However, Wells Fargo had already placed them into a forbearance.

195.    The Robinsons discovered this when Mr. Robinson applied for a personal line of credit from American Express, seeking the travel benefits and perks associated with that credit card. He was denied, because he was in forbearance.

196.    Shocked, the Robinsons called Wells Fargo and demanded to be removed from forbearance.

197.    Although Wells Fargo represented that they had been removed, Mr. Robinson's application for the personal line of credit was again denied due to the forbearance code on his credit report. Ultimately, he was only able to secure the personal line of credit after sending verification of his income.

**H.    Wells Fargo Profits Because Borrowers Can Not Refinance While in Forbearance**

198.    By placing hundreds of thousands, if not millions, of borrowers into unsolicited forbearance, Wells Fargo stood to gain in at least five ways:

>    i.    First, the value of Wells Fargo's mortgage servicing rights was increased, as borrowers were unable to refinance while in forbearance, thus eliminating the risk of runoff for that time period.

ii.     Second, Wells Fargo stood to gain incentive payments if the loans were "worked out."

iii.    Third, for loans that remained in the GSE pools, Wells Fargo capped the interest and principal advancements that would otherwise be due should the loan be in default.

iv.    Fourth, Wells Fargo increased the amount of interest that the loans would ultimately accrue over the lifespan of the loan.

v.     Fifth, Wells Fargo has purchased tens of billions of dollars' worth of these loans, whose value had been artificially deflated due to their forbearance status, and stands to reap a massive windfall when reselling these loans once the borrowers become current.

199.    Wells Fargo generates millions of dollars in revenue servicing mortgages. Mortgage servicing rights ("MRR") are the capitalized value of the right to receive future cash flows from the servicing of mortgage loans. WFC's most recent financial disclosure, a 10-Q for the third quarter of 2020, reports a valuation of over $6,000,000 in MSR accounts held by Wells Fargo.

200.    When borrowers refinance a mortgage with a different servicer, the associated mortgage servicing rights are terminated. Thus, when capitalizing the present value of MSRs, loan servicers adjust for the risk that borrowers will prepay or refinance. This risk of run-off decreases the present value of MSRs.

201.    As Plaintiffs Delpapa and Jacob experienced, being placed in forbearance is a barrier to refinancing. Prior to May 19, 2020, a borrower was generally required to wait a year until they could refinance. Even after the FHFA updated guidance relating to borrowers in forbearance, a borrower will typically have to wait three months after exiting forbearance in order to be able to refinance. Thus, by placing borrowers into unsolicited forbearance, Wells Fargo increased the value of the associated MSR accounts by reducing the risk of runoff through refinancing.

202.    Wells Fargo may have been incentivized to place borrowers in forbearance because, once the forbearance period ends, those borrowers could be placed in a payment deferral program. And as part of COVID-19 relief, the GSEs provide servicers like Wells Fargo an incentive payment, capped at $1,000 per mortgage, for placing borrowers in repayment or deferral plans:

**SERVICER INCENTIVES**

Bulletin 2020-15 stated that the Servicer incentive for a COVID-19 Payment Deferral would be communicated at a later date. With this Bulletin, we are informing Servicers of the COVID-19 Payment Deferral incentive amount, as well as making the following temporary updates to other Servicer incentives:

| Incentive Type | Incentive Amount |
|---|---|
| Repayment Plan | $500<br>Effective for all repayment plans with a first payment due date under the repayment plan on or after July 1, 2020 |
| Payment Deferral/COVID-19 Payment Deferral | $500<br>Effective immediately for all Payment Deferrals/COVID-19 Payment Deferrals (NOTE: Payment Deferral evaluations do not begin until on or after July 1, 2020) |

203.    Even for loans that are not granted deferment, Wells Fargo is incentivized to place GSE loans into forbearance in order to minimize its exposure to servicing requirements obligating Wells Fargo to advance borrowers' delinquent principal and interest payments to the investors in GSE-sponsored trusts even when the loan is not paying.

204.    Ordinarily, Wells Fargo's principal and interest advance obligations continue for GSE loans regardless of whether Wells Fargo collects payment from the borrowers, unless and until Wells Fargo either forecloses on the property or determines that the property's foreclosure value is insufficient to reimburse Wells Fargo for any further advances of monthly principal and interest after satisfying the remaining principal balance of the delinquent loan.

205.    However, exclusively for loans in CARES Act forbearances, Fannie Mae and Freddie Mac have modified those principal and interest advancement requirements. Servicers of GSE loans, including Wells Fargo, are obliged to only make four monthly advances of principal and interest payments for delinquent loans that have been in a CARES Act forbearance.

206.    While the CARES Act forbearance terms are limited to no more 360 consecutive days total, once a GSE loan has been placed into a CARES Act forbearance, the four-month cap on

delinquent principal and interest advancement obligations applies permanently. Thus, loans which have ever been in a CARES Act forbearance are increased in value, as they present a lower risk of loss due to the obligation to make advances while nonperforming for the life of the loan.

207.    Prior to the institution of the four-month cap, loan servicers would often voluntarily repurchase defaulting loans from the GSE trusts, to eliminate the continuing obligation to make principal and interest payments for nonperforming loans. In order to qualify for voluntary repurchasing, a loan must generally have four consecutive payments past due. See Fannie Mae Servicing Guide § A13-01: Requirements for Voluntary Repurchase. By placing loans into forbearance, Wells Fargo Bank rendered those loans eligible for voluntary repurchase – at par value.

208.    On information and belief, Wells Fargo exercised that option to a historic degree. In their most recent financial filings, Wells Fargo listed almost $22 billion in voluntarily repurchased government issued loans in the third quarter of 2020, compared to only $1.4 billion in the same period in 2019. By exercising that option to repurchase loans that were only in forbearance because of Wells Fargo's unilateral conduct, the bank was effectively purchasing loans at a discount due to their placement in forbearance, despite the underlying borrower not needing that relief. On information and belief, the loans, if not so distressed, would typically trade at 5% to 10% above par value.

209.    For instance, in July and August of 2020 Wells Fargo bought $19 billion of loans out the GSE reserves, for $1.5 billion less than the loans' market price.[45] Once the borrowers begin making payments again, Wells Fargo stands to resell those loans at premium prices or hold them. As former Ginnie Mae president Ted Tozer told Bloomberg News, Wells Fargo and other banks exercising this voluntary repurchase option for loans placed into CARES Act forbearances are "setting themselves up

---

[45] https://www.americanbanker.com/articles/banks-uncover-loophole-to-buy-home-loans-at-below-market-prices.

1    for a huge windfall. It's almost pure profit." [46]

2        210.    To effectuate this scheme, WFC's loan servicing subsidiary, Wells Fargo Bank,

3    artificially placed the loans into forbearance even when the borrower did not request such relief. But

4    Wells Fargo Bank did not act alone in performing its part in this scheme – it had the assistance of

5    Black Knight, Inc., a long-time vendor.

6        211.    Black Knight Inc., a publicly traded company, provides a platform for mortgage loan

7    servicing and borrower communication application, referred to as MSP and LoanSphere. Wells Fargo's

8    use of these platforms represents a substantial portion of Black Knight's business – in 2016, Black

9    Knight reported to the SEC in relation to a merger that Wells Fargo was its "largest client," and

10   "accounted for approximately 12% of Black Knight's consolidated revenues" and 15% of the revenues

11   from Black Knight's Technology and Data segment.[47]

12       212.    Black Knight capitalized on the COVID-19 crisis by marketing its MSP platform,

13   distributing a white paper advertising its products as assisting mortgage servicers in establishing

14   forbearance, allowing mortgage servicers to automate the management of forbearance programs.[48]

15   Black Knight gained increased revenue through this churn, assisting Wells Fargo with identifying

16   loans to be placed into forbearance through its automated services program.

17       213.    This enterprise in fact, formed of WFC, Wells Fargo Bank, and Black Knight,

18   perpetuated this fraud through the use of wires and mails, and committed thousands of predicate

19   violations by reporting the mortgages to be in faulty forbearance that the enterprise had imposed

---

[46] https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

[47] https://www.sec.gov/Archives/edgar/data/1704177/000104746917005400/a2233097z424b3.htm

[48] https://investor.blackknightinc.com/investors/press-releases/press-release-details/2020/Black-Knight-Issues-White-Paper-on-Managing-COVID-19-Challenges-for-Clients-Using-MSP-Servicing-System/default.aspx

without the borrowers' knowledge or consent. Thus, the participants are liable under the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as detailed *infra*.

## VI.    CLASS ACTION ALLEGATIONS

214.    Plaintiffs bring this complaint on behalf of themselves and all others similarly situated

under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). The nationwide Class that Plaintiffs

seek to represent is defined as follows:

> All residential mortgage borrowers with a Government Sponsored
> Enterprise-backed loan for whom Wells Fargo Bank, N.A., placed a
> residential mortgage into forbearance under the Coronavirus Aid, Relief,
> and Economic Security (CARES) Act or continued forbearance without
> receiving the borrower's request or continued consent for a forbearance
> and affirmation that the borrower is experiencing a financial hardship due
> to COVID-19.

215.    In addition, Plaintiffs Delpapa and Johnson seek to represent the following California

Class:

> All residential mortgage borrowers with a Government Sponsored
> Enterprise-backed loan for whom Wells Fargo Bank, N.A., placed a
> residential mortgage secured by real property in California into
> forbearance under the Coronavirus Aid, Relief, and Economic Security
> (CARES) Act or continued forbearance without receiving the borrower's
> request for a forbearance and affirmation that the borrower is experiencing
> a financial hardship due to COVID-19.

216.    In addition, Plaintiff Green seeks to represent the following Georgia Class:

> All residential mortgage borrowers with a Government Sponsored
> Enterprise-backed loan for whom Wells Fargo Bank, N.A., placed a
> residential mortgage secured by real property in Georgia into forbearance
> under the Coronavirus Aid, Relief, and Economic Security (CARES) Act
> or continued forbearance without receiving the borrower's request for a
> forbearance and affirmation that the borrower is experiencing a financial
> hardship due to COVID-19.

217.    In addition, Plaintiff Jacob seeks to represent the following New York Class:

> All residential mortgage borrowers with a Government Sponsored
> Enterprise-backed loan for whom Wells Fargo Bank, N.A., placed a
> residential mortgage secured by real property in New York into
> forbearance under the Coronavirus Aid, Relief, and Economic Security

(CARES) Act or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

218.    In addition, Renrick and Vivian Robinson seek to represent the following Texas Class:

All residential mortgage borrowers with a Government Sponsored Enterprise-backed loan for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Texas into forbearance under the Coronavirus Aid, Relief, and Economic Security (CARES) Act or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

219.    Excluded from the Classes are Wells Fargo's officers, directors and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

220.    **Numerosity**: The members of the Classes are so numerous that joinder of all members would be impractical. Wells Fargo is one of the nation's largest home lenders and servicers, and media reports indicate borrowers in at least 14 states have experience non-requested forbearances. The Consumer Financial Protection Bureau has documented dozens of complaints. Wells Fargo recently reported to the United States Senate that approximately 1,600 borrowers had called to complain about being placed into unwanted forbearances.

221.    **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Classes. For Plaintiffs and the Classes, the common legal and factual questions include, but are not limited to the following:

A.    Whether Wells Fargo negligently or intentionally enrolled customers in forbearance programs without their consent;

B.    Whether Wells Fargo has breached terms implied in its contracts with Plaintiffs and the Class Members;

C.    Whether Wells Fargo's actions or inactions violated the consumer protection statutes invoked herein;

D.      Whether Plaintiffs and the Class members were damaged by Wells Fargo's conduct and, if so, the appropriate amount of damages;

E.      Whether, because of Wells Fargo's misconduct, Plaintiffs and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

222.    **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by the same wrongful practices of Wells Fargo. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

223.    **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. None of the Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

224.    **Predominance and Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class members are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Classes could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

225.    Further, individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to

all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

226.   Wells Fargo has, or has access to, address and/or other contact information for the Class members, which may be used to provide notice of the pendency of this action.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") on Behalf of Plaintiffs and the Nationwide Class**

227.   Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

228.   This claim is brought by Plaintiffs against Wells Fargo & Co. and Wells Fargo Bank N.A. for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

229.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …" 18 U.S.C. § 1962(c).

230.   At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

231.   WFC and Wells Fargo Bank conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

232.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

233.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

a.    **WFC, Wells Fargo Bank, and Black Knight Comprised an Enterprise Whose Activities Affect Interstate or Foreign Commerce.**

234.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

235.    Based upon Plaintiffs' current knowledge and belief, the following persons constitute an associated in fact enterprise that will be referred to herein as the "Fraudulent Forbearance Enterprise" (1) WFC; (2) Wells Fargo Bank; and (3) vendors, including (without limitation) Black Knight, Inc., that created, maintained, and implemented the systems and processes used by Wells Fargo to impose unrequested forbearances and to voluntarily repurchase GSE backed loans that had been placed into unrequested forbearances.

236.    The Fraudulent Forbearance Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

237.    The members of the Fraudulent Forbearance Enterprise function as a continuing unit and share the common purpose of maximizing their profits by placing borrowers into CARES Act forbearances, regardless of whether the borrower requested to be placed into such a plan. The Fraudulent Forbearance Enterprise is linked systematically through contractual relationships, financial ties, and parent/subsidiary relationships.

238.    Wells Fargo Bank has contracted with Black Knight Inc. for the purposes of using the MSP mortgage servicing system to identify loans to be placed into unsolicited forbearance. Wells Fargo Bank contracts with Black Knight Inc. for the purposes of using Black Knight's Loss Mitigation

services to identify borrowers who can be placed into deferment post-forbearance, entitling Wells Fargo to GSE incentive payments.

239.    While all Enterprise members participate in and are part of the Fraudulent Forbearance Enterprise, they each also exist as separate and distinct entities apart from the Enterprise.

240.    WFC is a diversified financial services company organized under the laws of Delaware and registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended.

241.    WFC provides banking, investment and mortgage products and services, as well as consumer and commercial finance through banking locations, ATMs, the internet and mobile banking.

242.    WFC conducts substantially all of its operations through its subsidiaries, including but not limited to Wells Fargo Bank, although WFC is a separate and distinct legal entity from its subsidiaries, including Wells Fargo Bank.

243.    A significant source of the funds WFC uses to pay dividends on its common and preferred stock and debt service on its debt is dividends from WFC's subsidiaries, including dividends from Wells Fargo Bank generated by the Wells Fargo Enterprise's fraudulent forbearance scheme.

244.    WFC uses funds it obtains from Wells Fargo Bank, including funds generated in connection with the Fraudulent Forbearance Enterprise, to satisfy WFC's financial obligations, including payments of principal and interest on WFC's debt.

245.    WFC and Wells Fargo Bank control, operate, and direct the affairs of the Fraudulent Forbearance Enterprise by, among other things, working with Black Knight to program their computer systems to identify borrower accounts for inclusion in the fraudulent forbearance scheme.

246.    The Fraudulent Forbearance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity.

### b.   The Fraudulent Forbearance Enterprise Committed Thousands of Predicate Acts.

247.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

248.   As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to serving through the mail correspondence with some borrowers and correspondence regarding proposed loan retention workout options with respect to accounts placed into unauthorized forbearance status.

249.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to loan data, proposed post-forbearance workout terms and agreements, false forbearance notices, false reporting to the GSEs and Ginnie Mae, as well as to the Securities and Exchange Commission, Federal Reserve Board, and the Office of the Comptroller of the Currency, among others, regarding loans Wells Fargo subjected to its fraudulent forbearance scheme, as well as related email correspondence, monthly mortgage statements and online account information, and telephone correspondence.

250.   The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: false reports to credit reporting

agencies that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false, deceptive and misleading written correspondence with borrowers; email correspondence; misleading websites and mobile device electronic user interfaces that place borrowers into forbearance with the click of a single button without warning or explanation, as well as other data used to place accounts into forbearance status and/or to inform third parties of borrowers' loans that Wells Fargo placed into forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor reporting; correspondence; and payments.

251.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants include information or communications in furtherance of or necessary to effectuate the scheme.

252.    Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators, and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

253.    Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

254.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and the GSEs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiffs and the other members of the class, relied upon or were injured by their and others' reliance upon the Defendants' misrepresentations and omissions.

Had the GSEs and their investors, Wells Fargo's debt and equity investors, the participants in the credit markets, and Plaintiffs and other members of the class, known that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide requested and agreed-to forbearance plans, they would have immediately rejected and disregarded Defendants' misconduct.

c.   **Pattern of Racketeering Activity.**

255.   The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

256.   Defendants began placement of borrowers' mortgage loans into unauthorized forbearances in March of 2020, which is within four years of Plaintiffs' filing of their original complaint in this case.

257.   Each of the Defendants has committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the other class members.

258.   The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

259.   As a direct and proximate result, Plaintiffs and class members have been injured in their business or property or both by the predicate acts, which make up the Defendants' patterns of racketeering activity.

260.   Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, including credit damage, loss of access to credit

markets and/or home equity lines of credit, an inability to refinance and costs associated with delayed

refinancing, reputational damage, frustration, outrage, and various out-of-pocket costs, and other

pecuniary damages and general damages

**SECOND CAUSE OF ACTION**

**Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA") on Behalf of Plaintiffs and the Nationwide Class**

261.   Plaintiffs incorporate by reference every prior and subsequent allegation of this

Complaint as if fully restated here.

262.   TILA requires creditors to provide borrowers with clear and accurate disclosures of

terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's

rights. In 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act amended the Truth

in Lending Act ("TILA") to, among other things, require servicers to promptly credit mortgage

payments. 15 U.S.C. § 1639f. 212.

263.   This requirement is implemented through Regulation Z, which states that:

> "In connection with a consumer credit transaction secured by a
> consumer's principal dwelling, no servicer shall . . . (f)ail to credit a
> payment to the consumer's loan account as of the date of receipt, except
> when a delay in crediting does not result in any charge to the consumer
> or in the reporting of negative information to a consumer reporting
> agency . . ."

Reg Z., 12 C.F.R. § 226.36(i).

264.   The Dodd–Frank Act amendments to the Truth in Lending Act ("TILA") also mandate

that servicers credit periodic payments on consumer credit transactions secured by a consumer's

principal dwelling as of the date of receipt. 15 U.S.C. § 1639f(a).

265.   As demonstrated through the experiences of Plaintiffs Green and Johnson, Wells Fargo

failed to timely credit payments.

266.    In some instances, Wells Fargo reversed payments. In others, Wells Fargo accepted the payments, but did not credit those payments to the mortgage account. Instead, the payments were held, without the borrowers' knowledge or consent, in "unapplied funds" accounts.

267.    TILA contains a private right of action for violations of these provisions. 15 § 1640(a). This cause of action extends to suits against entities who violate the provisions of TILA and who, at some point, owned the loan obligation. 15 U.S.C. § 1641(f). On information and belief, Wells Fargo voluntarily repurchased tens of billions of dollars of loans that had been placed into fraudulent forbearance, subjecting them to liability for TILA servicing violations for those loans.

### THIRD CAUSE OF ACTION

**Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 22601 et seq. ("RESPA") on Behalf of Plaintiffs and the Nationwide Class**

268.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

269.    RESPA, and the accompanying Regulation X, impose requirements on loan servicers who receive incomplete applications for loan modification. 12 C.F.R. § 1024.41. Guidelines relating to the CARES Act clarify that borrowers' inquiries into forbearance are incomplete applications for loan modification. Lending Letter 2020-02.

270.    Generally, loan servicers are not to "evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon" an incomplete application. 12 C.F.R. § 1024.41(c)(2)(i). However, upon receipt of an incomplete application, a loan servicer may nonetheless offer a short-term payment forbearance program based on that application. *Id.* § 1024.41(c)(2)(iii). "Promptly after offering" a forbearance program, unless the borrower rejects the offer, "the servicer must provide the borrower a written notice stating the specific payment terms and duration of the program or plan, that the servicer offered the program or plan based on an evaluation of an incomplete application, that other loss

mitigation options may be available, and that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan." *Id.*

271.    Plaintiffs Delpapa and Green never received this notice, in contravention to RESPA and Regulation X.

272.    In addition to the above information, servicers are required to send an Evaluation Notice along with the offer of a forbearance program. The Evaluation Notice template provided by Fannie Mae is optional, though "it reflects a minimum level of information that the servicer must communicate and illustrates a level of specificity that complies with the requirements of this Guide." Fannie Mae Servicing Guide D2-2-05.

273.    If not using the template, the notice to be sent communicating the offer of forbearance must: "Be written in clear, concise language; (i)dentify whether the borrower is receiving an offer of a workout option and, if so, the decision for the workout option that is being offered to the borrower; (p)rovide the steps the borrower must take to participate in or accept any offer;" and "provide a 14-day time frame for the borrower to accept or decline the workout option or inform the servicer of the borrower's intent to accept the workout option, if applicable." Servicing Guide D2-2-05.

274.    In the instances in which Wells Fargo did send a notice, that notice was woefully inadequate. It did not provide any timeline for acceptance. Instead, it informed the borrower that the bank was "confirming the following short-term payment relief for [their] account" – relief that had been unilaterally imposed by the bank.

275.    The notice provided that borrowers could terminate the forbearance either by continuing to make payments, or by contacting Wells Fargo. However, as Plaintiff Johnson discovered, this was not so. Instead of shortening or canceling forbearance plans after receiving payments or requests to terminate, forbearance plans were *extended*, in direct contravention to the CARES Act.

276.    The CARES Act expressly states, in a subsection titled "Requirements for Servicers," that a forbearance "may be extended for an additional period of up to 180 days **at the request of the borrower**, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, **either the initial or extended period of forbearance may be shortened.**" Section 4022(c)(1) of the CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 490 (2020) (codified at 15 U.S.C. § 9056(c)(1)).

277.    In addition, as alleged above, Fannie Mae's Evaluation Notice template includes the following section regarding the impacts of forbearance:



**Additional Forbearance Plan Information and Legal Notices**

**Credit Reporting**:
- We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
- **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

278.    Wells Fargo's notices provided no warning about the potential credit impacts of being placed in forbearance. In fact, as Plaintiffs Delpapa, Jacob, and Johnson learned, being placed into forbearance had a serious and negative impact on their credit score and creditworthiness.

279.    Not only did Wells Fargo omit such warnings when sending notices to borrowers after placing them in unwanted forbearance plans, when those borrowers contacted Wells Fargo about this misconduct, the bank provided assurances which this Court has already instructed them to correct.

280.    The CARES Act does contain an amendment to the notice requirements of Regulation X, granting greater flexibility to loan servicers, but only with regard to deferrals, not forbearance. See 12 U.S.C. § 1024.41(c)(2)(v). Congress thus made a clear distinction between a loan deferral, and forbearance. The latter is an important financial decision that borrowers should make for themselves, and only when armed with all the necessary information.

281.     RESPA contains a private right of action for violations of this provision. 15 § 1640(a).

Plaintiffs allege a violation of Regulation X for the proposed nationwide class, as even those borrowers

who received any notice received notices that were woefully inadequate.

### FOURTH CAUSE OF ACTION

**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") on Behalf of Plaintiffs and the Nationwide Class**

282.     Plaintiffs repeat and reallege the allegations in this complaint.

283.     Plaintiff Jacob is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

284.     Wells Fargo is a "furnisher" of consumer information as defined by 12 CFR.

285.     1022.41(c) and as described throughout the Fair Credit Reporting Act ("FCRA"), as

Wells Fargo regularly reports consumer account information to the credit reporting agencies for

inclusion in credit reports.

286.     Wells Fargo willfully violated 15 U.S.C. § 1681s-2(b) by failing to adequately

investigate and correct inaccurate credit reporting information with the credit reporting agencies

following Plaintiff Jacob's formal reinvestigation requests with the credit reporting agencies under 15

U.S.C. § 1681i.

287.     Plaintiffs and the putative class members in this case have had their credit information

compiled and furnished by Wells Fargo regarding their mortgage loans indicating falsely that

Plaintiffs' and the putative class members' loans are in forbearance when Plaintiffs and the putative

class members did not request forbearance.

288.     Wells Fargo knew, or should have known, that Plaintiffs and the class members did not

request or affirmatively consent to the mortgage loan forbearances that Wells Fargo reported to the

credit reporting agencies.

289.     Despite the fact that Wells Fargo knew or should have known that it placed borrowers into mortgage forbearances that they did not request or consent to, Wells Fargo had a policy of reporting the forbearance in the comments section of Plaintiffs' and the class members' credit reports.

290.     Plaintiff Jacob submitted a dispute letter to Experian on September 9, 2020, disputing Wells Fargo's reporting of his mortgage loan account as "in forbearance" when Plaintiff Jacob never requested or authorized such forbearance.

291.     Wells Fargo received notice of Plaintiff Jacob's dispute from the credit reporting agencies and either (1) failed to reasonably investigate the dispute or (2) investigated the dispute and incorrectly determined that it had been accurately reporting Plaintiff Jacob and the class members' mortgage loan accounts.

292.     Wells Fargo failed to conduct and report the results of a complete investigation into each dispute raised by Mr. Jacob. Wells Fargo failed to promptly delete, modify, or block reporting of inaccurate, incomplete, or unverifiable information in response to each dispute raised by Mr. Jacob.

293.     Wells Fargo has breached its duties as set forth in 15 U.S.C. § 1681s-2(a) by failing to adequately investigate and fully correct inaccurate credit reporting information with the credit reporting agencies following Mr. Jacob's dispute of the credit reporting errors.

294.     Mr. Jacob has incurred actual damages and has suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the Fair Credit Reporting Act.

295.     Based on Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiffs and the class members are entitled to actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1681o.

296.     Moreover, as a result of each and every negligent violation of the FCRA, Plaintiffs and the class are entitled to statutory damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o.

297.     Plaintiffs and the class members are also entitled to statutory damages, punitive

damages, and reasonable attorneys' fees for each and every of Wells Fargo's willful violation of the

FCRA pursuant to 15 U.S.C. § 1681n(a).

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiffs and the Nationwide Class

298.     Plaintiffs brings this claim on behalf of themselves and the Nationwide Class.

299.     Plaintiffs, the Class members, and Wells Fargo were parties to contracts, referred to as

Deeds, Deeds of Trust, or Securities (collectively, "Deeds"). Wells Fargo may be either a signatory to

> with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than
> the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be
> transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the
> Note purchaser.

those contract as the mortgage lender, as in the case of the Robinsons, or an assignee of that contract as

mortgage servicer. For instance, in Ms. Delpapa's case, Wells Fargo, as the loan servicer, assumed the

obligations of the original lender in her Deed:

300.     In either case, those Deed's for GSE-backed loans are substantially identical for all

borrowers in material respects. The covenant of good faith and fair dealing is a common foundation

inherent in all of the Deeds between the Plaintiffs, Class members, and Wells Fargo.

301.     In addition to the above language contained in the deeds, some borrowers had HAMP

agreements with Wells Fargo, which Wells Fargo violated by unilaterally changing those terms.

302.     Regardless of its terms, every contract contains an implied covenant of good faith and

fair dealing. The implied covenant obligates the parties to cooperate so that each party may obtain the

full benefit of performance of the contract. The duty of good faith and fair dealing means that parties

may not interfere with or fail to cooperate in the other party's performance. Neither party may engage

in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage

in conduct that prevents the other party from performing under the contract.

303.    Wells Fargo impliedly covenanted as a servicer that it would undertake its duties in good faith. In particular, Wells Fargo has a contractual duty under the Deed to apply payments it receives from borrower to interest, principal, and escrow items, in that order. Borrowers, in turn, must timely pay the amounts due for those items.

304.    By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with their ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts.

305.    No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

306.    Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

307.    By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence, and constituted an abuse of its power.

308.    As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiffs were injured. Their damages include, but are not limited to, damage to their credit including increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance while in forbearance.

### SIXTH CAUSE OF ACTION

### Unjust Enrichment on Behalf of Plaintiffs and the Nationwide Class

309.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

310.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

311.    Plaintiffs and members of the Nationwide Class have conferred a benefit upon Wells Fargo which received benefits by placing Plaintiffs and the Nationwide Class into forbearance without their consent.  By placing Plaintiffs' and members of the Nationwide Class' mortgages in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiffs and the Class from refinancing with another institution, and thus increasing the value of the mortgage servicing rights.

312.    Wells Fargo's forcing Plaintiffs and the Nationwide class into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

313.    Wells Fargo's forcing of Plaintiffs and the Nationwide class into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

314.    As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo simultaneously rendered those loans eligible for voluntary repurchase out of the GSE trusts, and distressed the value of the loans. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans will likely resell at the more traditional trading value of 5% to 10% above par value after the borrowers become current once the forbearance plans end.

315.    Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiffs and the Nationwide class and in contravention of the requirements of the CARES Act.

316.    As a result, the Plaintiffs and Nationwide class members are entitled to restitution, disgorgement, or both, of the benefits Wells Fargo has unjustly retained, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Johnson, and the California Class**

317.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

318.    Plaintiffs Delpapa and Johnson bring this claim on behalf of the California Class.

319.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."  Wells Fargo engaged in unlawful and unfair business acts and practices in violation of the UCL as follows.

320.    Wells Fargo's nonconsensual forbearance program is unlawful under the UCL because it violates Sections 4022 and 4023 of the CARES Act, which require that a borrower affirmatively request that their mortgage be placed in forbearance and affirmatively acknowledge they are experiencing a hardship due to COVID-19, and that loan servicers only extend forbearance upon a borrower's request.

321.    Additionally, Wells Fargo's practices are unlawful because they violate Regulation N, "Mortgage Acts and Practices—Advertising," which forbids "any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product[.]" 12 C.F.R. § 1014.3. Wells Fargo violated Regulation N by failing to inform borrowers that they were placing their mortgages in forbearance without their consent, and by sending notices with inaccurate information regarding the impact of forbearances.

322.    Additionally, Wells Fargo violated Regulations X and Z, as alleged *supra*, by failing to timely credit loan payments and by failing to provide adequate notice to borrowers associated with the unilateral forbearance plans.

323.    Wells Fargo's practices were also unfair under the UCL because placing borrowers' mortgages in forbearance without their consent is contrary to established public policy; immoral, unethical, oppressive or unscrupulous; and causes injury to consumers that outweighs its benefits.

324.    Plaintiffs and the Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misconduct. Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs and the Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices; any such orders or judgments as may be necessary to restore to Plaintiffs and the Class members any money acquired by unfair competition, including restitution, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345; and any other just and proper relief available under the California UCL. To the extent these remedies are equitable, Plaintiffs seek them in the alternative to any adequate remedy at law they may have.

### EIGHTH CAUSE OF ACTION

**California Consumer Credit Reporting Act, Cal. Civ. Code § 1785. 25 et seq.**
**Asserted on Behalf of Plaintiffs Delpapa, Johnson, and the California Class**

325.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

326.    Plaintiffs Delpapa and Johnson bring this claim on behalf of the California Class.

327.    The California Consumer Credit Reporting Act (CCRA) provides that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

328.   Wells Fargo, a "person" under the CCRA, furnished information on Plaintiffs' and Class Member's mortgage forbearances that it knew or should have known was incomplete or inaccurate to consumer credit reporting agencies.

329.   Wells Fargo acknowledged in its form letter to Plaintiffs that it informed the consumer reporting agencies that Plaintiff's mortgage was in forbearance:

plan. We also provided the credit bureaus with a comment code that says the account was in a forbearance plan. We have validated with FICO that this 'Account in Forbearance' code does not

330.   That information was incomplete, inaccurate, or materially misleading because the Plaintiffs did not request that their account would be placed in forbearance, or for that forbearance to be extended, and the false information was negative to the Plaintiffs and Class members.

331.   Plaintiffs suffered actual damage as a result of this violation because they were not able to pursue a refinancing or other forms of credit while in forbearance and for months after exiting those plans.

332.   Wells Fargo's violation was willful under Cal. Civ. Code § 1785.31 because Wells Fargo acted with reckless disregard for the rights of the Plaintiffs and the Class in enacting a statutory scheme meant to help, not further harm, borrowers.

333.   As a result of Wells Fargo's negligent and willful violations of the CCRA, Plaintiffs seek all available remedies under the CCRA, including actual damages, court costs, loss of wages, attorney's fees and, pain and suffering, and punitive damages.

## NINTH CAUSE OF ACTION

### Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*
### Asserted on Behalf of Plaintiffs Delpapa, Johnson, and the California Class

334.   Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

335.   Plaintiffs bring this claim on behalf of the California Class.

336.    The Rosenthal Fair Debt Collection Practices Act ("Rosenthal FDCPA") prohibits debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code § 1788.

337.    Wells Fargo is a "debt collector" because it "regularly . . . engages in debt collection" as a mortgage servicer. See Cal. Civ. Code § 1788.2(c). Plaintiffs and Class members are persons, and their mortgage loans are "consumer debts" under the Rosenthal FDCPA. Id. § 1788.2(f), (g).

338.    The Rosenthal FDCPA incorporates by reference and prohibits violations of the federal Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17. That includes the Federal Act's prohibition of "false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" including the false representation of the status of any debt, "communicating or threatening to communicate to any person credit information which is known or which should be known to be false," and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. 15 U.S.C. § 1692e(2), (8), (10).

339.    Wells Fargo violated the Rosenthal FDCPA through its violations of Section 1692e of the Federal Act, when it provided false, deceptive, or misleading information about the mortgage debt of Plaintiffs and the Class.

340.    As a result of Wells Fargo's violation of the State and Federal Acts, Plaintiffs are entitled to actual and statutory damages, fees, and costs available under those Acts. *See* Cal. Civ. Code § 1788.17; 15 U.S.C. § 1692k.

## TENTH CAUSE OF ACTION

**Georgia Fair Business Practices Act O.C.G.A. §§ 10-1-390, *et seq*. asserted on behalf of Plaintiff Green & the Georgia Class**

341.    Plaintiffs re-allege and incorporate by reference the above-numbered paragraphs.

342.    Wells Fargo committed unfair business acts and practices in violation of The Georgia Fair Business Practices Act, O.C.G.A §§ 10-1-390, et seq. ("GFBA"), by inaccurately reporting to

credit reporting agencies that Plaintiff's and the purported class members' mortgages were "in forbearance" when Plaintiff and the putative Georgia class members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

343.    Further, Wells Fargo committed an unfair practice by failing to disclose and provide Plaintiff Green and the Georgia class members with a voluntary option of opting out of the forbearance program should they chose to do so.

344.    Wells Fargo failed to disclose the consequences of the forbearance option, and moreover, involuntarily enrolled Plaintiff Green and the Georgia Class Members into this program.

345.    Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Green and the Georgia Class Members who were unaware that their mortgages had been place "in forbearance" without their knowledge or consent.

346.    Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

347.    As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiffs and the Georgia Class Members suffered and will continue to suffer actual damages.

348.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Green and the Georgia Class Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

349.    In addition, Plaintiff Green and the Georgia Class Members seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## VIII.   REQUEST FOR RELIEF

350.    Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment against Defendants, as follows:

A.      Certify the Classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appoint Plaintiffs as representatives of the Classes and appoint Plaintiffs' counsel as Class counsel;

B.      Award declaratory relief, including but not limited to a declaration that Wells Fargo's actions and business practices are unlawful and that Wells Fargo must comply with state and federal lending laws;

C.      Award injunctive relief, including public injunctive relief permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged;

D.      Award all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Classes, including penalties, and all other relief allowed under applicable law;

E.      Grant Plaintiffs and the Class awards of restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.      Award all costs of prosecuting this action, including attorneys' fees and expert fees as may be allowable under applicable law;

G.      Award both pre-judgment and post-judgment interest on any amounts awarded;

H.      Award treble or punitive damages insofar as they are allowed by applicable laws;

I.      Award appropriate individual relief as requested above; and

J.      Grant such other and further relief, including declaratory, injunctive, and equitable relief, as the Court may deem proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

1    DATED this 24th day of December, 2020.

2                                         KELLER ROHRBACK L.L.P.

3                                         By s/ Matthew J. Preusch

4                                             Matthew J. Preusch (SBN 298144)
                                             801 Garden Street, Suite 301
5                                             Santa Barbara, CA 93101
                                             (805) 456-1496
6                                             Fax (805) 456-1497
                                             mpreusch@kellerrohrback.com
7

8                                             Derek W. Loeser, admitted pro hac vice
                                             Gretchen Freeman Cappio, admitted pro hac vice
9                                             Zachary W. Gussin, admitted pro hac vice
                                             KELLER ROHRBACK L.L.P.
10                                            1201 Third Avenue, Suite 3200
                                             Seattle, WA 98101-3052
11                                            (206) 623-1900, Fax (206) 623-3384

12
                                             Abbas Kazerounian (SBN: 249203)
13                                            ak@kazlg.com
                                             Kazerouni Law Group, APC
14                                            245 Fischer Avenue, Suite D1
                                             Costa Mesa, CA 92626
15                                            (800) 400-6808, Fax (800) 520-5523

16
                                             Yana A. Hart (SBN: 306499)
17                                            yana@kazlg.com
                                             Kazerouni Law Group, APC
18                                            2221 Camino Del Rio South, Suite 101
                                             San Diego, CA 92108
19                                            (619) 233-7770, Fax (619) 297-1022

20
                                             Jason A. Ibey (SBN: 284607)
21                                            jason@kazlg.com
                                             Kazerouni Law Group, APC
22                                            321 N Mall Drive, Suite R108
                                             St. George, Utah 84790
23                                            (800) 400-6808, Fax (800) 520-5523

24

25

26

27

28

## CERTIFICATION OF SERVICE

I, Matthew J. Preusch, hereby certify that on December 24, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record who have appeared in this action.

By: *s/ Matthew J. Preusch*
Matthew J. Preusch