Gretchen Freeman Cappio (*Pro Hac Vice*)
Derek W. Loeser (*Pro Hac Vice*)
Zachary W. Gussin (*Pro Hac Vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | No. 3:20-cv-06009-JD |
| WELLS FARGO FORBEARANCE LITIGATION | **THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

Plaintiffs LUIS and MARISOL CASTRO, PAMELA DELPAPA, JENNA DOCTOR, GERALD FORSBURG, SAMARA GREEN, PATRICK HEALY, BRETT JACOB, CHARLES JOHNSON, BARBARA PRADO, and RENRICK and VIVIAN ROBINSON (collectively "Plaintiffs"), individually and on behalf of a class of similarly situated persons, bring this class action lawsuit against Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo & Co. ("WFC") (collectively, "Wells Fargo" or "Defendants"), and allege as follows:

## I.   INTRODUCTION

1.      In March of 2020, Americans were suffering through one of the worst pandemics in our nation's history. Millions of Americans had lost their jobs, thousands had lost loved ones, and the impact of this terrible plague was extending over every sector of our domestic and professional lives. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (codified as amended in sections of 2, 5, 12, 15, 20, 21, 29, 42, and 45 U.S.C.). That Act, among other things, gave American homeowners concerned about their ability to make mortgage payments as a result of the pandemic the right to forbearances for federally backed mortgages.

2.      This relief provided a band-aid, not a cure, staunching what could otherwise have been a Great Recession-level foreclosure crisis. However, forbearance is not forgiveness, and it is not right for everyone. Loan forbearance plans are agreements allowing borrowers to reduce or suspend payments for a short period of time, providing extended time for borrowers to become current on their payments and repay the amounts owed. Forbearance plans do not forgive unpaid loan payments and have attendant financial consequences. Being in forbearance restricts a borrower's access to credit, can damage a borrower's credit score, can prevent a borrower from refinancing, and can disrupt collateral agreements – such as bankruptcy plans or repayment plans – which assume continued payment on the mortgage.

3. For that reason, the CARES Act and related regulatory guidance mandate that participation in a COVID-19 mortgage forbearance plan is entirely voluntary; that is, a borrower must be informed of the various terms and conditions of the program and then affirmatively decide to enter the program, and the borrower retains the right to shorten, terminate, or extend the forbearance term.

CARES ACT § 4022: FORECLOSURE MORATORIUM AND CONSUMER RIGHT TO REQUEST FORBEARANCE

. . .

(b) FORBEARANCE.— (1)

IN GENERAL.—During the covered period, *a borrower* with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID–19 emergency *may request forbearance* on the Federally backed mortgage loan, regardless of delinquency status, by—

(A) *submitting a request to the borrower's servicer*;

and

(B) affirming that the borrower is experiencing a financial hardship during the COVID–19 emergency.

(2) DURATION OF FORBEARANCE.—

*Upon a request by a borrower* for forbearance under paragraph (1), such forbearance shall be granted for up to 180 days, and *shall be extended for an additional period of up to 180 days at the request of the borrower, provided that, at the borrower's request, either the initial or extended period of forbearance may be shortened.*

. . .

(c) REQUIREMENTS FOR SERVICERS.—

(1) IN GENERAL.— *Upon receiving a request for forbearance from a borrower under subsection (b), the servicer shall with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID–19 emergency* and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provide the forbearance for up to 180 days, *which*

2

> *may be extended for an additional period of up to 180 days at the request of the borrower, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, either the initial or extended period of forbearance may be shortened.*[1]

4.    As detailed herein, Wells Fargo—without receiving any request or financial hardship attestation—opted unwitting borrowers into its COVID-19 mortgage forbearance program. The bank's primary purpose in doing so was the same profit motive that led to Wells Fargo's well-documented history of violating its customers' trust. By placing borrowers into forbearance, and causing them to skip payments, Wells Fargo capitalized on an incredibly lucrative loophole.

5.    The majority of borrowers that Wells Fargo placed into unwanted forbearance plans had loans that were securitized and pooled into mortgage-backed securities ("MBS") by one of two Government Sponsored Entities, ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation, ("Freddie Mac"), or the Government National Mortgage Association ("GNMA"). The resulting securities, agency MBS, trade on a secondary market.

6.    Under normal circumstances, investors who purchase agency MBS (as opposed to private label securities) are insulated from the risk that the borrowers whose mortgages underlie the securities might fail to make payments because loan servicers are obligated to advance most principal and interest payments for federally backed loans to the GSEs and Ginnie Mae regardless of whether the loan is performing.

7.    If a loan is non-performing for three consecutive months, the loan servicer acquires the option to voluntarily repurchase the loan from the securities pool at par value.[2] This provides loan

---

[1] Coronavirus Aid, Relief, and Economic Security Act, H. R. 748, 116th Cong. (2nd Sess. 2020), https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (last visited Dec. 23, 2020) (emphasis added).

[2] Par value, also sometimes known as nominal or face value, is the amount at which a security can be redeemed, and its generally far less than market value.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

servicers with some limit on their obligation to advance payments for non-performing loans and allows the loan servicers to pursue loan modification options to help delinquent and distressed borrowers become current.

8.      The voluntary repurchase of loans at par value is a profit stream for loan servicers like Wells Fargo. Once the loan begins performing again, it can either be held for investment loan, re-securitized, or resold. Holding the loans for investment leads to profits based on the difference between the cost to service and the interest rate. Reselling or resecuritizing leads to a profit, as the resale price typically exceeds the par value that the loans are purchased for coupon. Under normal circumstances, this makes sense because it provides loan servicers a financial incentive to work with risky borrowers to recuperate loans that are more than 90 days delinquent.

9.      But by placing federally backed borrowers into *unsolicited* forbearance plans, Wells Fargo acquired the option to repurchase the underlying loans even though many borrowers did not want or need forbearance and remained financially solvent. Essentially, by placing loans in forbearance, Wells Fargo created the fiction that the loans were underperforming, then repurchased the loans at an artificially low price. As detailed below, Wells Fargo exercised this option at a historic rate, voluntarily repurchasing tens of billions of dollars' worth of otherwise performing mortgages out of the trust pools, for billions of dollars less than the loans' market price. Ted Tozer, the former President of Ginnie Mae, has said that banks engaging in this conduct "are setting themselves up for a huge windfall," and that the scheme is "almost pure profit."[3]

10.     In addition to exploiting this highly lucrative loophole, Wells Fargo benefitted by unilaterally opting unwitting homeowners into its forbearance program in several other ways. As

---

[3] Joe Light, *Banks Uncover Loophole to Buy Loans at below-market Prices*, BLOOMBERG (August 20, 2020, 3:00 AM PDT) https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

detailed below, Wells Fargo profited by protecting and increasing the value of the mortgage servicing rights associated with the proposed class members' mortgages; by capping its potential advancement liabilities for loans that were not voluntarily repurchased; by rendering the bank eligible for loan-workout incentive payments; and through spread earned on payments that class members made which were not timely credited to the borrower's mortgage. As Plaintiffs' experiences demonstrate, many borrowers received no notice that Wells Fargo had placed their mortgages into forbearance. They only found out about Wells Fargo's actions when they attempted to apply for credit (including the refinancing of their mortgage) and were denied, saw the forbearance noted on a credit report or tried, but were unable, to make a regularly scheduled mortgage payment with Wells Fargo.

11.    In those instances when Wells Fargo did send borrowers a template notice informing them that Wells Fargo had placed their loans into forbearance, the notice was both insufficient and inaccurate, containing misleading assurances and inadequate warnings about the potential consequences of being in forbearance.

12.    Some borrowers who initially wanted a forbearance later sought to end their forbearance plan upon learning more about the risks associated with forbearances. As Plaintiff Johnson's circumstances demonstrate, Wells Fargo not only failed to comply with the CARES Act's requirement that borrowers be allowed to end their forbearance at any time, but they unlawfully extended the period of forbearance after borrowers requested for their loans to be removed from the program.

13.    Numerous media reports suggest that these practices are widespread.

14.    Since the onset of COVID-19, approximately 6.3 million homeowners have participated in a mortgage forbearance program, either knowingly or unknowingly. Upon information and belief,

5

Wells Fargo accounted for over a million of those homeowners, many of whom never requested such forbearance.[4]

15.    As a result, those homeowners, including Plaintiffs, suffered damages, including, but not limited to an inability to access credit, an inability to refinance to lower interest rates (and with mortgage servicers instead of Wells Fargo), an inability to secure additional lines of consumer credit or to access existing credit, an inability to remove private mortgage insurance, and time spent dealing with the difficult situation of removing their mortgages from a program they did not want.

16.    Defendants' practice of involuntarily putting homeowners in the unwanted forbearance program without proper documentation prompted the following statement from Senator Sherrod Brown of Ohio, the ranking Democrat on the Banking Committee:

> Once again it seems that Wells Fargo's sloppy service and shoddy management are hurting consumers. Wells Fargo should immediately address each of these complaints and make changes to ensure that no borrower finds themselves worse off from actions that their servicer takes without their consent or notice.[5]

17.    In addition to Senator Brown's public statement, Senators Elizabeth Warren of Massachusetts and Brian Schatz of Hawaii wrote a letter to the Chief Executive Officer of Wells Fargo seeking information regarding its now well-documented practice of putting mortgagors into forbearance programs without their consent.[6]

18.    The Senators' July 29, 2020 letter stated that Wells Fargo "appears to be incapable of self-governance," and noted that reports of borrowers being placed in forbearance programs they did

---

[4] *See, e.g.*, Gretchen Morgenson, *More Wells Fargo customers say the bank decided to pause their mortgage payments without asking*, NBC NEWS (July 22, 2020, 1:00 PM PDT), https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.

[5] *Id.*

[6] Letter from Sens. Elizabeth Warren and Brian Schatz, United States Senate, to Charles W. Scharf, Chief Executive Officer and President (July 29, 2020), https://www.warren.senate.gov/imo/media/doc/2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

not want "raise even more questions about the inability of Wells Fargo and its leadership team to comply with the law and the needs of its customers."

19.    The letter proclaimed that "if these reports are true, they represent one more addition to a long list of inexcusable actions by Wells Fargo at customers' expense" because such conduct can affect borrowers' credit by suggesting that they are not making payments even when they are and can prevent them from refinancing their home loans to take advantage of lower interest rates.

20.    Wells Fargo, for its part, has not denied these allegations. Through its spokesperson Tom Goyda, Wells Fargo stated that "[i]n the spirit of providing assistance, [it] may have misinterpreted customers' intentions in a small number of cases."[7]

21.    Although Wells Fargo did not identify the complete number of borrowers who were unwillingly placed into the forbearance program, it reported having received 1,600 complaints of unwanted forbearances.[8] In a more recent filing with this Court, however, Wells Fargo reported receiving more than 33,853 complaints. *See* Dkt. 140, *2 n.1.

22.    The true scope of the problem far exceeds that figure. Freddie Mac and Fannie Mae publish loan-level performance data containing details on the performance of loans underlying credit risk transfer securities. The data includes origination characteristics, monthly performance information on the underlying mortgage loans, and the company that services each loan. This data contains a large majority of mortgages guaranteed by Freddie Mac and Fannie Mae.

---

[7] Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases*, BANKING DIVE (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.

[8] Gretchen Morgenson, *1600 customers say Wells Fargo paused their mortgage payments*, NBC NEWS, (Oct. 1, 2020, 3:00 AM PDT), https://www.nbcnews.com/business/personal-finance/1-600-customers-say-wells-fargo-paused-their-mortgage-payments-n1241620.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

23.     Comparing Wells Fargo's loans to their closest peers, Plaintiffs found the initial forbearance rate for GSE loans serviced by Wells Fargo was over 30 times greater than the industry average in April, 2010.

24.     When only looking at loans that had always been current prior to the forbearance, the difference is even starker. The forbearance rate for Wells Fargo borrowers was 6%, compared to 0.14% for the industry. This means, that in the early days of the CARES Act, a *borrower whose loan had never previously been delinquent was more than 40 times more likely to be placed into forbearance if her loan was serviced by Wells Fargo.*

25.     This disparity declined as Wells Fargo began to face scrutiny and unfavorable media coverage for its faulty forbearance program. Wells Fargo's forbearance rates reached approximately 2% in June of 2020, still twice the industry average, and approached industry forbearance rates by August 2020. On the whole, Wells Fargo's forbearance rates were twice as high as the rest of the industry over this time period, suggesting that hundreds of thousands of Wells Fargo's forbearances were the result of its faulty forbearance program.

26.     In sum, Wells Fargo cynically converted the CARES Act from protection for borrowers to a profit driver for the bank, hurting the people Congress intended to help. And it did so at the worst possible time. Many customers, like Ms. Delpapa, the Castros, Ms. Doctor, and Mr. Jacob, sought to refinance at more favorable rates or secure additional lines of credit and were unable to do so because they had been placed in forbearance. Some, like Mr. Johnson, noticed decreases in their credit scores. Others, like Ms. Green and Mr. Johnson, attempted to make payments, unaware that they were in forbearance, only to have Wells Fargo unlawfully retain those payments without crediting them towards the outstanding mortgage or escrow account balances.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

27.     Plaintiffs allege as follows upon personal knowledge as to themselves and their own experiences and, as to all other matters, upon information and belief including due investigation conducted by their attorneys.

## II.     JURISDICTION AND VENUE

28.     The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud); the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601, as implemented through Regulation Z; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 22601, as implemented through Regulation X; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.

29.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

30.     The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

31.     This Court has general personal jurisdiction over Wells Fargo & Co. because it has its principal place of business in San Francisco, California.

32.     This Court has general personal jurisdiction over Wells Fargo Bank, N.A., because its principal place of business is in San Francisco, California.

33.     This Court also has general personal jurisdiction over Wells Fargo Bank, N.A., because its contacts with California are so constant and pervasive as to render it essentially at home in California.

34.     This Court has specific personal jurisdiction over Wells Fargo Bank, N.A. because a substantial part of the actions or omissions giving rise to Plaintiffs' claims occurred in this District.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

35.    The exercise of specific personal jurisdiction over Wells Fargo Bank, N.A. is consistent with due process, as Wells Fargo Bank regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from services provided to, persons in this District and in California.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants and Defendants have sufficient contacts with this District, the situs of their principal places of business.

37.    Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

## III.    INTRADISTRICT ASSIGNMENT

38.    This case is properly brought in the San Francisco Division of the Northern District of California. Under Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred."

39.    Because WFC maintains its headquarters in San Francisco, and Wells Fargo Bank N.A.'s principal place of business is in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the Northern District of California.

## IV.    PARTIES

**A.    Representative Plaintiffs**

40.    Plaintiffs Luis and Marisol Castro ("Mr. and Mrs. Castro") are Texas citizens whose homestead property is located in Dallas, Texas. Mr. and Mrs. Castro's property is encumbered by a lien securing repayment of a federally related loan backed by the Federal National Mortgage Association ("Fannie Mae"), and is serviced by Wells Fargo.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

41.    Plaintiff Pamela Delpapa is a resident and citizen of Riverside County, California. Her property is encumbered by a loan backed by the Fair Housing Administration, and her loan was serviced by Wells Fargo until late in 2020.

42.    Plaintiff Jenna Doctor ("Ms. Doctor") is a citizen of Florida whose homestead property is located in Castleberry, Florida. Ms. Doctor's homestead property is encumbered by a lien securing repayment of a federally related loan backed by the FHA and is serviced by Wells Fargo.

43.    Plaintiff Samara Green is a resident and citizen of Rockdale County, Georgia, whose mortgage is serviced by Wells Fargo.

44.    Plaintiff Patrick Healy is a resident and citizen of San Diego County, California, whose mortgage is serviced by Wells Fargo.

45.    Plaintiff Brett Jacob is a resident and citizen of Nassau County, New York, whose mortgage is serviced by Wells Fargo.

46.    Plaintiff Charles Johnson is a resident and citizen of Riverside County, California, whose mortgage is serviced by Wells Fargo.

47.    Plaintiff Barbara Prado ("Ms. Prado") is a California citizen whose homestead property is located in Fremont, California. Ms. Prado's property is encumbered by liens securing repayment of two federally related loans backed by the FHA, which are both serviced by Wells Fargo.

48.    Plaintiffs Renrick and Vivian Robinson are citizens and residents of Grand Prairie, Texas. Their property is encumbered by a Veterans Administration Loan, which loan was originated by, refinanced by, and is serviced by, Wells Fargo.

**B.    Defendants**

49.    Defendant Wells Fargo & Co. ("WFC") is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage

banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

50.    WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein.

51.    Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States. While it is nominally headquartered in Sioux Falls, South Dakota, Wells Fargo Bank N.A.'s principal place of business is in San Francisco, California. Wells Fargo Bank provides WFC personal and commercial banking services, is the successor by merger of Wells Fargo Home Mortgage, Inc., and is WFC's principal subsidiary.

## V.    FACTUAL ALLEGATIONS

**A.    The Federal Government Passed the CARES Act to Help with the Economic Harm Caused by the COVID-19 Pandemic, in Part by Empowering Borrowers to Opt into Forbearance Plans.**

52.    On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

53.    On March 13, 2020, then-President Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the COVID-19 pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

54.    In addition to the human tragedy caused by the pandemic, the economic fallout was immediate and continues to be considerable.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

55.     On March 25, 2020, in response to the economic damage beginning to be felt by Americans throughout the country, the United States Senate passed the Coronavirus Aid, Relief and Economic Security ("CARES") Act.

56.     The CARES Act was passed by the House of Representatives the following day and signed into law on March 27, 2020. *See generally* CARES Act, Public Law No. 116-136.

57.     The CARES Act is the single-largest economic stimulus bill in the United States' history, allocating approximately $2.2 trillion of support to individuals and business affected by the COVID-19 pandemic.

**1.     The CARES Act Grants Borrowers the Privilege to Elect Mortgage Forbearance from Their Loan Servicers.**

58.     A substantial part of the coronavirus aid package was designed to assist American homeowners with Federally backed mortgages who were in economic distress as a result of the COVID-19 pandemic.

59.     First, the CARES Act assisted American homeowners with government backed mortgages by prohibiting their lenders and mortgage servicers from beginning a judicial or non-judicial foreclosure or from finalizing a foreclosure judgment or sale through at least August 31, 2020.

60.     Second, and most relevant to this action, the CARES Act provided homeowners with federally backed loans experiencing financial hardships because of COVID-19 with the option to request up to 180 days of forbearance on their mortgage.

61.     Specifically, Section 4022(b) provides, in relevant part, that:

> (1) IN GENERAL.—During the covered period [beginning February 15, 2020 and ending on June 30, 2022], a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency ***may request*** forbearance on the Federally backed mortgage loan, regardless of delinquency status, by—
>
>     (A)  submitting a request to the borrower's servicer and

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

> (B) affirming that the borrower is experiencing a financial hardship during the COVID-19 emergency.
>
> (2) DURATION OF FORBEARANCE.—***Upon a request by a borrower for forbearance*** under paragraph (1), such forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*See* CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT, PL 116-136, March 27, 2020, 134 Stat. 281, § 4022(b) (emphasis added).

62.    Section 4022(c) provides, in relevant part, that:

> ***Upon receiving a request for forbearance from a borrower under subsection (b),*** the servicer shall ***with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID-19 emergency*** and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provided the forbearance up to 180 days, which may be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***the borrower's request for an extension*** is made during the covered period, and, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*Id*., § 4022(c) (emphasis added).

63.    These provisions make it abundantly clear that participation in a COVID-19 forbearance program is voluntary and to be initiated and maintained only at the request of the mortgagor.

64.    Congress intentionally limited CARES Act forbearances to only occur upon the request of a borrower, as can be shown through legislation considered but not enacted. At the same time that the CARES Act was being negotiated between the chambers, Congressman William Lacy Clay introduced a bill, H.R. 6340, which would have required servicers to grant automatic loan forbearance for delinquent borrowers, in addition to granting borrowers the right to receive a forbearance regardless of

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

delinquency. When the CARES Act was passed, Congressman Clay's approach was rejected, and the CARES Act was limited to providing forbearances only upon a borrower's request.

65.    As explained by the CFPB, a forbearance is "when [] mortgage servicer[s] or lender[s] allow [mortgagors] to pause (suspend) or reduce [their] mortgage payments for a limited period of time while [they] build back [their] finances."[9]

66.    Notably, while the CARES Act provides many homeowners with the right to have all mortgage payments completely paused for a period of time, forbearance doesn't mean [mortgagors'] payments are forgiven or erased. [Rather, mortgagors] are still required to repay any missed payments, which, in most cases, may be repaid over time."[10]

67.    For mortgagors to avail themselves of the COVID-19 mortgage forbearance option, they were instructed to contact their loan servicer to obtain information and, if appropriate, request forbearance.[11]

### 2.    Guidance Clarifies the CARES Act's Protections

68.    While the CARES Act was passed quickly and with laudable intentions, there has been a tremendous amount of consumer confusion around many aspects of the Act, including the forbearance program.

---

[9] *Learn about forbearance,* CONSUMER FIN. PROT. BUREAU (Updated Oct. 21, 2021) https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/mortgage-relief/.
[10] *Id.*
[11] *See Request forbearance or mortgage relief,* CONSUMER FIN. PROT. BUREAU BUREAU (updated Mar. 25, 2021) https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/request-forbearance-or-mortgage-relief/.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

a.   **The Initiation, Maintenance, and Extension of a Forbearance are Decisions Left to Borrowers.**

69.    The initial term of CARES Act mortgage forbearances was designed to be 180 days[12] and, after that term expires, lenders were instructed to work with borrowers to—upon request by the homeowners—extend the forbearance or establish a repayment plan.[13] But borrowers were always intended to have the ability to only accept a shorter forbearance period, to shorten the term of a previously-accepted forbearance, and to cancel a forbearance plan. While the text of the Act is clear on this subject, subsequent guidance has further emphasized that borrowers retain the privilege to shorten, end, or decline a forbearance.

70.    Freddie Mac issued an April 8, 2020 Temporary Service Guidance Related to COVID-19, which stated that "the length of each forbearance plan term must be for an appropriate length, based on the Borrower's individual circumstances and nature of the hardship, and must be agreed upon with or requested by the Borrower."[14]

71.    As the April 27, 2020 U.S. Department of Housing and Urban Development's Inspector General report explained, "[t]he borrower also has the option at any time to shorten the forbearance

---

[12] Wells Fargo provided three-month forbearances, notwithstanding guidance requiring that the default length of forbearance in the event that a loan servicer and borrower could not agree on a length of forbearance is 180 days. Three consecutive missed payments is enough to render a loan eligible for voluntary repurchase, as alleged below, further evincing the bank's true motive in effectuating this program.

[13] *See* U.S. DEP'T OF VETERANS AFFAIRS, *Information for VA home loan borrowers during COVID-19,* (updated Aug. 5, 2022) https://benefits.va.gov/homeloans/cares-act-frequently-asked-questions.asp #FAQ6 (stating that "[f]orbearance is broken down into two pieces; an *initial* period and an *additional* period.  To receivie the initial period, you may notify your mortgage company that you are experiencing financial hardship due to the COVID-19 pandemic. As mentioned above, the hardship can be direct or indirect.  When you notify the mortgage company, you may request up to 180 days of forbearance.  You don't have to use the entire forbearance period if you can resume payments sooner, but **the deadline to request COVID-19 forbearance is through the end of the nationally declared emergency.** If you need the additional period, you may notify your mortgage company that you are still experiencing hardship due to the COVID-19 pandemic and request up to 180 additional days of forbearance.").

[14] *Temporary Servicing Guidance Related to COVID-19,* FREDDIEMAC, (Apr. 8, 2020) https://guide. freddiemac.com/app/guide/bulletin/2020-10 (last visited Mar. 30, 2022).

16

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

period and resume payments." (emphasis added).[15] Likewise, Fannie Mae Lending Letter 2020-02 requires servicers to inform borrowers that they can shorten a forbearance plan's terms. *Lending Letter 2020-02*, FANNIE MAE (updated Dec. 9, 2020) https://singlefamily.fanniemae.com/media/22261/display.

72.    Thus, not only the initiation, but the maintenance and extension of a CARES Act forbearance were privileges held by the borrowers, not the loan servicers.

### b. Accepting a Forbearance Plan Is an Important Financial Decision Obliging Servicers to Provide Ample and Accurate Information.

73.    Forbearance plans can help people experiencing temporary hardships due to COVID-19. But a survey by LendingTree found that 70% of homeowners who have gone into forbearance did not need the relief.[16]

74.    Because forbearance does not forgive the missed payments and is an important financial decision, mortgage servicers are obligated to provide accurate notices to borrowers who are deciding whether a forbearance is right for them.

75.    Servicers like Wells Fargo are required to make sure that borrowers like Plaintiffs are fully informed about the downsides to a forbearance and provided with an appropriate Evaluation Notice. As stated in the Fannie Mae, July 15 Lending Letter 2020-02:

---

[15] Memorandum from Assistant Inspector Gen. Brian T. Pattison to Joseph M. Gormley, Deputy Assistant Sec'y, *Some Mortgage Servicers' Websites Offer Information about CARES Act Loan Forbearance That Is Incomplete, Inconsistent, Dated, and Unclear*, U.S. DEP'T OF     (Apr. 27, 2020), https://www.hudoig.gov/sites/default/files/2020-04/Single%20Family%20Mortgage%20Forbearance%20Brief.pdf.

[16] Tendayi Kapfidze, *LendingTree Finds the Majority of Homeowners Approved for a Mortgage Forbearance May Not Have Needed One,* LENDING TREE, (May 18, 2020), https://www.lendingtree.com/home/mortgage/majority-of-homeowners-approved-for-mortgage-forbearance-may-not-have-needed-one-study/; *see also* Aly J. Yale, *70% Of Homeowners Seeking Mortgage Relief Don't Actually Need The Help,* FORBES, (May 19, 2020, 4:34 PM EDT), https://www.forbes.com/sites/alyyale/2020/05/19/70-of-homeowners-seeking-mortgage-relief-dont-actually-need-the-help/?sh=b52a98052a54.

17

Servicers must inform the borrower that the payments which are the subject of a forbearance plan have only been delayed or reduced, not forgiven, and that once the forbearance plan is complete, one of the following must occur:

(1) the mortgage loan must be brought current through a reinstatement,

(2) the borrower is approved for another workout option,

(3) the mortgage loan is paid in full, or

(4) the servicer refers the mortgage loan to foreclosure in accordance with applicable law.

The servicer must also inform the borrower that he or she may shorten a forbearance plan term at any time to reduce the amount of payments which are being delayed or reduced. As stated in the Servicing Guide D2-3.2-01, Forbearance Plan, the forbearance plan terms must be provided to the borrower using the appropriate Evaluation Notice, which must be revised in accordance with applicable law. In addition, the servicer must document in the individual mortgage loan file the borrower's request for forbearance and attestation as to a financial hardship caused by the COVID-19 emergency, and the terms of the initial and any extended forbearance, including the duration of the forbearance period.[17]

76. The template Evaluation Notice, provided in the Servicing Guide D2-3.2-01, contains the following warnings to borrowers contemplating forbearance:

> We will not pursue foreclosure during the forbearance plan term. However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and:

> ## Additional Forbearance Plan Information and Legal Notices
>
> **Credit Reporting**:
> - We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
> - **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

---

[17] *Lender Letter (LL-2020-02)*, FANNIE MAE (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

77.     Yet Wells Fargo's forbearances practices failed to ensure that borrowers understood their obligations and options at the end of the forbearance period, for instance misleadingly indicating that deferments would be available when that was not the case. Wells Fargo did not include an evaluation notice, with the applicable warnings. Borrowers were thus deprived of the information required to make an informed decision about whether a forbearance was right for them.

### c.  Deferment Is the Default Workout Option for Federally-Backed Loans.

78.     Leaving aside the issue of whether mortgagors are even aware that they are in a mortgage forbearance program, the provision that has caused the most confusion is that participating mortgagors often do not know if they have to get their mortgage current at the conclusion of the forbearance period or how their lender and/or servicer will treat the deferred payments.

79.     When a mortgage servicer like Wells Fargo places a loan in forbearance, it permits borrowers to suspend or reduce mortgage payments for a limited time. However, those payments are not forgiven. They are just delayed. The borrower must still repay the missed payments in the future. Some borrowers may be eligible for deferment, which adds the missed payments to the end of loan. Others, however, may be required to pay them more rapidly. Moreover, during forbearance, interest continues to accrue even though the principal is not being paid down.

80.     Fannie Mae and Freddie Mac attempted to address the confusion about the post-CARES Act forbearance loss mitigation landscape when they introduced the "COVID-19 Payment Deferral" option with Lender Letter (LL-2020-07) and Bulletin 2020-15.[18]

81.     The COVID-19 Payment Deferral brought Fannie Mae and Freddie Mac in line with the United States Department of Housing and Urban Development's ("HUD") COVID-19 National

---

[18] *Lender Letter (LL-2020-07)*, FANNIE MAE,  https://singlefamily.fanniemae.com/media/22916/display (updated Nov. 18, 2020) and *Freddie Mac COVID-19 Payment Deferral Bulletin 2020-15*, FREDDIE MAC, (Issued May 13, 2020) https://guide.freddiemac.com/app/guide/bulletin/2020-15.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Emergency Standalone Partial Claim option, which provides borrowers with a junior mortgage (zero additional interest, no fees) not payable until the mortgage is paid off, comprised of the total amount of payments missed during a CARES Act forbearance period.[19]

82.     Under a COVID-19 Payment Deferral described in LL-2020-07, all forborne payments (up to 12 months) are to be placed into a non-interest-bearing balance to be paid back at the end of the loan term. Thus, the forborne payments are not a source of increased interest accrual upon exiting forbearance. However, not all borrowers are eligible for a deferral.

83.     Wells Fargo provided misleading communications to borrowers contemplating entering payment suspensions, indicating that they would receive a deferral or deferment even when the borrower was not eligible for a deferral.

**3.     Millions of Homeowners with Federally Backed Loans Are in a Forbearance Program.**

84.     As of June 30, 2020, 4.58 million homeowners were in COVID-19 related forbearance plans, representing 8.6% of all active mortgages.[20]

85.     All told, roughly 6.2 million homeowners entered into COVID-19 forbearances.

86.     Some 6.8% of all GSE-backed loans and 12.3% of all FHA/VA loans were in forbearance plans,[21] and approximately 11% of privately-held mortgages were in some type of forbearance or deferment program.

---

[19] *Mortgagee Letter 2020-06*, U.S. DEP'T OF (Apr. 1, 2020) https://www.hud.gov/sites/dfiles/OCHCO/documents/20-06hsngml.pdf

[20] *See* Diana Olick, *Loans in coronavirus mortgage bailouts see largest weekly decline yet – but there are more red flags*, CNBC (Jul. 3, 2020, 7:43 AM EDT), https://www.cnbc.com/2020/07/03/loans-in-coronavirus-mortgage-bailouts-see-largest-weekly-decline-yet.html.

[21] *See* Black Knight Inc, *Forbearance Volumes Reverse Course For Largest Decline Yet*, (Jul. 3, 2020), https://www.blackknightinc.com/blog-posts/forbearance-volumes-reverse-course-for-largest-decline-yet/.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

87.    Wells Fargo has stated publicly that it has deferred 2.5 million payments for consumer and small business customers since the start of the pandemic.[22]

**B.    Wells Fargo Seized Upon the CARES Act as an Opportunity for Profit.**

88.    Wells Fargo put borrowers into unwanted forbearances. Doing so put the bank "deeply in the money" while harming the borrowers. Tom Goyda, Wells Fargo's representative, admitted that the bank "misinterpreted" customer intent in many instances, placing loans into unwanted or unasked-for forbearances.[23] A more robust explanation for the bank's motives can be discerned from a statement that John Shrewsberry, Wells Fargo's Chief Financial Officer made in the bank's earnings call for the second quarter of 2020. Betsy Graseck, an analyst for Morgan Stanley, asked about American Banker's reporting on Wells Fargo's Ginnie Mae buyouts. Mr. Shrewsberry explained the option to repurchase loans placed into forbearances is "deeply in the money."[24]

89.    This is not the first time that Wells Fargo has violated customers' trust in this manner. Implementing forbearance plans without customer approval is reminiscent of other troubling practices at Wells Fargo in recent years. Most notably, Wells Fargo opened an estimated 3.5 million debit or credit accounts without customer consent, as alleged in a class action complaint in this District and resolved by a $142 million settlement finally approved by the Hon. Vince Chhabria[25] and a $3 Billion settlement with the federal government. [26]

---

[22] *See* Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases,* BANKINGDIVE, (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.

[23] *Id.*

[24] *See https://www.fool.com/earnings/call-transcripts/2020/07/14/wells-fargo-wfc-q2-2020-earnings-call-transcript.aspx.*

[25] *See Jabbari, et al. v. Wells Fargo & Company and Wells Fargo Bank, N.A.* No. 3:15-cv-02159-VC.

[26] *See* Pete Williams, *Wells Fargo to pay $3 billion over fake account scandal,* NBC NEWS, (Feb 21, 2020, 1:06 PM PST), https://www.nbcnews.com/news/all/wells-fargo-pay-3-billion-over-fake-account-scandal-n1140541.

**1. Wells Fargo Unilaterally Placed Homeowners into Forbearance Programs and Extended Homeowners' Forbearance Plans Without Their Consent.**

90. As detailed above, accepting a forbearance is an important financial decision, one that a loan servicer cannot unilaterally make on behalf of a borrower. Before the passage of the CARES Act, for instance, there were substantial restrictions on a loan servicer's ability to grant a Freddie Mac borrower a forbearance, requiring negotiations of the forbearance terms with the borrower.[27] Even if a borrower needs the help or is fully informed of the consequences, lenders may not put a loan in forbearance without a customer requesting it. As the Consumer Financial Protection Bureau explains, "You must contact your loan servicer to request this forbearance." Banks may not institute it automatically. But that's exactly what Wells Fargo did.

91. Since the passage of the CARES Act in late March of 2020, millions of homeowners across the country have attempted to obtain information from their mortgage servicers and lenders as to the specifics of their COVID-19 forbearance program.[28]

92. As numerous media reports have detailed, Wells Fargo unilaterally put borrowers into their mortgage forbearance programs despite having no clear indication of borrowers' consent.[29] Thousands of homeowners were put into mortgage forbearance programs they did not request or had their forbearance period extended for an additional period of time without their consent, causing substantial problems for those homeowners.

---

[27] *Requirements for a forbearance plan*, FREDDIE MAC, (DEC. 01, 2018) https://guide. freddiemac.com/app/guide/section/9203.13

[28] Anna Bahney, *Homeowners are getting mortgage relief they didn't want*, CNN, (May 20, 2020, 4:25 PM ET), https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html.

[29] Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC (May 12, 2020, 11:15 AM EDT), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

93.     As experienced by Plaintiffs, and as attested to in consumer complaints from across the nation, Wells Fargo automatically placed borrowers in forbearance when they contacted the bank by phone or online to merely inquire about their options.

94.     As one consumer told the Consumer Financial Protection Bureau, a Wells Fargo employee admitted "that the system is like a 'hair trigger'" automatically placing loans into forbearance, "even though I did nothing to start a forbearance."[30]

95.     In an interview with Fortune Magazine, the CEO of Wells Fargo, Paul Scharf, explained, regarding the forbearance program, that "every institution makes mistakes."[31] The forbearance program was in fact a series of mistakes: placing borrowers into unrequested forbearance; making it extremely difficult for borrowers to make payments while in a forbearance; providing inaccurate and misleading information to borrowers considering forbearances; improperly and inaccurately reporting to credit reporting agencies that borrowers who never requested a forbearance were in such a plan; and improperly extending forbearances even when a borrower requested to end a forbearance.

96.     These "mistakes" were widespread. The Consumer Financial Protection Bureau's database of consumer complaints lists numerous examples of similar complaints. This is a sample:

---

[30] *Consumer Complaint 3663700,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3663700 (last visited Sept. 27, 2022).

[31] Rey Mashayekhi, *Can anyone fix Wells Fargo?* FORTUNE (Feb. 3, 2021 3:30 AM PST), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

"Due to a job loss, I reached out to Wells Fargo and asked for information on their Covid-19 mortgage relief program. To clarify, I only asked for information on the program. The representative on the phone stated that an information packet would be mailed to me. About a week later, a letter arrived from Wells Fargo stating that they are 'confirming short term payment relief for the account.' This was not what I had requested. In addition, the letter states 'We won't report this account to consumer reporting agencies.' It has now come to light that Wells Fargo has put a forbearance on the mortgage, preventing any ability to refinance." *Consumer Complaint 3658898*, Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3658898 (last visited Sept. 27, 2022).

"Wells Fargo put my account in forbearance when I didn't request it. After talking to multiple individuals on the phone I was told that if you click the 'more info' button on the site that you will be automatically enrolled without asking." *Consumer Complaint 3751149,* Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3751149 (last visited Sept. 27, 2022).

"Wells Fargo will NOT allow us to end our forbearance. We have spent over 7 hours trying to reach them to resolve this." *Consumer Complaint 3749254,* Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3749254 (last visited Sept. 27, 2022)

"[W]e started getting email about COVID-19 relief from Wells Fargo, regarding mortgage assistance. I sent them an email for more information. . . I tried to pay my house note on the WF app, as I have always done. The app advised me that I did not have an active account, that's when we called to make the payment. We were told that our loan was in forbearance and we could make a payment, but it would not post to the loan until after the forbearance period was over." *Consumer Complaint 37339887,* Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3739887 (last visited Sept. 27, 2022).

"I contacted my mortgage company WELLS FARGO to inquire about what types of services were available IF my renter's were unable to make their payment due to covid. It was for an inquiry purpose and I was told that I would receive a letter regarding any programs available. . . . I did in fact receive a letter and in that letter it stated my mortgage was placed in forbearance! I did not request any forbearance. Recently I was notified by a lender that it showed on my credit report and have been trying to have it removed since then." *Consumer Complaint 3661764,* Consumer Fin. Prot. Bureau, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3661764 (last visited Sept. 27, 2022).

"Wells Fargo put me into CARES act forbearance without my consent. I was unable to make a payment online like I usually do. I called and was on hold for an hour but finally was able to talk to a rep, …. I told them they put me into forbearance without my consent. He apologized and said that the system is like a 'hair trigger' even though I did nothing to start a forbearance, I've never missed a payment, have no reason to apply for forbearance and am able to make payments." *Consumer Complaint 3663700,* CONSUMER FIN. PROT. BUREAU, https://www.consumer finance.gov/data-research/consumer-complaints/search/detail/3663700 (last visited Sept. 27, 2022).

"Wells Fargo has placed or enrolled me in forbearance without my permission. This has negatively impacted me as [redacted] has placed my home equity mortgage application in denial status because of this." *Consumer Complaint 3669074,* CONSUMER FIN. PROT. BUREAU, https:// www.consumerfinance.gov/data-research/consumer-complaints/search/ detail/3669074 (last visited Sept. 27, 2022).

"I did not sign anything to agree to forbearance and subsequent calls to them I stressed that I'm paying my mortgage and don't want a forbearance. Instead they listed it on my credit without authorization. When I called them they said it was an error n they are working on it. They ruined my wife and my credit." *Consumer Complaint 3662758,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/data-research/consumer-compl aints/search/detail/3662758 (last visited Sept. 27, 2022).

"I called Wells Fargo, and asked what relief they could provide due to Covid-19. . . . I am very familiar with how a forbearance versus a deferment works. I was adamant if all they could offer me was a forbearance that I was not interested and I was assured by the Wells Fargo rep that they would just put the 3 payments at the back end of the loan and it was not a forbearance so I agreed. Yesterday . . . I received a notice from Wells Fargo asking If I need to extend my forbearance or discuss repayment options for the missed payments. I am livid!" *Consumer Complaint 3707815,* CONSUMER FIN. PROT. BUREAU, https://www.consumer finance.gov/data-research/consumer-complaints/search/detail/3707815 (last visited Sept. 27, 2022).

97.     A media report details Wells Fargo's monitoring of the Chapter 13 bankruptcy dockets of its debtor clients and unilateral placement of them into its mortgage forbearance program.[32]

---

[32] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him.*, NBC NEWS, (Jul. 16, 2020, 2:00 AM PDT), https://www.nbcnews.com /business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

98. That article, entitled *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, details the plight of numerous borrowers in Chapter 13 bankruptcy who had been unwittingly enrolled in Wells Fargo's mortgage forbearance program:

> None of the borrowers in the lawsuit who were contacted by NBC News told the bank that they'd been affected by COVID-19, and **none had requested the bank's assistance because of it. Nor had they requested loan modifications when Wells Fargo claimed they wanted forbearance.** In addition, none of the borrowers or their attorneys say they were contacted by Wells Fargo.

> Asked about the discrepancies, Wells Fargo said that because it had seen references to COVID-19 in the borrowers' court filings, it provided forbearance.[33]

99. When reached for comment, Wells Fargo did not deny the practice of unilaterally enrolling unwitting persons to its mortgage forbearance program:

> In the early days of the pandemic, we provided immediate payment relief to customers in bankruptcy if a review of their court filings indicated they were impacted by COVID-19 or if they had a loan modification review in process.[34]

100. Wells Fargo's blunder is not an inconsequential administrative glitch. Rather, forbearances can have grave impacts on a borrower's credit history or access to credit.

101. As Sen. Elizabeth Warren (D-Mass.) and Sen. Brian Schatz (D-Hawaii) wrote in a July 29, 2020 letter to Wells Fargo CEO Charles Scharf, the bank was "putting consumers at risk of greater financial hardship amidst one of the worst economic downturns in our country's history." Letter from Sens. Elizabeth Warren and Brian Schatz, United States Senate, to Charles W. Scharf, Chief Executive Officer and President, July 29, 2020, https://www.warren.senate.gov/imo/media/doc/2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.pdf.

---

[33] *Id.*
[34] *Id.*

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

102.    In its first response to the Senators' letter, sent on August 12, 2020, Wells Fargo admitted putting borrowers into forbearance when they had only "made an inquiry or expressed hardship but had not explicitly requested a forbearance."[35] Wells Fargo identified that over 821,000 forbearances had been granted since March 9, 2020. In addition, Wells Fargo identified five scenarios in which it admitted its practice was to place borrowers into unrequested forbearances. *Id.*

103.    First, Wells Fargo placed borrowers into forbearance for borrowers in active bankruptcy proceedings, without any borrower request. Second, Wells Fargo placed borrowers into forbearance when a customer contacted the bank via e-mail or telephone regarding a COVID-19 hardship, regardless of whether the borrower requested forbearance. Third, the bank automatically placed borrowers into forbearance when the borrower was in the process of seeking a loan modification. Fourth, the bank automatically placed borrowers into forbearance if the borrower had been denied a forbearance before the COVID-19 epidemic. Fifth, Wells Fargo placed mortgage and home equity accounts into forbearance when the borrower had another mortgage-linked account placed into forbearance.

104.    In a second letter sent on September 4, 2020, Wells Fargo provided updates on the bank's attempt to contact borrowers. *Id.* Wells Fargo identified 904 accounts held by customers in active bankruptcy for whom forbearance was granted without a borrower request. *Id.* The bank attempted to contact each borrower, to confirm whether they wanted the forbearance assistance, and were able to contact 699 of the borrowers. *Id.* Of those 699 borrowers, 355 confirmed that they wanted forbearances, and 344 confirmed that they did not – almost exactly 50%. *Id.*

---

[35] https://www.warren.senate.gov/imo/media/doc/WF_2020.pdf.

### 2. Wells Fargo's Misleading and Inaccurate Representations Led to Hundreds of Thousands of Borrowers Being Placed in Forbearances they Did Not Knowingly Request

105.    Borrowers in the so-called "business decision groups" were not the only ones placed into forbearances that they did not knowingly request. As detailed above, accepting a forbearance is an important financial decision. Federal loan servicers are thus generally required, under RESPA, to provide adequate disclosures for borrowers contemplating a forbearance. *See* 12 C.F.R. § 1024.38(b). However, as Plaintiffs' experiences demonstrate, borrowers were placed into unwanted forbearances in response to misleading prompts after Wells Fargo representatives and automated messages steered the borrowers into payment deferrals, or when they were requesting for more information about their options for mortgage assistance.

106.    Wells Fargo has acknowledged that merely inquiring about forbearance options should not result in a borrower's unwitting entry into the program. Specifically, Tom Goyda, a Wells Fargo consumer lending spokesperson admitted that "[j]ust asking about a forbearance should not result in a forbearance being applied."[36] Paul Scharf, the CEO of Wells Fargo recently stated, regarding the involuntary forbearance program, that "every institution makes mistakes."[37] This "mistake" came at the expense of the borrowers that Congress intended to protect through the passage of the CARES Act, and generated potentially billions of dollars of profits for Wells Fargo.

107.    Some borrowers were placed into forbearances based upon phone calls with Wells Fargo representatives. Others were placed into forbearances after utilizing automated systems established by Wells Fargo. For many borrowers, these forbearances were not the result of a valid request.

---

[36] *See* Anna Bahney, *Homeowners are getting mortgage relief they didn't want,* CNN, https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html (Updated May 20, 2020, 4:25 PM ET).

[37] Rey Mashayekhi, *Can anyone fix Wells Fargo?*, Fortune, (Feb. 3, 2021, 3:30 AM PST), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

### a. Misleading Phone Calls

108.    After the CARES Act was passed, the CFPB advised borrowers to contact their mortgage servicer to learn about potential relief, noting that the "decision to request a forbearance should be considered carefully."[38]

109.    Hundreds of thousands of borrowers with mortgage loans serviced by Wells Fargo called the bank to inquire about available relief.

110.    However, many borrowers who merely called to learn more information were placed into forbearances they never asked for. In some instances, as with the Robinsons, the borrower merely requested more information. The customer service representative offered to send a letter with additional information – without disclosing the fact that merely sending the letter would automatically place the borrower into a forbearance.

111.    In addition, while discussing forbearances, Wells Fargo's customer service representatives did not consistently advise the borrower of the potential negative consequences of being placed into a forbearance.

112.    For a period of time, the applicable script did not contain any disclosures of the negative consequences of a forbearance. While some disclosures were added, others – including disclosures of known damages to credit scores – were never included. Nor were disclosures ever provided regarding the known impact of being placed into a forbearance on a borrowers' eligibility to remove PMI.

113.    What's more, Wells Fargo's customer services representatives did not consistently provide borrowers with disclosures about the limitations on refinancing or securing new credit that

---

[38] *Consumer Relief Guide – Your Rights to Mortgage Payment Forbearabce and Forclosure Protection Under the Federal CARES Act*, CONSUMER FIN. PROT. BUREAU, https://files.consumer finance.gov/f/documents/cfpb_csbs_consumers-forbearance-guide_2020-05.pdf (last visited Sept. 27, 2022).

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

1    would result from being placed into a forbearance. Nor did they consistently provide borrowers with

2    information about the negative consequences on borrowers' ability to access existing lines of credit.

3        114.    Most egregiously, in the vast majority of instances the borrowers' intent to be placed into

4    a forbearance was not confirmed and documented.

5        115.    Thus, placing borrowers into a forbearance based on a phone conservation in which the

6    borrower was misled regarding the negative consequences of being placed into a forbearance and

7    without documented confirmation of the borrowers' intent to accept a forbearance is another instance of

8    Wells Fargo placing borrowers into forbearances without a valid request.

9                    **b. Misleading Interactive Voice Response System**

10       116.    Wells Fargo implemented an interactive voice response (IVR) system in April of 2020,

11   to address borrowers' questions concerning relief available to them in the early days of the pandemic.

12       117.    The IVR system used a series of recorded messages to justify placing borrowers into

13   forbearances. Rather than reach quality first person contact and confirming the borrowers' intent, Wells

14   Fargo automatically placed borrowers into forbearances based upon their responses to the recorded

15   messages.

16       118.    However, these messages did not adequately apprise borrowers that the relief they were

17   requesting was a forbearance, or of the negative consequences of being placed into a forbearance.

18       119.    For a period of time, the IVR system only used the terms "payment assistance" or

19   "suspension of payments," and not the term "forbearance."

20       120.    Even after the IVR system included the term "forbearance," it misleadingly omitted

21   critical information about what a forbearance was and its impact on a borrower.

22       121.    When it was initially deployed, Wells Fargo's IVR system did not apprise borrowers that

23   the forbearance would be reported to the credit reporting agencies, or the consequences of that reporting.

24

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

122.    Wells Fargo was aware that being placed into a forbearance could impact a borrowers' credit score, it did not provide any warnings to that effect.

123.    The bank knew that a borrowers' VantageScore credit score could experience a substantial decline as a result of being placed into a forbearance. However, despite knowing this fact, Wells Fargo did not disclose this to borrowers utilizing the IVR system.

124.    Likewise, despite knowing that being placed into a forbearance could impact a borrowers' ability to refinance, the IVR system initially contained no information about the impact of accepting a "payment suspension" on a borrowers' ability to refinance.

125.    When information related to refinancing was added to the IVR system, it remained misleading, in that it only referred to restrictions on refinancing with Wells Fargo, and not other lenders. Even the information communicated regarding Wells Fargo's own policies for refinancing after a forbearance was misleading and inaccurate.

126.    Similarly, the IVR system initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to secure additional lines of consumer credit, and when those advisements were added they were incomplete and misleading.

127.    The IVR system initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to access existing credit, such as a Wells Fargo Home Equity Line of Credit.

128.    The IVR system likewise misleadingly communicated that borrowers would have the option to add unpaid amounts to the end of the loan, or to extend the term of the loan, even though those options would not be available for all borrowers.

### c.  Misleading Online Tool

129.    In April of 2020, Wells Fargo implemented a tool for borrowers to request information about payment assistance online. When a borrower viewed their mortgage account on Wells Fargo's

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

website, a new banner was added that asked if borrowers needed payment assistance due to COVID-19, inviting them to request a payment suspension by clicking on a button.

130.    The word "forbearance" was not used on the banner routing borrowers to the online tool, nor were any disclosures provided about the potential negative consequences associated with having a loan in a forbearance.

131.    Nor, when originally implemented, did the online tool itself use the word "forbearance" or provide any disclosures to borrowers about the negative consequences associated with having a loan in a forbearance.

132.    For a period of time, the online tool only used the terms "payment assistance," "payment suspension," or "suspension of payments." Even after the online tool included the term "forbearance," it misleadingly omitted critical information about what a forbearance was and its impact on a borrower.

133.    When it was initially deployed, Wells Fargo's online tool did not apprise borrowers that the forbearance would be reported to the credit reporting agencies, or the consequences of that reporting.

134.    Wells Fargo was aware that being placed into a forbearance could impact a borrowers' credit score, but it did not provide any warnings to that effect. The bank knew that a borrowers' VantageScore credit score could experience a substantial decline as a result of being placed into a forbearance. However, despite knowing this fact, Wells Fargo did not disclose this to borrowers utilizing the online tool.

135.    Likewise, despite knowing that being placed into a forbearance could impact a borrowers' ability to refinance, the online tool initially contained no information about the impact of "payment suspension" on a borrowers' ability to refinance.

136.    When information related to refinancing was added to the online tool, it remained misleading, in that it only referred to restrictions on refinancing with Wells Fargo and not other lenders.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Even the information communicated regarding Wells Fargo's own policies for refinancing after a forbearance was misleading and inaccurate.

137.    Similarly, the online tool initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to secure additional lines of consumer credit, and when those advisements were added they were incomplete and misleading.

138.    Likewise, the online tool initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to access existing credit, such as a Wells Fargo Home Equity Line of Credit.

139.    As well, the online tool misleadingly communicated that borrowers would have the option to add unpaid amounts to the end of the loan, or to extend the term of the loan, even though those options would not be available for all borrowers.

140.    Thus, neither utilization of the online tool nor the IVR system were valid requests for forbearances. Wells Fargo's placement of borrowers into forbearances based on these faulty systems was another instance of borrowers being placed into forbearances without a valid request.

141.    While Wells Fargo's spokespeople have declined to say, in response to Senators Warren and Schatz' inquiry, whether the bank has benefited financially from placing borrowers into unrequested forbearances, upon information and belief, Wells Fargo stands to gain a tremendous windfall based on these practices.[39]

### 3.    The Faulty Forbearance Program Led to Billions of Dollars in Profits for Wells Fargo.

142.    Placing borrowers into forbearances was not without consequences for the borrowers. It frustrated borrowers' ability to refinance their mortgages during a time of historically low interest rates.

---

[39] Joe Light, *Banks Uncover Loophole to Buy Loans at below-market Prices*, BLOOMBERG (August 20, 2020, 3:00 AM PDT) https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

It rendered borrowers ineligible for removal of PMI. It reduced borrowers' access to existing lines of credit, and their ability to secure new lines of consumer credit. And it led to billions of dollars in profits for Wells Fargo.

> **a. While Wells Fargo's Misconduct Rendered Billions of Dollars in Loans Eligible for Highly Lucrative Voluntary Repurchase.**

143.    Wells Fargo performs multiple roles in America's housing finance system. This case is primarily concerned with Wells Fargo's role as a mortgage servicer, in which it receives a fee for acting as an intermediary between the loan holder and the borrower, performing the day-to-day administrative tasks associated with the lending side of a mortgage loan. The majority of first lien mortgages in America are federally backed, meaning that the loan has been securitized by Fannie Mae, Freddie Mac, or Ginnie Mae, government sponsored mortgage companies ("GSMC's"). Wells Fargo acts as loan servicer for billions of dollars' worth of such loans.

144.    Both Fannie Mae and Freddie Mac are government-sponsored private corporations with congressional charters. They provide liquidity to the housing finance market by purchasing mortgages from lenders and guaranteeing the default risk linked to their issuances of mortgage-backed securities tied to those loans. Likewise, Ginnie Mae is a federal government agency that guarantees MBSs which are issued by program participants (like Wells Fargo) for loans linked to mortgages whose default risks are guaranteed by the FHA, VA, and USDA. Ginnie Mae guarantees MBS investors timely principal and interest payments for those investments.

145.    Wells Fargo acts as loan servicer for loans that have been securitized by all three entities, and in exchange, is paid servicing fees. In this role, Wells Fargo forwards principal and/or interest payments to the GSMC's, or the investors, depending upon the remittance types of the underlying servicing contracts.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

146.    For the vast majority of Wells Fargo's GSMC servicing contracts, the obligation to advance monthly principal and/or interest payments for pooled loans exists even if the borrower does not pay the bank.

147.    For Fannie Mae loans, a loan servicer has the option to voluntarily repurchase a mortgage loan from the MBS pool when the loan has four consecutive payments past due, cutting off the advancement risk.[40]

148.    Likewise, for Freddie Mac Loans, a servicer may request to voluntarily repurchase the GSE's interest in a mortgage, a request that is generally granted for mortgages that are 90 or more days delinquent. *Servicing Guide, 3602.4 Repurchases requested by the Seller/Servicer*, FREDDIE MAC (Aug. 17, 2016), https://guide.freddiemac.com/app/guide/section/3602.4.

149.    For Ginnie Mae loans, the loan servicer has the option to repurchase delinquent loans issued on or after January 1, 2003, so long as the borrower fails to make payment for three consecutive months.

150.    After repurchasing, the servicer's obligation to advance principal and interest payments ends. In addition, the loan servicer has more flexibility to negotiate workout options with the borrowers to preserve the mortgage, or, if loss mitigation fails, foreclose.

151.    Placing loans into forbearances led to the loans being eligible for exercising this option -called early pool buyout, or EPBO, because it led to missed payments.

---

[40] *Guide A1-3-01, Requirements for Voluntary Repurchase*, FANNIE MAE  (Oct. 13, 2021), https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-A-Doing-Business-with-Fannie-Mae/Subpart-A1-Contractual-Obligations/Chapter-A1-3-Repurchases-Indemnifications-and-Make-Whole/A1-3-01-Requirements-for-Voluntary-Repurchase/1581707431/A1-3-01-Requirements-for-Voluntary-Repurchase-10-13-2021.htm

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

152.    Being placed into a forbearance made a loan more likely to become delinquent for many reasons. First, it removes the obligation to pay, making it more likely that a borrower would miss payments they otherwise would have made.

153.    Second, it obstructed borrowers from making payments using their preferred and common method of payment. Borrowers that had established automatic payments, or ACH, had those automatic payments automatically terminated after being placed into forbearances. Coupled with misleading communications sent to borrowers indicating that if a forbearance was not right for them they could continue making payments as normal, many borrowers placed into unrequested forbearances were not aware that they had missed payments.

154.    In addition, for a period of time, borrowers in forbearances were unable to make payments online or through Wells Fargo's mobile payment app. At the same time, there were widespread branch closures and limited local branch hours, due to the COVID-19 epidemic. And borrowers who attempted to make payments through the telephone experienced extraordinarily long wait times. Thus, placing a borrower into a forbearance often led to the loan becoming delinquent.

155.    Many of these loans were, before Wells Fargo's misconduct, performing. They generally represent a low risk of falling into foreclosure, as Wells Fargo itself recognized in an earnings call. Michael Santomassimo, Wells Fargo's Senior Executive Vice President and Chief Financial Officer stated that for loans that had already exited their COVID-19 forbearance plans, "90% of the balance is current as of the end of the year."[41]

---

[41] https://www.fool.com/earnings/call-transcripts/2021/01/15/wells-fargo-wfc-q4-2020-earnings-call-transcript/

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

156.    Once a voluntarily repurchased loan becomes reperforming, it can either be sold in the non-agency secondary mortgage market, held by the bank/servicer (who profits based on the spread between the servicing costs and the loan's interest), or resold into the GSMC pools. If resold in the GSMC pools, the resale price is generally substantially higher than par. For instance, the average trading price for a Ginnie Mae MBS with a 3.5% coupon was well above the coupon rate from January of 2020 to January of 2022, with an average trade value from January of 2021 to January of 2022 of 107. Thus, if a 3.5% loan is purchased at par and resold after it becomes reperforming, the loan servicer stands to make a 7% return.



157.    On the other side of the voluntary purchase transaction are the MBS investors. When they purchase an MBS at 105 basis points, and part of that pool is bought out at par, the yield of the MBS decreases. In its disclosures to potential investors, the GSMC's disclose voluntary repurchase as a potential risk to investors. However, in typical years, prepayment rates are stable and tied to the normally occurring delinquencies in the housing market. For instance, on information and belief, in 2017, Wells Fargo voluntary purchased roughly $8.6 billion in loans out of GNMA pools. In 2018, that figure was $7.8 billion, and in 2019 it was $6.2 billion. That changed in 2020. Wells Fargo purchased $30.3 billion in loans out of GNMA pools in 2020, an unprecedented amount. In 2021, the repurchase rates returned to normal, $4.6 billion.

158.    Wells Fargo's conduct did not go unnoticed. Industry reports began to circulate in July of 2020, as Wells Fargo's unprecedented buyout rate of 99% of eligible loans serviced by the bank was having a dramatic and outsized impact on the overall buyout rate (CBR) for Ginnie Mae backed securities.

159.    Riskspan, a consulting firm in the residential mortgage, MBS trading, and structured finance space, published the following chart, detailing the buyout rate increase in July of 2020 and reporting that "this increase was driven almost entirely by Wells [Fargo], which accounted for 25% of the servicing in some pools." [42]



160.    American Banker began reporting on Wells Fargo's conduct, with articles titled "Banks uncover loophole to buy home loans at below market prices," reporting that in July and August of 2020 alone, Wells Fargo bought $19 billion of loans out the Ginnie Mae reserves for $1.5 billion less than the loans' market price.[43] As former Ginnie Mae president Ted Tozer told Bloomberg News, Wells Fargo

_____

[42] Don Brown, *Edge: Bank Buyouts in Ginnie Mae Pools*, RISKSPAN, (July 20, 2020), https://riskspan.com/bank-buyouts-in-ginnie-mae-pools/.

[43] *Banks uncover loophole to buy home loans at below-market prices,* AMERICAN BANKER (Aug. 20, 2020 8:53 AM EDT), https://www.americanbanker.com/articles/banks-uncover-loophole-to-buy-home-loans-at-below-market-prices.

and other banks exercising this voluntary repurchase option for loans placed into CARES Act forbearances are "setting themselves up for a huge windfall. It's almost pure profit."[44] While many banks exercised this option, Wells Fargo's repurchasing far exceeded its peers.

161.   The FHFA, which regulates the GSE's, anticipated the potential that COVID forbearances could be abused by loan servicers, and issued guidance on March 21, 2020, informing servicers that loans forborne due to COVID-19 would not generally be available for voluntary repurchase, under a national disaster's exception.[45] In that same guidance, FHFA created a new limit on the servicer advance obligations, capping the advance obligations at four months. As discussed below, this created an additional incentive for Wells Fargo to place GSE loans into forbearance, but as a result of this policy, Fannie Mae and Freddie Mac loans did not experience as high of a spike in artificially inflated voluntary repurchases.

162.   Ginnie Mae, however, took a different approach. On June 29, 2020, Ginnie Mae issued APM-20-07, a memorandum incorporating new terms into its policies for resecuritizing reperforming loans, [46] due to the recognition that mass early buyouts "could undermine the integrity of the MBS program." [47] Prior to APM-20-07, a loan that had been voluntarily repurchased out of a Ginnie Mae pool and brought back to performing status could be resold into the same pool type it was purchased out of.

---

[44] Joe Light, *Banks uncover loophole to buy home loans at below-market prices*, BLOOMBERG (Aug. 20, 2020, 3:00 PDT), https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

[45] *FHFA Addresses Servicer Liquidity Concerns, Announces Four Month Advance Obligation Limit for Loans in Forbearance*, FED. HOUS. FIN. AGENCY, (Apr. 21, 2020), https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Addresses-Servicer-Liquidity-Concerns-Announces-Four-Month-Advance-Obligation-Limit-for-Loans-in-Forbearance.aspx.

[46] *All Participant Memorandum APM 20-18: Extension to the Deadline for Submission of Resolution of Board of Directors and Certificate of Authorized Signatures (HUD-11702) Certification and Renewal of Other Master Agreements*, GINNIEMAE, (Dec. 16, 2020, 8:30 AM), https://www.ginniemae.gov/issuers/program_guidelines/Pages/mbsguideapmslibdisppage.aspx?ParamID=109.

[47] Seth B. Appleton, *Housing Analysis & Policy Spotlight*, GINNIE MAE (June 29, 2020), https://www.ginniemae.gov/newsroom/HAPS/Pages/Post.aspx?PostID=39.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

Under the new guidance, reperforming loans will be eligible instead to be sold into new pool types created just for resecuritizing such loans. In addition, the loan must have been current for each of the six months immediately preceding resecuritization, essentially requiring servicers to hold repurchased loans for a longer period of time before profiting.

163.     Wells Fargo's plan was to do exactly that – hold the reperforming loans until they could be sold or resecuritized. In its 2020 Q4 earnings call, Mike Santomassimo stated that the bank's mortgage balances would see "headwinds" in 2021, in part due to the "expected sale or resecuritization of loans previously purchased out of agency mortgage securitizations."[48]

164.     Mr. Santomassimo was correct – the bank profited tremendously. Based on Wells Fargo's 2021 reporting, the bank profited by at least $789 million on the resecuritization of roughly $13 billion of the $30 billion in 2020 GNMA repurchases. If the remaining $17 billion in GNMA loans repurchased are resecuritized at the same profit rate, that would lead to $1.8 billion in profits from resecuritization alone.

165.     Although the underlying regulations may be complicated, the scheme itself is simple and conducted in the open: Place otherwise solvent borrowers into unrequested forbearances, purchase their loans out of security pools at par (less than market value), hold the loans and profit once the loans exit forbearance (due to the delta between the interest payments on the loan and the cost of servicing), and once eligible for resecuritization, repool the loans for even greater profits.[49]

---

[48] https://www.fool.com/earnings/call-transcripts/2021/01/15/wells-fargo-wfc-q4-2020-earnings-call-transcript/

[49] Wells Fargo is not the first bank to use GNMA's repurchasing in order to unjustly profit. In 2016, the SEC filed a civil enforcement action under the Securities Act and Exchange Act against First Mortgage Corporation, a privately-held GNMA mortgage issuer which delayed crediting borrower payments in order to render the mortgages eligible for voluntary repurchase. Complaint, *S.E.C. v. First Mortgage Corp., Inc. et al*, 2:16-cv-03772 (C.D. Cal., f May 31, 2016) ECF No. 1. The SEC alleged that FMC profited by $7.5 million on a mere 532 transactions, at a profit rate of 7.5%, and ultimately the United States District Court for the Central District of California entered a consent

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

166.   To effectuate this scheme, WFC's loan servicing subsidiary, Wells Fargo Bank, artificially placed the loans into forbearance even when the borrower did not request such relief. But Wells Fargo Bank did not act alone in performing its part in this scheme – it had the assistance of Black Knight, Inc., a long-time vendor.

167.   Black Knight Inc., a publicly-traded company, provides a platform for mortgage loan servicing and borrower communication application, referred to as MSP and LoanSphere. Wells Fargo's use of these platforms represents a substantial portion of Black Knight's business – in 2016, Black Knight reported to the SEC in relation to a merger that Wells Fargo was its "largest client," and "accounted for approximately 12% of our consolidated revenues" and 15% of the revenues from Black Knight's Technology and Data segment.[50]

168.   Black Knight capitalized on the COVID-19 crisis by marketing its MSP platform, distributing a white paper advertising its products as assisting mortgage servicers in establishing forbearance, allowing mortgage servicers to automate the management of forbearance programs.[51] Black Knight gained increased revenue through this churn, assisting Wells Fargo with identifying loans to be placed into forbearance through its automated mortgage servicing program.

169.   This enterprise formed of WFC, Wells Fargo Bank, and Black Knight, perpetuated this fraud through the use of wires and mails, and committed thousands of predicate violations by reporting the mortgages to be in faulty forbearances that the enterprise had imposed without the borrowers' knowledge or consent. Additional predicate violations include false reporting of the loans' status to

---

judgment against FMC for $11,784,474.82. *Id.* at ECF No. 8, Final Judgement as to Defendant First Mortgage Corp., Inc.

[50] Black Knight Financial Services Letter to Shareholders, U.S. Sec. and Exch. Comm'n (Aug, 25, 2017), https://www.sec.gov/Archives/edgar/data/1704177/000104746917005400/a2233097z424b3.htm.

[51] Michelle Kersch and Mitch Cohen, *Black Knight Issues White Paper on Managing COVID-19 Challenges for Clients Using MSP Servicing System*, (Apr. 13, 2020), https://www.blackknightinc.com/black-knight-issues-white-paper-on-managing-covid-19-challenges-for-clients-using-msp-servicing-system/.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

credit reporting agencies, using Black Knight's platform as modified specifically for COVID forbearance reporting, communications to borrowers related to the servicing of those loans, and communications with GNMA regarding the repurchase and resecuritization of loans that were only rendered delinquent by being placed into unrequested forbearances. Thus, the participants are liable under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as detailed *infra*.

### b. Wells Fargo's Misconduct Capped Its Principal and Interest Advancement Obligations for Loans that Remain in GSE Pools.

170.    Even for loans that are not voluntarily repurchased for profit, Wells Fargo is incentivized to place GSE loans into forbearance in order to minimize its exposure to servicing requirements obligating Wells Fargo to advance borrowers' delinquent principal and interest payments to the investors in GSE-sponsored trusts when the loan is not paying.

171.    Ordinarily, as described above, Wells Fargo's advancement obligations continued for Fannie Mae loans regardless of whether Wells Fargo collected payment from the borrowers, unless and until Wells Fargo either foreclosed on the property or determined that the property's foreclosure value was insufficient to reimburse Wells Fargo for any further advances of monthly principal and interest after satisfying the remaining principal balance of the delinquent loan.

172.    However, exclusively for loans in CARES Act forbearances, Fannie Mae and Freddie Mac have modified those advancement requirements.[52] Servicers of GSE loans, including Wells Fargo, are obliged to only make four monthly advances of principal and interest payments for delinquent loans that have been in a CARES Act forbearance.

---

[52] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News, (July 16, 2020, 2:00 AM PDT), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

173.    Thus, the servicing rights associated with loans that have ever been in a CARES Act forbearance are increased in value, as they present a lower risk of loss due to the obligation to make advances while nonperforming for the life of the loan.

### c. Wells Fargo's Misconduct Prevents Runoff for its Mortgage Servicing Rights by Reducing Refinancing Opportunities for Borrowers.

174.    For much of the last two years, interest rates were at all-time lows, and many homeowners – such as the Castros, Ms. Delpapa, Mr. Doctor, and Mr. Jacob – sought to take advantage of these historically low rates by refinancing. If an account is placed into a forbearance program, those borrowers cannot typically refinance for many months, even after bringing the account current. As detailed more fully below, by retaining borrowers who might otherwise refinance their mortgages with other institutions, Wells Fargo protected their mortgaging servicing rights – accounts associated with the fees Wells Fargo earns for servicing mortgages.

175.    Wells Fargo generates millions of dollars in revenue servicing mortgages. Mortgage servicing rights ("MSR") are the capitalized value of the right to receive future cash flows from the servicing of mortgage loans. In Wells Fargo's 2021 Annual Report, the bank reported MSR accounts with a fair value of over $6,000,000, recognizing that "MSRs may increase upon repurchase [of loans from GNMA loan securitization pools]."[53]

176.    When borrowers refinance a mortgage with a different servicer, the associated mortgage servicing rights are terminated. Thus, when capitalizing the present value of MSRs, loan servicers adjust for the risk that borrowers will prepay or refinance. This risk of run-off decreases the present value of MSRs. In 2021, despite historically low interest rates and a red-hot real estate market, Wells Fargo's estimate of prepayment rates (one measure of "runoff") for their MSR portfolio *declined* by 11% compared to the prior year.

---

[53] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2021-annual-report.pdf

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

177.    As the Castros, Ms. Delpapa, and Mr. Jacob experienced, being placed in forbearance is a barrier to refinancing. Before May 19, 2020, a borrower was generally required to wait a year until they could refinance. As told by a Wells Fargo mortgage servicer client, it was virtually impossible to obtain any form of credit for up to a year after a forbearance program concluded:

> The note on his credit report saying the loan is in forbearance makes it impossible for him to refinance. Fannie Mae and Freddie Mac, which, along with the Federal Housing Administration and the Department of Veterans Affairs, fund or insure the vast majority of mortgages from lenders, do not allow borrowers with a loan in forbearance to either refinance or obtain a new loan until one year after the loan payments are up to date again.[54]

178.    Even after the FHFA updated guidance relating to borrowers in forbearance,[55] a borrower with a Fannie Mae or Freddie Mac loan will typically have to wait three months after exiting forbearance in order to be able to refinance. Thus, by placing borrowers into unsolicited forbearance, Wells Fargo increased the value of the associated MSR accounts by reducing the risk of runoff through refinancing.

### d. Wells Fargo's Misconduct Entitles the Bank to Workout Incentive Payments.

179.    By placing borrowers into unrequested forbearances, Wells Fargo was manufacturing delinquencies which it could receive incentive payments for curing. Upon information and belief, for each loan placed into forbearance that Wells Fargo subsequently modifies in accordance with Fannie

---

[54] *See* Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC, (May 12, 2020, 11:15 AM EDT), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html (stating that "It also puts barriers in front of homeowners who could really benefit now from refinancing and saving on their monthly payments. Servicers are swamped with those requests as well. Applications to refinance a home loan are currently up more than 200% from a year ago").

[55] *Lender Letter (LL-2021-03)*, *Impact of COVID-19 on Originations,* FANNIE MAE, (Feb. 2, 2022), https://selling-guide.fanniemae.com/Content-Management-Labels/KB-Management/Guide-FM-com/2169430921/Lender-Letter-LL-2021-03-Impact-of-COVID-19-on-Originations-01-14-2021.htm.

Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of up to $1,000.[56]

180.    If the borrower enters into a repayment plan, under which the forborne payments are brought current over a period of up to 12 months, the loan servicer is eligible for a $500 incentive payment. Likewise, if the forborne payments are deferred to the back of the loan, the servicer is eligible for a $500 incentive payment. If the loan is modified, to permanently change the payment terms, the servicer is eligible for a $1,000 incentive payment. The below chart, from Freddie Mac Bulletin 2020-21,[57] details those incentives.

| Incentive Type | Incentive Amount |
| --- | --- |
| Repayment Plan | $500<br><br>Effective for all repayment plans with a first payment due date under the repayment plan on or after July 1, 2020 |
| Payment Deferral/COVID-19 Payment Deferral | $500<br><br>Effective immediately for all Payment Deferrals/COVID-19 Payment Deferrals (NOTE: Payment Deferral evaluations do not begin until on or after July 1, 2020) |
| Flex Modification® | $1,000<br><br>Effective for all Flex Modifications completed with a Trial Period Plan effective date on or after July 1, 2020 |

**e.    Wells Fargo's Misconduct Allowed the Bank to Profit from Spread from Servicing Repurchased Loans.**

181.    In Wells Fargo's 2021 Annual Report the bank reported that it had interest income associated with loans repurchased from Government National Mortgage Association (GNMA) loan securitization pools of $1.1 billion. In its earning call associated with the Q4 2021 report, Wells Fargo stated that it earned $318 million of interest income associated with EPBO loans in the fourth quarter alone. Meanwhile, Wells Fargo reported the annual cost to service at a mere $91 per loan. Thus, Wells Fargo has earned hundreds of millions of dollars servicing loans that it repurchased, with staggering

---

[56] *See Lender Letter (LL-*2020-09), Fannie Mae, https://singlefamily.fanniemae.com/media/23091/display, (updated July 15, 2020).

[57] *Temporary Servicing Guidance Related to COVID-19 (Bulletin 2020-21)*, Freddie Mac (June 10, 2020), https://guide.freddiemac.com/app/guide/bulletin/2020-21

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

profit margins. Rather than spend the amount necessary to properly service those loans (for instance, confirming with each borrower whether they in fact had requested a forbearance), Wells Fargo continues to profit at the borrowers' expense.

**C.  Wells Fargo's Misconduct Harmed the Very Consumers that the CARES Act Was Intended to Protect.**

182.    These gains come at the expense of borrowers, who were placed into unwanted forbearances or who had forbearance terms extended without their intent. Despite Wells Fargo's protestations in its response to Senators Warren and Schatz, these forbearance plans led to real and substantial damages to borrowers.

183.    As has previously been briefed before this Court, FICO performed an analysis which concluded that the majority of borrowers whose loans were placed into a CARES Act forbearance can expect a resulting decrease in their credit score.[58]

184.    In addition, regardless of any direct impact on borrowers' credit scores, in practical effect a forbearance is such a negative indicia that borrowers are rendered ineligible to refinance and capitalize on record low interest rates, or potentially remove PMI, during the term of the forbearance and for up to a year after the forbearance plan ends.

185.    The actions taken by Defendants were in direct contravention of the CARES Act requirements that forbearances be provided in response to the request of the borrower, and with an attestation of hardship due to COVID-19. In many instances, the borrowers received no notice that they had been placed in forbearance at all, and in those instances in which the borrowers received some notice, it was woefully insufficient under the requirements of RESPA, 12 U.S.C. §§ 2601 *et seq*.

---

[58] Paul Panichelli, *Simulated FICO Score Impacts due to Mortgage Forbearance*, FICO, (Sept. 29, 2020), https://www.fico.com/blogs/simulated-fico-score-impacts-due-mortgage-forbearance.

46

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

186.    Many borrowers, unaware that they were in forbearance, continued to make or attempted to make payments on their loans. Upon information and belief Wells Fargo failed to timely credit those payments to borrowers' mortgage loans, instead, holding those payments in separate "unapplied funds" accounts without notifying the borrowers.

187.    Even when Wells Fargo did, internally, credit borrower payments, its failure to report timely payments to the credit reporting agencies during the unauthorized forbearance periods was tantamount to a failure to timely credit, because prospective lenders would not be able to confirm payments by the borrowers by reference to their credit reports. For those borrowers whose loans were owned by Wells Fargo, this failure to timely credit payments constituted an actionable violation of the Truth in Lending Act, 15 U.S.C. § 1601, as detailed *infra*.

188.    Some individuals, such as the Castros, Ms. Doctor, and Mr. Jacob, noticed that their mortgages had been noted as "in forbearance," despite never having requested that relief, and that their credit scores had declined as a result of Wells Fargo's actions. When Mr. Jacob and Ms. Doctor submitted notices of dispute to the credit reporting agencies, upon receipt of the notices of disputes from the credit reporting agencies, Wells Fargo was obligated under FCRA, 15 U.S.C. § 1681i, to adequately investigate and correct the matter. Wells Fargo did not, violating FCRA.

189.    Many borrowers, like Mr. Forsburg, were in the process of seeking a HAMP loan modification or had already received such relief. In an article by Pulitzer Prize-winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[59] By

---

[59] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC NEWS, (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

placing borrowers into forbearance, Wells Fargo risked rendering them ineligible for the HAMP loan modifications that they would otherwise have been eligible to receive.

190.    In Mr. Forsburg's case, Wells Fargo terminated his fully executed modification agreement without notice, telling him he would have to resubmit his modification application after the forbearance period ended.

191.    Tragically, the harms have disproportionately impacted borrowers of color. Borrowers of color were twice as likely to miss mortgage payments during the early months of the pandemic.[60] When borrowers attempted to refinance during the historic low interest rates of 2020, Wells Fargo approved refinancing applications for only 47% of Black homeowners, compared to 72% of White homeowners.[61]

192.    The representative Plaintiffs' experiences further demonstrate some of the harms caused by the unilateral forbearance scheme.

**D.    Wells Fargo Placed Plaintiffs' Loans in Forbearance Without Their Consent**

    **1.    Pamela Delpapa, a California resident.**

193.    One of the many victims of Wells Fargo's Faulty Forbearance Program is Plaintiff Pamela Delpapa. Ms. Delpapa lost her job at a nail salon due to COVID-19.

194.    Concerned about whether she would be able to make her mortgage payments, she called Wells Fargo—her mortgage servicer—to learn about her options.

---

[60] *CFPB Issues Reports Detailing Mortgage Borrowers' Continuing COVID-19 Challenges*, CONSUMER FIN. PROT. BUREAU, (May 04, 2021), https://files.consumerfinance.gov/f/documents/cfpb_csbs_consumers-forbearance-guide_2020-05.pdf https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-reports-detailing-mortgage-borrowers-continuing-covid-19-challenges/
[61] Ann Choi, Bloomberg News, *Wells Fargo Faces Persistent Racial Gap in Mortgage Refinancing,* (March 25, 2022 at 12:20 PM PDT), https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

195.    At that point, she was paid in advance for five months; in fact, the Wells Fargo representative she spoke to said she would *not* be a candidate for assistance at this time, but should feel free to call back in five months. She relied on this misrepresentation to her detriment.

196.    Unbeknownst to her, after that call Wells Fargo placed her loan in forbearance anyway. She only found out when she called her mortgage broker to refinance her home. Her mortgage broker told her she could not refinance because her loan was in forbearance. She was understandably shocked.

197.    When she called Wells Fargo to complain, a Wells Fargo employee told her that when a borrower calls the bank and pushes the button directing them to information on COVID mortgage options, the bank automatically places those accounts in forbearance.

198.    Ms. Delpapa never requested that her mortgage be placed in forbearance. In a June letter to her, Wells Fargo admitted it placed her mortgage in forbearance without her consent and without discussing it with her "in detail":

> We found that On March 17, 2020, your account was set up for the 90-day forbearance option that was being offered to our customers. After listening to the phone call between you and our representative, we discovered that you never requested to be placed on the plan nor was the plan discussed with you in detail. On May 21, 2020, we updated the account and removed your account from the forbearance plan as you requested. Additionally we updated our reporting to ensure the forbearance comment was removed.

199.    The bank's letter also conceded that by reporting her mortgage as in forbearance, Wells Fargo may have damaged Ms. Delpapa's ability to get consumer credit, as she experienced firsthand:

> The credit bureaus have independent credit score models. We cannot speculate how any of their proprietary models account for this; however, we do know, generally, those are not used for underwriting of credit. If you apply for credit while on a forbearance plan, however, the lender will see the "account in forbearance" comment on your credit report, and the fact that your account is in forbearance may impact your ability to qualify for new credit or refinance.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

200.    Since then, Ms. Delpapa attempted to refinance her loan to capitalize on historically low interest rates. Despite having been prepaid for the period she was in forbearance, that is, despite *not missing a single payment*, she was unable to refinance for months as a result of the forbearance notation.

201.    This delay in refinancing cost Ms. Delpapa hundreds of dollars, as she remained locked into her higher interest payment with Wells Fargo for months after Wells Fargo represented that they had removed her account from a forbearance plan she never requested.

### 2.    Jenna Doctor, a Florida resident

202.    Ms. Doctor's mortgage loan, secured by a lien against her property located at 7 Hitching Post Ln, Casselberry, FL 32707, is a loan backed by the FHA and serviced by Wells Fargo.

203.    Ms. Doctor and her husband are both employed and have been able to continue making their monthly mortgage payments without interruption. Mr. and Mrs. Doctor were current on their mortgage loan.

204.    Around the second week of April 2020, Ms. Doctor, using her Wells Fargo online account, reviewed information about Wells Fargo's COVID-19 and CARES Act relief. After reviewing the information, Ms. Doctor elected not to enroll in the forbearance program because Ms. Doctor and her husband were able to continue making their payments and they had no financial need to forgo payments.

205.    At no time did Ms. Doctor consent to or request that Wells Fargo place her mortgage loan account in forbearance.

206.    However, at some point prior to June 29, 2020, Wells Fargo placed Ms. Doctor's mortgage loan account in forbearance status without Ms. Doctor's knowledge or consent.

207.    In the summer of 2020, Ms. Doctor was pregnant, with her baby due in late 2020. In June 2020, Ms. Doctor learned that her baby had developed a medical condition that would require treatment, causing Ms. Doctor and her husband to incur additional out-of-pocket medical expenses. Ms. Doctor

and her husband also wished to make certain upgrades and improvements to their home prior to the birth of their child.

208.    On or about June 29, 2020, Ms. Doctor contacted a loan officer at the Fairwinds Credit Union (the "Credit Union"), where Ms. Doctor is a member and account holder. Ms. Doctor sought to obtain a secured loan to cover both the out-of-pocket medical expenses for herself and her unborn child and the improvements to her homestead.

209.    The Credit Union made a "hard inquiry" with Equifax on June 29, 2020. The credit information the Credit Union received in response to its inquiry indicated that Ms. Doctor's mortgage loan was in forbearance.

210.    Also on June 29, 2020, the Credit Union informed Ms. Doctor that it could not extend Ms. Doctor credit because her mortgage loan was in forbearance. Ms. Doctor then informed the Credit Union that she was not in forbearance, that she had made her monthly mortgage payments each month, and that she never requested a forbearance with Wells Fargo.

211.    Prior to June 29, 2020, Ms. Doctor had applied for and received several loans with the Credit Union. Ms. Doctor was informed by the Credit Union that the reason for the decision not to extend credit to Ms. Doctor on June 29, 2020 was because of the reporting or furnishing to the credit reporting agency that her Wells Fargo account was in forbearance for May and June 2020.

212.    During the phone call with Wells Fargo on June 29, 2020, Ms. Doctor was informed that she was automatically put in forbearance, since every Wells Fargo borrower has been affected by COVID-19. The Wells Fargo representative indicated that Ms. Doctor's account was in a forbearance from May 1, 2020 through July 1, 2020, but Ms. Doctor could "opt-out" of the forbearance program. Ms. Doctor demanded that her account be removed from the forbearance program, as she had never requested any forbearance relief with Wells Fargo.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

213.    On July 1, 2020, Ms. Doctor contacted Wells Fargo and spoke with a representative concerning its reporting of the unwanted forbearance to the credit agencies. Wells Fargo refused to change the information it reported regarding Ms. Doctor's account and stated that the account would reflect she had chosen to opt out of the final forbearance month of July 2020.

214.    On July 6, 2020, Ms. Doctor contacted the Credit Union loan officer about the steps she took with Wells Fargo and what she needed to do to move forward with a loan. Ms. Doctor was informed by the Credit Union that her Wells Fargo account was still reported as in forbearance.

215.    On July 6, 2020, Ms. Doctor called Wells Fargo and spoke with a Wells Fargo supervisor. Ms. Doctor explained that she needed the forbearance removed from Wells Fargo's reporting to the credit reporting agencies because continued reporting would result in her being denied a loan with her Credit Union. The Wells Fargo supervisor stated Wells Fargo could only send Ms. Doctor an official "opt out" document.

216.    Also on July 6, 2020, Wells Fargo sent an email to Ms. Doctor attaching a letter dated July 1, 2020, which referenced "Confirming your request to opt out of mortgage payment suspension" and stated that Wells Fargo was returning the account to normal servicing and "reporting payment activity to the consumer reporting agencies."

217.    For the months of April through July 2020, Wells Fargo furnished information to the credit reporting agencies that the status of Ms. Doctor's monthly mortgage payments was paid, paid as agreed, or current. In addition, Wells Fargo furnished information that Ms. Doctor's mortgage loan account was in forbearance for at least May and June of 2020.

218.    On July 7, 2020, Ms. Doctor filed a complaint online with the Consumer Financial Protection Bureau about Wells Fargo's credit reporting and reporting incorrect information. Specifically, Ms. Doctor complained that Wells Fargo placed her mortgage loan account in forbearance without her knowledge or consent and reported her mortgage loan as in forbearance to the credit

reporting agencies, which would prevent Ms. Doctor from obtaining credit from her Credit Union until the reference to the forbearance was removed from her credit reports.

219.    On or about July 7, 2020, Ms. Doctor disputed with Equifax the reporting of false and incorrect information furnished by Wells Fargo stating that Ms. Doctor's mortgage loan account was in forbearance. On information and belief, Equifax sent notice of Ms. Doctor's disputes to Wells Fargo pursuant to 15 U.S.C. § 1681s-2(b).

220.    On or about July 16, 2020, Ms. Doctor complained again about Wells Fargo's credit reporting and, by July 16, 2020, Equifax began a re-investigation of Ms. Doctor's dispute relating to Wells Fargo's reporting of her account as in forbearance.

221.    On July 31, 2020, Ms. Doctor sent written disputes to Equifax, Transunion, and Experian. On information and belief Wells Fargo received notice from each of those credit reporting agencies pursuant to 15 U.S.C. § 1681s-2(b).

222.    On or about July 31, 2020, Ms. Doctor received a response from Wells Fargo concerning her complaint with the CFPB regarding Wells Fargo's placement and reporting of her account in a forbearance status. Wells Fargo states that it is "unable to remove the forbearance comment that was previously reported for April 1, 2020, through June 1, 2020." Wells Fargo goes on to state that the "account was last reported to the consumer reporting agencies on July 15, 2020, as current with no forbearance comment."

223.    As of August 6, 2020, Ms. Doctor's Equifax report still noted that her mortgage loan account was in forbearance for the months of May and June 2020.

**3.    Gerald Forsburg, a Virginia resident**

224.    Mr. Forsburg's mortgage loan, secured by a lien against his property located at 129 Shannon Avenue in Mount Jackson, Shenandoah County, Virginia, is a loan backed by the FHA and serviced by Wells Fargo.

225.    Mr. Forsburg' personal liability on the mortgage loan secured by the Shannon Avenue property was discharged in a Chapter 7 bankruptcy in 2016, although the remaining unpaid debt on that loan continues to be secured by a lien against the Shannon Avenue property.

226.    After his 2016 bankruptcy, Mr. Forsburg's mortgage loan fell into default, and Mr. Forsburg began working with Wells Fargo in an effort to obtain a FHA Home Affordable Mortgage Program ("HAMP") loan modification in order to reduce his interest rate and monthly mortgage payment and to catch up on the arrears owing on the mortgage loan.

227.    In connection with his mortgage modification efforts, Mr. Forsburg accepted a trial modification plan offered by Wells Fargo, which required Mr. Forsburg to make three monthly payments of $848.53 for January, February, and March of 2020 as a precondition to Wells Fargo providing Mr. Forsburg with a final mortgage modification.

228.    Mr. Forsburg made each of the trial modification payments under the trial modification plan on time and in full, as required.

229.    On March 11, 2020, Wells Fargo approved Mr. Forsburg's loan for a final FHA HAMP mortgage modification.

230.    The monthly payment under the terms of Mr. Forsburg's modified mortgage loan is $831.75, with the first post-modification installment due May 1, 2020.

231.    Mr. Forsburg was not required to make a monthly payment for April of 2020 under the terms of his mortgage modification agreement. Moreover, Mr. Forsburg's modified monthly payment of $831.75 represents substantial savings compared with his pre-modification monthly mortgage payment of approximately $1,052.68. Additionally, the contractual annual interest rate for Mr. Forsburg's modified loan is 3.5%, a significant reduction of the pre-modification interest rate of 4.875%.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

232.    Mr. Forsburg's mortgage modification recapitalized $8,648.26 in unpaid amounts, resulting in a $148,633.85 new modified principal balance for his mortgage loan secured by the Shannon Avenue property.

233.    On March 18, 2020, Wells Fargo sent final modification paperwork via FedEx to Mr. Forsburg, with instructions that Mr. Forsburg needed to sign the documents and have them notarized before returning the executed documents to Wells Fargo.

234.    Mr. Forsburg received the FedEx from Wells Fargo with the final modification paperwork on March 19, 2020.

235.    On March 20, 2020, Mr. Forsburg executed the final modification documents before a notary, who notarized Mr. Forsburg's signature and returned the final modification documents to Wells Fargo.

236.    On or about April 2, 2020, Mr. Forsburg attempted to log into Wells Fargo's online payment portal in order to confirm that Wells Fargo had implemented his FHA HAMP mortgage modification and to make his May 1, 2020 modified monthly mortgage payment of $831.75.

237.    When he attempted to log in to make his mortgage payment on April 2, 2020, Mr. Forsburg received a message from Wells Fargo stating that his mortgage loan had not yet been updated with the terms of his March 11, 2020, Wells Fargo approved, fully executed, final FHA HAMP modification, and Wells Fargo indicated that it would "be in touch" with Mr. Forsburg "soon."

238.    Unbeknownst to Mr. Forsburg, sometime after March 20, 2020 and prior to April 2, 2020, Wells Fargo had placed his original, unmodified loan into a three-month forbearance program, effective as of the mortgage payment due for April of 2020.

239.    Mr. Forsburg did not request that his mortgage loan be placed into forbearance prior to April of 2020, or at any time thereafter.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

240.    Prior to placing Mr. Forsburg's loan into forbearance status for April of 2020, Wells Fargo did not inform Mr. Forsburg that placing his loan into forbearance would result in Wells Fargo terminating the final mortgage modification agreement Mr. Forsburg had accepted on March 20, 2020.

241.    Because Mr. Forsburg's loan was in forbearance status, Wells Fargo stopped implementation of the final FHA HAMP mortgage modification that it offered to Mr. Forsburg, which Mr. Forsburg had accepted.

242.    Instead, without notice to Mr. Forsburg, Wells Fargo unilaterally placed Mr. Forsburg's original, unmodified mortgage loan into forbearance status.

243.    As a result, without Mr. Forsburg's prior knowledge or consent, Wells Fargo cancelled the final FHA HAMP modification Mr. Forsburg had accepted on March 20, 2020.

244.    When Mr. Forsburg contacted Wells Fargo by telephone to make his May 2020 payment under the newly modified loan terms, he was told that he did not need to make a payment because his loan was in forbearance. Mr. Forsburg was not told at that time that his modification had not been implemented by Wells Fargo.

245.    As recently as July 21, 2020, a Wells Fargo representative told Mr. Forsburg that Wells Fargo placed all loans that were in the modification process into forbearance status.

246.    Moreover, upon information and belief, after cancelling the modification and placing the loan in forbearance, Wells Fargo has also placed Mr. Forsburg's loan in foreclosure status.

247.    Mr. Forsburg has contacted Wells Fargo multiple times regarding this issue and, despite spending anywhere from 45 – 90 minutes on the phone, has not received a definitive answer from Wells Fargo regarding this issue. Indeed, Wells Fargo's representatives have given him conflicting information about the status of his mortgage loan after Wells Fargo placed his account in forbearance.

248.    In an article by Pulitzer Prize winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[62]

249.    Wells Fargo's website's "FAQ" section related to COVID-19 and CARES Act forbearance indicates that Wells Fargo cancels pending modification applications for its borrowers when borrowers accept a CARES Act forbearance. Yet, Mr. Forsburg was told by a Wells Fargo representative that *Wells Fargo* placed borrowers with pending loan modifications into forbearances.

250.    Mr. Forsburg had the ability and intention of making the payments required of him under his modified loan terms, as set forth in the final modification documents he executed and returned to Wells Fargo on March 20, 2020.

251.    Mr. Forsburg did not want or request a CARES Act forbearance from Wells Fargo.

252.    During the unauthorized forbearance period, Mr. Forsburg was prevented from making any payment via Wells Fargo's online payment system, other than payment in the amount of his pre-modification loan; Wells Fargo gives him no option to specify a different payment amount.

253.    Wells Fargo's actions in placing Mr. Forsburg's loan in forbearance, without Mr. Forsburg's knowledge or consent, deprived Mr. Forsburg of the opportunity to cure his arrears and lower his interest rate through the modification.

**4.    Luis and Marisol Castro, Texas residents**

254.    Mr. and Mrs. Castro's mortgage loan, secured by a lien against their homestead property located at 3221 San Marcus Ave., Dallas, TX 75228, is a federally related mortgage loan backed by Fannie Mae and serviced by Wells Fargo.

---

[62] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him,* NBC NEWS (July 16, 2020, 2:00 AM PST), https://www.nbcnews.com/ business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

255.    In late March, Mr. Castro went to Wells Fargo's website to pay their April 2020 mortgage payment.

256.    While Mr. Castro was on Wells Fargo's website, he noticed a large "box" on the website that referenced COVID-19 and contained a button marked "Get Help Now" for payment assistance.

257.    Mr. Castro was curious about what "payment assistance" would involve and clicked on the "Get Help Now" button on Wells Fargo's website, expecting more information about the various payment assistance options that might be available to him.

258.    Once Mr. Castro clicked that "Get Help Now" button, Wells Fargo's website displayed a message "congratulating" him and informing him that his loan has been enrolled in a forbearance plan.

259.    Mr. Castro did not receive any additional information at that time explaining the terms or the consequences of the forbearance program, and Mr. Castro assumed that being automatically enrolled in the program would not be detrimental to him or Mrs. Castro.

260.    Despite Wells Fargo placing Mr. and Mrs. Castro's loan account into a forbearance that he did not request, Mr. Castro proceeded to make his April 2020 payment that same day in late March.

261.    Wells Fargo accepted Mr. and Mrs. Castro's April 2020 mortgage payment.

262.    In late April, Mrs. Castro went to Wells Fargo's website to make their May 2020 mortgage payment but found that she was unable to log on to make the payment.

263.    Later that same day, Mrs. Castro called Wells Fargo and made the May 2020 mortgage payment by telephone. Wells Fargo accepted Mr. and Mrs. Castro's May 2020 payment.

264.    While speaking with the Wells Fargo representative in connection with their May 2020 mortgage payment, the Wells Fargo representative informed Mrs. Castro that she was unable to make her payment online because their loan was in forbearance status.

265.    Mrs. Castro did not understand at the time she was speaking with the Wells Fargo representative that having a loan in forbearance status could be harmful to her credit or otherwise, but

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

Mrs. Castro also did not like being unable to make payments online. Accordingly, during her call in late April 2020, Mrs. Castro asked Wells Fargo's representative to remove whatever it was that was keeping her from making her payments online.

266.    Wells Fargo subsequently removed the restriction on Mr. and Mrs. Castro's account that prevented them from making their monthly mortgage payments online, and they have made their June – August 2020 mortgage payments.

267.    Wells Fargo did not remove Mr. and Mrs. Castro's mortgage loan from forbearance status in April 2020.

268.    In fact, Wells Fargo sent Mr. and Mrs. Castro a letter dated April 16, 2020, regarding the "short-term payment suspension." The April 16, 2020 letter stated: "This payment suspension option is based on an incomplete application for assistance. Other payment assistance options may be available. If you would like a review for all available assistance options, you may submit a complete application, which would include information about your income and expenses. This review is available whether or not you accept this short-term payment suspension. Please contact us for more information."

269.    The April 16, 2020 letter also stated: "Note: If you find you don't need this short-term payment suspension, please continue to make your normal payments. Take advantage of this payment suspension only when you really need it, because you may need to repay any missed payments at the end of the short-term payment suspension period."

270.    Further, the April 16, 2020 letter did not disclose that the forbearance status of Mr. and Mrs. Castro's mortgage loan account would be reported to the credit reporting agencies or that Wells Fargo would suppress its reporting regarding the payments it was receiving from Mr. and Mrs. Castro during the forbearance period.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

271.    In late May 2020, Mr. and Mrs. Castro decided to refinance their mortgage loan. At the time, Mr. and Mrs. Castro did not know or understand that Wells Fargo was reporting their mortgage loan to the credit reporting agencies as in forbearance status.

272.    Mr. and Mrs. Castro attempted to obtain a refinance but were unable to close on their refinance of their mortgage loan account in July 2020 because Wells Fargo had reported their mortgage loan account as in forbearance status.

273.    Moreover, due to the credit reporting of their loan as in forbearance preventing Mr. and Mrs. Castro from closing their refinance, Mr. and Mrs. Castro incurred a late fee for their July 2020 monthly mortgage payment because they anticipated that they would not have to make a mortgage payment in July 2020 due to their anticipated refinance.

274.    The tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their TransUnion credit reports indicate in the "Remarks" section of the report that their mortgage loan account is in forbearance. Further, the "Terms" section of the report states "$0 per month for 360 months, Deferred" and Wells Fargo did not report that Mr. and Mrs. Castro made their April – June 2020 mortgage payments.

275.    Similarly, the tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their Equifax credit reports indicate in the "Comments 2" section that their mortgage loan account was in forbearance in April and May 2020 and the "Payment History" section does not indicate that Mr. and Mrs. Castro made their April – July 2020 monthly mortgage payments. Moreover, the "Terms Frequency" is listed as "DEFERRED" and the "Comments" section states their mortgage loan account is in forbearance.

276.    The tradeline for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on Mrs. Castro's Experian report states the "Status" of the loan as "Open/Never late. Deferred, payments begin Oct 2020," and states the monthly payment is "$0." Further, the payment history section does not reflect

Wells Fargo's receipt of Mr. and Mrs. Castro's April through June 2020 mortgage payments and the "Comment" section states "Account in Forbearance."

277.    Wells Fargo sent Mr. and Mrs. Castro a letter dated July 9, 2020, which informed Mr. and Mrs. Castro that Wells Fargo had extended the forbearance period for another three months. The Castro's did not consent to Wells Fargo's extension of the forbearance, which they had not wanted or authorized in the first place.

278.    Mr. and Mrs. Castro then contacted Wells Fargo via telephone on multiple occasions in June and July of 2020, asking to be removed from the forbearance program.

279.    On a call in late July 2020, Mr. Castro was informed by a Wells Fargo representative that the "Get Help Now" button was placed on Wells Fargo's website due to higher than normal call volume that resulted in five hour wait times before customers could speak to a Wells Fargo representative.

280.    On August 3, 2020, Mr. Castro called Wells Fargo again in a further attempt to get his account removed from forbearance status. He spoke to four different Wells Fargo representatives and none of them were able to remove his loan from forbearance status. Ultimately, a Wells Fargo representative hung up on him.

**5.    Samara Green, a Georgia resident**

281.    Plaintiff Samara Green has a mortgage serviced by Wells Fargo.

282.    On or about June 15, 2020, a representative from Wells Fargo called Ms. Green to address concerns Ms. Green had about her escrow payments. During this call, the Wells Fargo representative talked to Ms. Green about the option of placing her mortgage in forbearance.

283.    Ms. Green told the Wells Fargo representative that she was not interested in Wells Fargo's forbearance program.

284.    Before the June 15, 2020 phone call, Ms. Green had already made a mortgage payment to Wells Fargo on June 12, 2020.

285.    However, unbeknownst to Ms. Green, her June 12, 2020 payment was not timely applied to her mortgage or her escrow account because Wells Fargo placed her mortgage in forbearance without her knowledge or consent.

286.    On or around June 26, 2020, Ms. Green called Wells Fargo again to further inquire about fees and the application of escrow payments. During the phone call, the Wells Fargo representative informed Ms. Green that her mortgage had been placed in forbearance.

287.    Ms. Green informed the representative that she had never requested nor consented to forbearance on her mortgage, that Wells Fargo had acted without her knowledge or consent, and demanded that her account be taken out of forbearance.

288.    Ms. Green received a letter from Wells Fargo dated July 1, 2020 which memorialized this conversation. As the letter recounted, Wells Fargo placed Ms. Green's mortgage into forbearance though she "did not request this."

289.    Wells Fargo admits in the letter that though Ms. Green called Wells Fargo to discuss her escrow account, Wells Fargo instead suspended all her mortgage payments.

290.    Wells Fargo never informed Ms. Green, either on the June 26, 2020 phone call or in the July 1, 2020 letter, that Wells Fargo had failed to apply her June 12, 2020 payment to her mortgage or her escrow account.

291.    On or about July 15, 2020, Ms. Green went to a Wells Fargo bank branch in order to make another mortgage payment to Wells Fargo.

292.    However, when Ms. Green spoke with the Wells Fargo representative at the bank branch, she was told that the amount due on her mortgage was over $3,500, that her prior June payment had not been applied to her mortgage or her escrow, and that her mortgage had been placed in forbearance.

293.    After Ms. Green's visit to the Wells Fargo branch, she immediately called Wells Fargo and spoke to a representative. The Wells Fargo representative confirmed that Ms. Green's mortgage

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

payment had not been applied to her mortgage or her escrow because she had been placed in forbearance. The Wells Fargo representative told Ms. Green that her payment had been placed in an "unapplied fund" and that those payments would be reversed because they could not be applied to her mortgage or escrow while she was in forbearance.

294.    Wells Fargo placed Ms. Green's loan in forbearance without her consent and incorrectly reported this to credit reporting agencies.

295.    Because Wells Fargo failed to timely apply her June 12, 2020 payment, Wells Fargo reported to the Credit Reporting Agencies that Ms. Green was 30 days late on her mortgage for the month of June 2020.

296.    While Wells Fargo did, ultimately, apply the June 12, 2020 payment to her mortgage, they did so months late and after reporting Ms. Green as in forbearance.

297.    Ms. Green did not request a forbearance of her mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and she did not—and does not—want a forbearance of her mortgage payment obligations.

**6.    Patrick Healy, a California resident.**

298.    Mr. Healy's residential property located in San Marcos, California is encumbered by a lien securing repayment of a mortgage that is serviced by Wells Fargo.

299.    In June of 2020, Mr. Healy discovered that Wells Fargo had been persistently reporting inaccurate credit information about this mortgage loan account with Wells Fargo. Specifically, Wells Fargo had been falsely reporting that his mortgage loan was in forbearance and that no payments had been made on the account for months, at least as of April 2020.

300.    In a letter from Wells Fargo dated June 3, 2020, Wells Fargo incorrectly stated that Mr. Healy "had asked for help with [his] mortgage payments because [he] was facing a financial

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

hardship as a result of the [COVID-19] crisis." The letter then went on to say, "To help, we suspended your mortgage payments for three months, but you've still been making your payments."

301.    However, Mr. Healy never requested or agreed to a forbearance on his mortgage loan or any type of deferment.

302.    During the purported period of forbearance, Mr. Healy has been making each monthly mortgage payment in full and on time, yet Wells Fargo furnished to the credit reporting agencies the indisputably false and inaccurate information that he had not made any recent monthly payments during the several months that his account was wrongfully placed in forbearance.

303.    Mr. Healy contacted Wells Fargo about the forbearance status on the loan that he did not request. In response, in a letter from Wells Fargo, dated June 15, 2020, Wells Fargo stated "Thank you for updating us on your situation. We're confirming that we've canceled the short-term payment suspension."

304.    In fact, in a letter from Wells Fargo dated July 6, 2020, Wells Fargo admitted that Mr. Healy did not request a forbearance. Specifically, Wells Fargo stated: "We found that when you first spoke with us you requested information about the forbearance plan. We can confirm you did not request or accept the plan at that time and the plan was added to the account in error." The letter further stated in part, "We apologize for any confusion or frustration regarding how your credit report may have been impacted due to the COVID-19 pandemic."

305.    Unfortunately, as a result of the false mortgage forbearance reporting by Wells Fargo, Mr. Healy was deprived of a home mortgage refinance loan with another lender who declined to extend Mr. Healy credit in light of Wells Fargo's reporting of the account in forbearance with no recent payment made.

306.    After the inaccurate credit reporting with Experian was disputed, Experian in response indicated that following their "reinvestigation" of the dispute, "The information you disputed has been

updated," and the credit report, generated on June 20, 2020, then showed that the mortgage account was current on payments from January to June 2020.

307.    Only after the dispute was corrected was Mr. Healy able to secure new credit that had previously been denied for months.

**7.    Brett Jacob, a New York resident.**

308.    Plaintiff Brett Jacob has a mortgage serviced by Wells Fargo.

309.    On or about March 16, 2020, Mr. Jacob called Wells Fargo and asked that his mortgage payments no longer be automatically debited from his bank account.

310.    Mr. Jacob requested that he be permitted to make payments at a time and in a manner of his own choosing. Wells Fargo honored Mr. Jacob's request and, a few days later, Mr. Jacob received a letter from Wells Fargo dated March 20, 2020 confirming that Wells Fargo had "completed your request to suspend your automatic mortgage payments."

311.    However, approximately one week later, Mr. Jacob received a second letter from Wells Fargo dated March 26, 2020. This letter informed Mr. Jacob, much to his surprise, that Wells Fargo had placed his mortgage into forbearance for six months. The letter stated that his monthly mortgage obligations had been suspended until October 1, 2020.

312.    Mr. Jacob never requested that Wells Fargo place his mortgage into forbearance.

313.    Since being placed in forbearance, Mr. Jacob has tried to make mortgage payments, but Wells Fargo suspended his online payment option.

314.    Further, though Wells Fargo assures its customers otherwise, the forbearance that he did not request is reflected on his credit report. Mr. Jacob filed a written notice of dispute with Experian on September 9, 2020.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

315.    After Wells Fargo placed him in forbearance, Mr. Jacob attempted to secure a small-business loan but was denied, at least in part because the lender pulled his credit report and saw that his mortgage had been placed in forbearance.

316.    In addition, Mr. Jacob's attempt to refinance his mortgage and to obtain a lower interest rate on his mortgage was denied because Wells Fargo placed his mortgage into forbearance without his consent.

317.    Wells Fargo placed Mr. Jacob's loan in forbearance without his consent and incorrectly reported this to credit reporting agencies such that it appears on Mr. Jacob's credit report.

318.    Mr. Jacob disputed this inaccurate credit reporting with Experian. On information and belief, Experian sent notice of Mr. Jacob's dispute to Wells Fargo pursuant to 15 U.S.C. § 1681s-2(b).

319.    Experian added a comment to Mr. Jacob's credit report, generated on September 25, 2020, that opined, "The information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated."

320.    Mr. Jacob disputed the forbearance notation, as he had never requested a forbearance. Rather than investigate whether it had erred in placing Mr. Jacob into a forbearance, Wells Fargo merely confirmed to Experian that it *had* placed Mr. Jacob into a forbearance. This paltry investigation is inadequate – akin to a debt collector only investigating whether a disputed debt had been paid, and not whether they had reported it against the right debtor.

321.    The credit reporting concerning the forbearance was incorrect, as Mr. Jacob did not request a forbearance of his mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and did not—and does not—want a forbearance of his mortgage payment obligations.

**8.    Charles Johnson, a California resident.**

322.    Plaintiff Charles Johnson has a mortgage serviced by Wells Fargo.

66

323.    At the end of March 2020, Mr. Johnson called Wells Fargo and asked to be placed into the forbearance program, to receive short-term payment relief for his mortgage account.

324.    Per his request, Mr. Johnson's forbearance period was to last three months, from April through June 2020.

325.    Mr. Johnson received a letter from Wells Fargo dated April 6, 2020 confirming that they had "suspended [his] obligation to make monthly mortgage payments for three months" and that Mr. Johnson needed to resume his "regular mortgage payment schedule beginning on July 1, 2020."

326.    Wells Fargo sent Mr. Johnson a letter dated May 26, 2020 informing him that his account was due for two payments "for the month(s) of April 1, 2020 through May 26, 2020."

327.    Concerned by this correspondence, Mr. Johnson called Wells Fargo and spoke to a customer representative and asked specifically to be removed from the program when his three-month period ended.

328.    He also asked about the process of resuming payments when his forbearance period ended on July 1, 2020.

329.    Mr. Johnson did not ask that his forbearance period be extended; in fact, he requested the exact opposite.

330.    Despite this conversation, Mr. Johnson received a letter from Wells Fargo dated June 17, 2020, asking Mr. Johnson if he wished to extend his period of forbearance for another three months.

331.    Mr. Johnson did not want the period of forbearance be extended, and since he already called Wells Fargo he expected that he would be taken out of the forbearance program.

332.    However, in a letter from Wells Fargo dated July 8, 2020, Mr. Johnson was informed that Wells Fargo had yet again "suspended [his] mortgage payments for an additional three months." Mr. Johnson was told that he would not need to resume his mortgage payments until October 1, 2020.

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

333.    Mr. Johnson made a $1,446.80 mortgage payment on or about July 1, 2020 which Wells Fargo accepted.

334.    However, Wells Fargo failed to apply Mr. Johnson's July 1, 2020 payment to his mortgage account.

335.    Mr. Johnson made a $1,446.80 mortgage payment on or about August 1, 2020 which Wells Fargo accepted.

336.    However, Wells Fargo failed to apply Mr. Johnson's August 1, 2020 payment to his mortgage account, and decrease his principal and interest.

337.    Mr. Johnson called Wells Fargo on or about July 16, 2020, told a customer service representative that he never requested that his forbearance period be extended, and requested to be removed from the forbearance program.

338.    Wells Fargo did not provide Mr. Johnson with answers to his questions nor was he told that he was removed from the forbearance program.

339.    Instead, Mr. Johnson was told to not make a payment on his mortgage and that he would be receiving further correspondence.

340.    Mr. Johnson did not receive any further correspondence regarding the status of his mortgage account.

341.    Mr. Johnson called Wells Fargo three additional times—on or about August 6th, 7th, and 11th—but Wells Fargo was not able to tell Mr. Johnson that he had been removed from the forbearance program.

342.    Because Mr. Johnson's mortgage was placed in an extended forbearance program without his consent and without his knowledge, Wells Fargo incorrectly reported to the credit reporting agencies that his mortgage was in forbearance after July 1, 2020 and until October 1, 2020.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

343.     Mr. Johnson's credit score dropped by 13 points after July 1, 2020 as a result of Wells Fargo's incorrectly reporting to the credit reporting agencies that his mortgage was in forbearance.

344.     Wells Fargo placed Mr. Johnson's loan in a second forbearance without his consent, and incorrectly reported this to credit reporting agencies such that it appears on Mr. Johnson's credit report.

345.     Wells Fargo also incorrectly reported the total balance of Mr. Johnson's mortgage, failing to account for the payments made for the months of April 2020 and May 2020.

346.     Further, despite placing Mr. Johnson unwillingly into forbearance during these months and taking Mr. Johnson's payments, Wells Fargo reported to the credit reporting agencies that Mr. Johnson's mortgage balance had increased from $141,175 in April 2020 to $143,288 in June 2020.

347.     As such, Mr. Johnson suffered damages to his credit and reputation.

348.     Further, Wells Fargo's extension of Mr. Johnson's forbearance without his request, failure to account for the payments he made, incorrect reporting to the credit bureaus, and to date failure to remedy the issues, are continuously causing Mr. Johnson mental anguish, embarrassment, and stress.

**9.     Barbara Prado, a California resident**

349.     Barbara Prado is a chef by trade. Until September 1, 2020, for eight years, she had been employed as a manager by the Bon Appetit cafe and restaurant chain, including throughout March 2020.

350.     Ms. Prado has two FHA mortgage loans that are serviced by Wells Fargo and are secured by her homestead property, which is located in Fremont, California.

351.     Ms. Prado's primary mortgage loan has an account number ending in 4898 (the "Primary Mortgage Loan").

352.     From April through September 2020, Ms. Prado's monthly payment on her Primary Mortgage Loan has been $1,594.70, which includes principal, interest, and escrow for property taxes and insurance.

353.    Ms. Prado's secondary mortgage loan has an account number ending in 9035 (the "Secondary Mortgage Loan").

354.    The monthly payment on Ms. Prado's Secondary Mortgage Loan is $167.90.

355.    Prior to April 2020, Ms. Prado had arranged for her payments on the Secondary Mortgage Loan to be automatically drafted from her bank account by Wells Fargo each month in the amount of $200.00, designating the $32.10 surplus to be applied to further reduce the loan's principal balance.

356.    Ms. Prado called Wells Fargo on Saturday, March 28, 2020, to inquire about COVID-19 related payment assistance options with respect to her Primary Mortgage Loan only. Including hold time, Ms. Prado's March 28, 2020 call to Wells Fargo lasted approximately 43 minutes.

357.    Ms. Prado does not recall or believe that she ever requested "forbearance" during her March 28, 2020 call with Wells Fargo and she does not recall authorizing Wells Fargo to place her Primary Mortgage Loan account into forbearance status effective April 1, 2020.

358.    Wells Fargo sent Ms. Prado a letter dated September 4, 2020, in which Wells Fargo asserts that Ms. Prado called Wells Fargo regarding her Primary Mortgage Loan on March 28, 2020, "and stated that [Ms. Prado] would need two months deferred as [she] did not know when [she] would be going back to work."

359.    Wells Fargo's September 4, 2020 letter does not assert that Ms. Prado ever requested "forbearance" as to her Primary Mortgage Loan, nor does it assert that Ms. Prado agreed on March 28, 2020 (or at any other time) to a "payment suspension" that would be immediately effective.

360.    On September 15, 2020, a Wells Fargo representative, Erica Nosbisch, informed Ms. Prado that Wells Fargo placed her Primary Mortgage Loan account into forbearance status on March 30, 2020.

361.    Ms. Prado actually made her monthly mortgage payments on her Primary Mortgage Loan from April through September of 2020.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

362.    In addition to placing Ms. Prado's Primary Mortgage Loan into forbearance following Ms. Prado's March 28, 2020 call, Wells Fargo placed Ms. Prado's Secondary Loan Account into forbearance status, without Ms. Prado requesting a forbearance on her Secondary Mortgage Loan and without her knowledge or consent.

363.    Wells Fargo's September 4, 2020 letter to Ms. Prado acknowledges that Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance status without Ms. Prado's consent, "because of the request from [her] on [her Primary Mortgage Loan]. Due to high call volumes, the process was automated and forbearance assistance was provided for all accounts associated with [Ms. Prado's Primary Mortgage Loan]."

364.    When Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance status, it also terminated the pre-arranged automatic electronic monthly payments that Ms. Prado had set up with Wells Fargo for her Secondary Mortgage Loan without prior notice to Ms. Prado.

365.    Because she had come to expect that the $200 monthly payment on her Secondary Mortgage Loan would be automatically drafted from her bank account each month, Ms. Prado did not notice that her Secondary Mortgage Loan payments to Wells Fargo for April, May, and June 2020 had not been drafted from her account.

366.    On June 10, 2020, at her daughter's urging, and with her daughter present, Ms. Prado called Wells Fargo to obtain information about the CARES Act forbearance program.

367.    During her June 10, 2020 call, after listening to a Wells Fargo representative's attempt to explain how the forbearance program would work, Ms. Prado informed Wells Fargo that she was not interested in forbearance at that time.

368.    The Wells Fargo representative Ms. Prado spoke with on June 10, 2020 did not mention to Ms. Prado that both her Primary Mortgage Loan and her Secondary Mortgage Loan were already, or had already been, in forbearance.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

369.    On July 9, 2020, Ms. Prado received an email from Wells Fargo informing her that Wells Fargo would be extending the forbearance term on her Secondary Mortgage Loan for an additional 90 days.

370.    Ms. Prado was alarmed by Wells Fargo's July 9, 2020 email extending the term of the unauthorized forbearance on her Secondary Mortgage Loan.

371.    Ms. Prado did not request that Wells Fargo extend the forbearance on her Secondary Mortgage Loan.

372.    On July 9, 2020, Ms. Prado attempted to call Wells Fargo to get information about why Wells Fargo was sending her an email that said her Secondary Mortgage Loan account was in forbearance status. However, she was kept on hold for so long that it was interfering with her work and she ultimately was forced to hang up before she was able to speak with anyone at Wells Fargo.

373.    So, after getting off work on July 9, 2020, Ms. Prado went to a Wells Fargo branch bank to seek an explanation for Wells Fargo's email indicating that her Secondary Mortgage Loan was in forbearance.

374.    Upon Ms. Prado's arrival at the Wells Fargo branch bank at approximately 4:30pm on July 9, 2020, Ebonique Edogun, a Wells Fargo representative at the Wells Fargo branch banking location, attempted to assist Ms. Prado that evening by trying to call Wells Fargo's mortgage division to obtain information about the forbearance on the Secondary Mortgage Loan.

375.    Ms. Edogun's call to Wells Fargo on Ms. Prado's behalf remained on hold past the Wells Fargo branch bank's business hours, until approximately 5:30 p.m. Pacific time. At that point, Ms. Prado asked Ms. Edogun to end the call so they could both go home.

376.    The next morning, at approximately 5:30 a.m. Pacific time on July 10, 2020, Ms. Prado again called Wells Fargo to inquire about the July 9, 2020 email regarding extension of the forbearance on her Secondary Mortgage Loan.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

377.    During the July 10, 2020 call, Ms. Prado first spoke with a Wells Fargo representative named Colleen, who later transferred Ms. Prado's call to a supervisor named Rosemary.

378.    While speaking with Colleen during the July 10, 2020 call, Ms. Prado learned, to her surprise, that her Primary Mortgage Loan was also in forbearance status.

379.    During the July 10, 2020 call, Ms. Prado also learned that her Secondary Mortgage Loan was three months behind because of the unauthorized forbearance on her Secondary Mortgage Loan account and Wells Fargo's undisclosed cancellation of her automatic electronic payment arrangement with Wells Fargo for the Secondary Mortgage Loan.

380.    While speaking with Rosemary during the July 10, 2020 call, Ms. Prado requested to have the forbearance removed from both loans.

381.    Rosemary, Wells Fargo's representative, advised Ms. Prado during the July 10, 2020 call that Ms. Prado would be able to defer the missed (forborne) payments on her Secondary Mortgage Loan to the end of her loan, and that this process would be done through correspondence Ms. Prado would receive by mail.

382.    Later in July, instead of offering to defer the missed (forborne) payments on her Secondary Mortgage Loan, Wells Fargo sent Ms. Prado a letter dated July 13, 2020, informing Ms. Prado that she had an overdue balance on her Secondary Mortgage Loan account and requesting that Ms. Prado call Wells Fargo because "...we want to help you."

383.    Ms. Prado made her July 2020 Secondary Mortgage Loan payment directly to Wells Fargo in the amount of $200, which Wells Fargo initially accepted and applied to Ms. Prado's Secondary Mortgage Loan account on July 14, 2020, designating $167.90 as the regular payment, and $32.10 as a principal payment, as reflected on the July 14, 2020 statement Wells Fargo sent Ms. Prado.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

384.    Wells Fargo then sent Ms. Prado a second statement in July 2020, dated July 16, 2020, which reverses the $32.10 that Wells Fargo applied as a principal payment on July 14, 2020, and places $32.10 into an unapplied funds account.

385.    Wells Fargo also sent Ms. Prado a letter dated July 14, 2020, congratulating Ms. Prado because she was once again enrolled in monthly automatic payments for her Secondary Mortgage Loan, beginning August 14, 2020.

386.    Wells Fargo next sent Ms. Prado a letter dated July 15, 2020 stating that her account was due for "3 payment(s) for the month(s) of May 1, 2020 through July 15, 2020 [sic] . . .." Wells Fargo's July 15, 2020 letter offers Ms. Prado various options to "help [her] stay in [her] home," none of which included deferral of her payments to the end of the note, as she had been told previously.

387.    On July 22, 2020, Ms. Prado called Wells Fargo regarding her Secondary Mortgage Loan account because she was confused by Wells Fargo's correspondence, which did not comport with her prior conversation on July 10, 2020 with Wells Fargo's representative, Rosemary, in which Rosemary informed Ms. Prado that the forborne payments on her Secondary Mortgage Loan would be put at the end of her loan.

388.    A Wells Fargo representative named Raphael spoke with Ms. Prado during the July 22, 2020 call. Raphael informed Ms. Prado that he could see no indication in Wells Fargo's system that Ms. Prado had requested forbearance on her Secondary Mortgage Loan and that a Wells Fargo representative named "Tayion Pugh" appeared to be the person who put the process in motion that resulted in Ms. Prado's Secondary Mortgage Loan account being placed into forbearance status. Raphael was not able to explain why the forborne (without authorization) payments on Ms. Prado's loan were not being deferred.

389.    On July 28, 2020, Ms. Prado accessed her Secondary Mortgage Loan account information through Wells Fargo's website in order to determine how much she would need to pay to

bring her Secondary Mortgage loan current. According to Wells Fargo's website as of July 28, 2020, Ms. Prado was required to pay $610.40 to bring her loan current at that time.

390.    The next day, July 29, 2020, Ms. Prado went to a Wells Fargo branch bank and paid $610.40, believing that she was bringing her account contractually current.

**10.    Renrick and Vivian Robinson, Texas residents**

391.    The Robinsons' residence, in Grand Prairie, Texas, is encumbered by a Veterans Administration mortgage, which on information and belief was originated by Wells Fargo, refinanced by Wells Fargo, and is serviced by Wells Fargo.

392.    On March 20, 2020, Ms. Robinson called Wells Fargo to discuss a potential refinance, to take advantage of the historically low prevailing interest rates. The Wells Fargo representative told her about the forbearance program and asked if she wanted to receive some literature on forbearance relief. Ms. Robinson agreed to accept the literature, but expressly stated that she was not accepting forbearance.

393.    As Wells Fargo explained in a letter sent to the Robinsons months later, the customer service representative added the coding on the Robinsons' loan to have the informational packet sent, however, this also placed their mortgage into forbearance.

394.    When the Robinsons received the information, they reviewed it together. They decided that they did not want or need a forbearance and threw away the notice. However, Wells Fargo had already placed them into a forbearance.

395.    The Robinsons discovered this when Mr. Robinson applied for a personal line of credit from American Express, seeking the travel benefits and perks associated with that credit card. He was denied because he was in forbearance.

396.    Shocked, the Robinsons called Wells Fargo and demanded to be removed from forbearance.

397.    Although Wells Fargo represented that they had been removed, Mr. Robinson's application for the personal line of credit was again denied due to the forbearance code on his credit report. Ultimately, he was only able to secure the personal line of credit after sending verification of his income.

## VI.    CLASS ACTION ALLEGATIONS

398.    Plaintiffs bring this complaint on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4). The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage into forbearance or continued forbearance without receiving the borrower's request or continued consent for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

399.    In addition, Plaintiffs Delpapa, Healy, Johnson, and Prado seek to represent the following California Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in California into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

400.    In addition, Plaintiff Doctor seeks to represent the following Florida Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Florida into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

401.    In addition, Plaintiff Green seeks to represent the following Georgia Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Georgia into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

402.   In addition, Plaintiff Jacob seeks to represent the following New York Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in New York into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

403.   In addition, Plaintiffs Renrick and Vivian Robinson and Luis and Marisol Castro seek to represent the following Texas Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Texas into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

404.   In addition, Plaintiff Gerald Forsburg seeks to represent the following Virginia Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Virginia into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

405.   Excluded from the Classes are Wells Fargo's officers, directors and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

406.   **Numerosity**: The members of the Classes are so numerous that joinder of all members would be impractical. Wells Fargo is one of the nation's largest home lenders and servicers, and media reports indicate borrowers in at least 14 states have experience non-requested forbearances. The Consumer Financial Protection Bureau has documented dozens of complaints. Wells Fargo recently reported to the United States Senate that approximately 1,600 borrowers had called to complain about being placed into unwanted forbearances. Based on the elevated volume of Wells Fargo's borrowers placed into forbearances, when compared to its industry peers, Plaintiffs estimate that hundreds of thousands of forbearances were the result of Wells Fargo's faulty program.

407.   **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Classes. For Plaintiffs and the Classes, the common legal and factual questions include, but are not limited to the following:

A.   Whether Wells Fargo negligently or intentionally enrolled customers in forbearance programs without their consent;

B.   Whether Wells Fargo has breached terms implied in its contracts with Plaintiffs and the Class Members;

C.   Whether Wells Fargo's actions or inactions violated the consumer protection statutes invoked herein;

D.   Whether Plaintiffs and the Class members were damaged by Wells Fargo's conduct and, if so, the appropriate amount of damages;

E.   Whether, because of Wells Fargo's misconduct, Plaintiffs and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

408.   **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by the same wrongful practices of Wells Fargo. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

409.   **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. None of the Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

410.   **Predominance and Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class members are likely in the hundreds of millions of dollars, the individual

damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Classes could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

411.    Further, individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

412.    Wells Fargo has, or has access to, address and/or other contact information for the Class members, which may be used to provide notice of the pendency of this action.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")
on Behalf of Plaintiffs and the Nationwide Class**

413.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

414.    This claim is brought by Plaintiffs against Wells Fargo & Co. and Wells Fargo Bank N.A. for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

415.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …" 18 U.S.C. § 1962(c).

416.    At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

417.    WFC and Wells Fargo Bank conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

418.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

419.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

**A.    WFC, Wells Fargo Bank, and Black Knight Comprised an Enterprise Whose Activities Affect Interstate or Foreign Commerce.**

420.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

421.    Based upon Plaintiffs' current knowledge and belief, the following persons constitute an associated in fact enterprise that will be referred to herein as the "Fraudulent Forbearance Enterprise:" (1) WFC; (2) Wells Fargo Bank; and (3) vendors, including (without limitation) Black Knight, Inc., that created, maintained, and implemented the systems and processes used by Wells Fargo to impose unrequested forbearances and to voluntarily repurchase GSE backed loans that had been placed into unrequested forbearances.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

422.    The Fraudulent Forbearance Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

423.    The members of the Fraudulent Forbearance Enterprise function as a continuing unit and share the common purpose of maximizing their profits by placing borrowers into CARES Act forbearances. The Fraudulent Forbearance Enterprise is linked systematically through contractual relationships, financial ties, and parent/subsidiary relationships.

424.    Wells Fargo Bank has contracted with Black Knight, Inc. for the purposes of using the MSP mortgage servicing system to identify loans to be placed into unsolicited forbearance. Wells Fargo Bank contracts with Black Knight, Inc. for the purposes of using Black Knight's Loss Mitigation services to identify borrowers who can be placed into deferment post-forbearance, entitling Wells Fargo to GSE incentive payments, and Wells Fargo Bank uses Black Knight to convey COVID-forbearance specific false credit reporting to credit reporting agencies, to process loan modifications, and to effectuate early pool buyouts.

425.    While all Enterprise members participate in and are part of the Fraudulent Forbearance Enterprise, they each also exist as separate and distinct entities apart from the Enterprise.

426.    WFC is a diversified financial services company organized under the laws of Delaware and registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended.

427.    WFC provides banking, investment and mortgage products and services, as well as consumer and commercial finance through banking locations, ATMs, the internet and mobile banking.

428.    WFC conducts substantially all of its operations through its subsidiaries, including but not limited to Wells Fargo Bank, although WFC is a separate and distinct legal entity from its subsidiaries, including Wells Fargo Bank.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

429.    A significant source of the funds WFC uses to pay dividends on its common and preferred stock and debt service on its debt is dividends from WFC's subsidiaries, including dividends from Wells Fargo Bank generated by the Wells Fargo Enterprise's fraudulent forbearance scheme and Wells Fargo's capital markets business's conversion of unrequested forbearance into illicit profit vehicles.

430.    WFC uses funds it obtains from Wells Fargo Bank, including funds generated in connection with the Fraudulent Forbearance Enterprise, to satisfy WFC's financial obligations, including payments of principal and interest on WFC's debt.

431.    WFC and Wells Fargo Bank control, operate, and direct the affairs of the Fraudulent Forbearance Enterprise by, among other things, working with Black Knight to program their computer systems to identify borrower accounts for inclusion in the fraudulent forbearance scheme.

432.    The Fraudulent Forbearance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity.

**B.    The Fraudulent Forbearance Enterprise Committed Thousands of Predicate Acts.**

433.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

434.    As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to serving through the mail correspondence with some

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

borrowers and correspondence regarding proposed loan retention workout options with respect to accounts placed into unauthorized forbearance status.

435.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to loan data, proposed post-forbearance workout terms and agreements, false forbearance notices, false reporting to the GSMC's, as well as to the Securities and Exchange Commission, Federal Reserve Board, and the Office of the Comptroller of the Currency, among others, regarding loans Wells Fargo subjected to its fraudulent forbearance scheme, as well as related email correspondence, monthly mortgage statements and online account information, and telephone correspondence.

436.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: false reports to credit reporting agencies that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false, deceptive and misleading written correspondence with borrowers; email correspondence; misleading websites and mobile device electronic user interfaces that placed borrowers into forbearance with the click of a single button without warning or explanation, as well as other data used to place accounts into forbearance status and/or to inform third-parties of borrowers' loans that Wells Fargo placed into forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor reporting; correspondence; and payments.

437.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants include information or communications in furtherance of or necessary to effectuate the scheme.

438.    Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-

backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators, and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

439.    Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

440.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and that the GSMCs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiffs and the other members of the Class, relied upon or were injured by their and others' reliance upon the Defendants' misrepresentations and omissions. Had the GSMCs and their investors, Wells Fargo's debt and equity investors, the participants in the credit markets, and Plaintiffs and other members of the Class, known that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide requested and agreed-to forbearance plans, they would have immediately halted Defendants' misconduct.

**C.    Pattern of Racketeering Activity.**

441.    The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

442.    Defendants began placing of borrowers' mortgage loans into unauthorized forbearances in March of 2020, which is within four years of Plaintiffs' filing of their original complaint in this case.

84

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

443.    Each of the Defendants has committed numerous acts of racketeering activity. Racketeering activities include delivering false and misleading communications to borrowers via mail or wire; false and misleading communications to government sponsored entities like Ginnie Mae, involving the exercise of the early pool buyout option and resecuritization of loans that would never have been non-performing but for Wells Fargo's unlawfully placing them into forbearances; and false and misleading communications to credit reporting agencies. These communications continue to this day.

444.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the other Class members.

445.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Wells Fargo continues to profit, by resecuritizing billions of dollars in illicitly repurchased GNMA loans, and reaping the windfalls associated with servicing and holding those loans up until they are resecuritized.

446.    As a direct and proximate result, Plaintiffs and class members have been injured in their business or property or both by the predicate acts, which make up the Defendants' patterns of racketeering activity.

447.    Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, including credit damage, loss of access to credit markets and/or home equity lines of credit, an inability to refinance and costs associated with delayed refinancing, reputational damage, frustration, outrage, and various out-of-pocket costs, and other pecuniary damages and general damages.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

## SECOND CAUSE OF ACTION

### Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA") on Behalf of Plaintiffs and the Nationwide Class

448. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

449. TILA requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights. In 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act amended the Truth in Lending Act ("TILA") to, among other things, require servicers to promptly credit mortgage payments. 15 U.S.C. § 1639f.

450. This requirement is implemented through Regulation Z, which states that:

> "In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall . . . (f)ail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency …"

Reg Z., 12 C.F.R. § 226.36(c)(1)(i).

451. The Dodd–Frank Act amendments to the Truth in Lending Act ("TILA") also mandate that servicers credit periodic payments on consumer credit transactions secured by a consumer's principal dwelling as of the date of receipt. 15 U.S.C. § 1639f(a).

452. As demonstrated through the experiences of the Castros, Ms. Green, Ms. Doctor, Mr. Forsburg, and Mr. Johnson, Wells Fargo failed to timely credit payments.

453. In some instances, Wells Fargo reversed payments. In others, Wells Fargo accepted the payments, but did not credit those payments to the mortgage account. Instead, the payments were held, without the borrowers' knowledge or consent, in "unapplied funds" accounts.

454.    Wells Fargo's failure to timely credit resulted in negative credit reporting, as Wells Fargo continued to report the borrowers as "in forbearances," despite their never having asked for that relief, and failed to report those payments.

455.    Because being in a forbearance is a significant indicator of a lack of creditworthiness, the failure to timely credit and negative credit reporting resulted in concrete harms, such as the inability to refinance, the inability to secure additional lines of credit, damage to credit scores, and reputational harm.

456.    For some borrowers, like Mr. Forsburg, the failure to timely credit a payment resulted in the denial of a HAMP modification agreement,

457.    TILA provides a private right of action for violations of these provisions. 15 U.S.C. § 1640(a). This cause of action extends to suits against entities who violate the provisions of TILA and who, at some point, owned the loan obligation. 15 U.S.C. § 1641(f). On information and belief, Wells Fargo voluntarily repurchased tens of billions of dollars of loans that had been placed into fraudulent forbearance, subjecting them to liability for TILA servicing violations for those loans.

458.    Plaintiffs are entitled to actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. § 1640(a)(2)(B), and attorney's fees, under 15 U.S.C. § 1640(a)(4).

### THIRD CAUSE OF ACTION

**Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 22601 et seq. ("RESPA") on Behalf of Plaintiffs and the Nationwide Class**

459.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

460.    The residences secured by the mortgages in question were the principal residences of the Plaintiffs.

461.    RESPA, and the accompanying Regulation X, impose requirements on loan servicers who receive incomplete applications for loan modification. 12 C.F.R. § 1024.41. Borrowers' inquiries into forbearance are incomplete applications for loan modification, even where those communications are not requests for forbearances. *Lender Letter (LL-2020-02)*, FANNIE MAE (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display.

462.    Generally, loan servicers are not to "evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon" an incomplete application. 12 C.F.R. § 1024.41(c)(2)(i). However, upon receipt of an incomplete application, a loan servicer may nonetheless offer a short-term payment forbearance program based on that application. *Id.* § 1024.41(c)(2)(iii). "Promptly after offering" a forbearance program, unless the borrower rejects the offer, "the servicer must provide the borrower a written notice stating the specific payment terms and duration of the program or plan, that the servicer offered the program or plan based on an evaluation of an incomplete application, that other loss mitigation options may be available, and that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan." *Id.*

463.    Many borrowers did not receive any notification letter, in contravention to RESPA.

464.    In addition to those requirements, RESPA incorporates other notification requirements, through 12 C.F.R. § 1024.38(b). For instance, 12 C.F.R. § 1024.38(b)(2)(v) requires loan servicers that service federally-backed-loans to comply with the notification and other servicing requirements of the loan owners, even where those notification requirements go further than what is detailed in 12 C.F.R. § 1024.41. For federally backed loans, Wells Fargo was required to send an Evaluation Notice along with the offer of a forbearance program. *See Lender Letter (LL-2020-02)*, FANNIE MAE (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display. The Evaluation Notice template

provided by Fannie Mae is optional, though "it reflects a minimum level of information that the servicer must communicate and illustrates a level of specificity that complies with the requirements of this Guide." *Servicing Guide, D2-2-05*, *Receiving a Borrower Response Package*, FANNIE MAE (06/09/2021), https://singlefamily.fanniemae.com/media/31901/display.

465.    If not using the template, the notice to be sent communicating the offer of forbearance must: "Be written in clear, concise language; (i) identify whether the borrower is receiving an offer of a workout option and, if so, the decision for the workout option that is being offered to the borrower; (p)rovide the steps the borrower must take to participate in or accept any offer;" and "provide a 14-day time frame for the borrower to accept or decline the workout option or inform the servicer of the borrower's intent to accept the workout option, if applicable." *Id.*

466.    In the instances in which Wells Fargo did send a notice, that notice was woefully inadequate. It did not provide any timeline for acceptance. Instead, it informed the borrower that the bank was "confirming the following short-term payment relief for [their] account" – relief that had been unilaterally imposed by the bank.

467.    The notice stated that borrowers could terminate the forbearance either by continuing to make payments, or by contacting Wells Fargo. However, as Plaintiff Johnson discovered, this was not so. Instead of shortening or canceling forbearance plans after receiving payments or requests to terminate, forbearance plans were *extended*, in direct contravention to the CARES Act.

468.    The CARES Act expressly states, in a subsection titled "Requirements for Servicers," that a forbearance "may be extended for an additional period of up to 180 days **at the request of the borrower**, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, **either the initial or extended period of forbearance may be shortened.**" Section 4022(c)(1) of the CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 490 (2020) (codified at 15 U.S.C. § 9056(c)(1)) (emphasis added).

469.    In addition, as alleged above, Fannie Mae's Evaluation Notice template includes the following sections regarding the impacts of forbearance:

We will not pursue foreclosure during the forbearance plan term.  However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and

**Additional Forbearance Plan Information and Legal Notices**

**Credit Reporting**:
- We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
- **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK.  HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

470.    Wells Fargo's notice provided no warnings about the potential credit impacts of being placed in forbearance.

471.    The CARES Act does contain an amendment to the notice requirements of Regulation X, granting greater flexibility to loan servicers, but only with regard to deferrals, not forbearances. *See* 12 U.S.C. § 1024.41(c)(2)(v). Congress thus made a clear distinction between a loan deferral, and forbearance. The latter is an important financial decision that borrowers should make for themselves, and only when armed with all the necessary information.

472.    Not only did Wells Fargo omit such warnings when sending notices to borrowers after placing them in unwanted forbearance plans, when those borrowers contacted Wells Fargo about this misconduct, the bank provided assurances which this Court has already instructed them to correct about the absence of credit harm from being placed into a forbearance. In fact, as Plaintiffs Delpapa, Jacob, and Johnson learned, being placed into forbearance had a serious and negative impact on their credit score and creditworthiness.

473.    Wells Fargo's failure to provide accurate information when making an offer of forbearance caused concrete harms. Some borrowers, like the Robinsons, understood that by not

affirmatively accepting the forbearance plan they would not be placed in a forbearance. Others were misled as to their ability to terminate the forbearance, and the impact it would have on their ability to refinance.

474.     Had Wells Fargo provided adequate and accurate information about the potential negative consequences of being placed into a forbearance, the borrowers would have been able to more expeditiously resolve their unwanted forbearances and become eligible to refinance sooner.

475.     Providing inaccurate or incomplete information in response to a borrowers' request for information with respect to a borrower's loan is a violation of RESPA. 12 C.F.R. § 1024.38(b)(1)((iii-iv).

476.     RESPA contains a private right of action for violations of this provision. 12 C.F.R. § 1024.41(a). ("A borrower may enforce the provisions of this section [Regulation X] pursuant to section 6(f) of RESPA (12 U.S.C. § 2605(f)"). Plaintiffs allege a violation of Regulation X for the proposed Nationwide class, as even the notices that some borrowers received were inadequate and inaccurate.

477.     Plaintiffs are entitled to actual and statutory damages under 12 U.S.C. § 2605(f) and attorneys fees under 12 U.S.C. § 2605(f)(3).

**FOURTH CAUSE OF ACTION**

**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA")
on Behalf of Plaintiffs and the Nationwide Class**

478.     Plaintiffs repeat and reallege the allegations in this complaint.

479.     Plaintiffs Jacob and Doctor are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

480.     Wells Fargo is a "furnisher" of consumer information as defined by 12 C.F.R. § 1022.41(c) and as described throughout the Fair Credit Reporting Act ("FCRA"), as Wells Fargo

1    regularly reports consumer account information to the credit reporting agencies for inclusion in credit

2    reports.

3    481.    Wells Fargo willfully violated 15 U.S.C. § 1681s-2(b) by failing to adequately investigate

4    and correct inaccurate credit reporting information with the credit reporting agencies following Plaintiffs

5    Doctor and Jacob's formal reinvestigation requests with the credit reporting agencies under 15 U.S.C. §

6    1681i. Alternatively, Wells Fargo negligently violated 15 U.S.C. § 1681s-2(b) by failing to adequately

7    investigate and correct inaccurate credit reporting information with the credit reporting agencies

8    following Plaintiffs Doctor and Jacob's formal reinvestigation requests with the credit reporting

9    agencies under 15 U.S.C. § 1681i.

10    482.    Plaintiffs and the putative class members in this case have had their credit information

11    compiled and furnished by Wells Fargo regarding their mortgage loans indicating falsely that Plaintiffs'

12    and the putative class members' loans are in forbearance when Plaintiffs and the putative class members

13    did not request forbearance.

14    483.    Wells Fargo knew, or should have known, that Plaintiffs and the Class members did not

15    request or affirmatively consent to the mortgage loan forbearances that Wells Fargo reported to the

16    credit reporting agencies.

17    484.    Despite the fact that Wells Fargo knew or should have known that it placed borrowers

18    into mortgage forbearances that they did not request or consent to, Wells Fargo had a policy of reporting

19    the forbearance in the comments section of Plaintiffs' and the Class members' credit reports.

20    485.    Plaintiff Jacob submitted a dispute letter to Experian on September 9, 2020, disputing

21    Wells Fargo's reporting of his mortgage loan account as "in forbearance" when Plaintiff Jacob never

22    requested or authorized such forbearance.

23    486.    Wells Fargo received notice of Plaintiff Jacob's dispute from the credit reporting

24    agencies and failed to reasonably investigate the dispute.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

487.    Wells Fargo failed to conduct and report the results of a complete investigation into each dispute raised by Mr. Jacob. Wells Fargo failed to promptly delete, modify, or block reporting of inaccurate, incomplete, or unverifiable information in response to each dispute raised by Mr. Jacob.

488.    Wells Fargo has breached its duties as set forth in 15 U.S.C. § 1681s-2(a) by failing to adequately investigate and fully correct inaccurate credit reporting information with the credit reporting agencies following Mr. Jacob's dispute of the credit reporting errors.

489.    Mr. Jacob has incurred actual damages and has suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the Fair Credit Reporting Act.

490.    Plaintiff Doctor likewise submitted dispute letters to Equifax on July 7, 2020 and July 16, 2020.

491.    Wells Fargo received notice of these disputes from the credit reporting agencies and failed to conduct and report the result of a complete investigation into Ms. Doctor's dispute. Wells Fargo continued to misleadingly report Ms. Doctor as in a "forbearance", despite the fact that she had never requested to be placed in such a program.

492.    Being reported as in a "forbearance" communicates to potential creditors or third-parties that a borrower has experienced a financial hardship, and results in an abridgement of the borrowers' ability to access new credit, such as refinancing their mortgages to receive a lower interest rate, or to borrower against the equity in their homes.

493.    Ms. Doctor experienced actual damages as a result of Wells Fargo's continued inaccurate reporting, including her inability to access credit, time spent attempting to rectify Wells Fargo's inaccurate reporting, and emotional and mental distress and anguish,

494.    Based on Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiffs and the Class members are entitled to actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1681o.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

495.    Moreover, as a result of each and every negligent violation of the FCRA, Plaintiffs and the Class are entitled to statutory damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o.

496.    Plaintiffs and the Class members are also entitled to statutory damages, punitive damages, and reasonable attorneys' fees for each and every of Wells Fargo's willful violation of the FCRA pursuant to 15 U.S.C. § 1681n(a).

**FIFTH CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing
on Behalf of Plaintiffs and the Nationwide Class**

497.    Plaintiffs brings this claim on behalf of themselves and the Nationwide Class.

498.    Plaintiffs, the Class members, and Wells Fargo were parties to contracts, referred to as Deeds, Deeds of Trust, or Securities (collectively, "Deeds"). Wells Fargo may be either a signatory to

> with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

those contracts as the mortgage lender, as in the case of the Robinsons, or an assignee of that contract as mortgage servicer. For instance, in Ms. Delpapa's case, Wells Fargo, as the loan servicer, assumed the obligations of the original lender in her Deed:

499.    In either case, those Deed's for GSE-backed loans are substantially identical for all borrowers in material respects. The covenant of good faith and fair dealing is a common foundation inherent in all of the Deeds between the Plaintiffs, Class members, and Wells Fargo.

500.    In addition to the above language contained in the deeds, some borrowers, had HAMP agreements with Wells Fargo, which Wells Fargo violated by unilaterally changing those terms.

501.    Every contract contains an implied covenant of good faith and fair dealing. The implied covenant obligates the parties to cooperate so that each party may obtain the full benefit of performance of the contract. The duty of good faith and fair dealing means that parties may not interfere with or fail

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

to cooperate in the other party's performance. Neither party may engage in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage in conduct that prevents the other party from performing under the contract.

502.    Wells Fargo impliedly covenanted as a servicer that it would undertake its duties in good faith. In particular, Wells Fargo has a contractual duty under the Deed to apply payments it receives from borrower to interest, principal, and escrow items, in that order. Borrowers are obliged to timely pay the amounts due for those items.

503.    By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with Class members' ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts.

504.    No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

505.    Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

506.    By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence and constituted an abuse of its power.

507.    As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiffs were injured. Their damages include, but are not limited to, damage to their credit including increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance or secure additional lines of credit.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

## SIXTH CAUSE OF ACTION

### Unjust Enrichment on Behalf of Plaintiffs and the Nationwide Class

508.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

509.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

510.    Plaintiffs and members of the Nationwide Class have conferred a benefit upon Wells Fargo which received benefits by placing Plaintiffs and the Nationwide Class into forbearance without their consent. By placing Plaintiffs' and members of the Nationwide Class's mortgages in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiffs and the Class from refinancing with another institution, and thus increasing the value of the mortgage servicing rights.

511.    Wells Fargo's forcing Plaintiffs and the Nationwide Class into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

512.    Wells Fargo's forcing of Plaintiffs and the Nationwide Class into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

513.    As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo simultaneously rendered those loans eligible for voluntary repurchase out of the GSE trusts, and distressed the value of the loans. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% to 10% above par after the borrowers become current.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

514.    Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiffs and the Nationwide Class and in contravention of the requirements of the CARES Act.

515.    Some of the profits Wells Fargo made are restitution – that is, they are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread – the difference between interest payments made on the loans and the cost to service the loan. Because being placed into a forbearance restricted borrowers from refinancing to lower interest rates, borrowers were forced to continue making larger interest payments to Wells Fargo.

516.    However, most of Wells Fargo's ill-gotten profits are nonrestitutionary – not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and nonrestitutionary disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-market interest payments made to Wells Fargo while borrowers were barred from refinancing.

517.    While the damages to the Cass members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

518.    As a result, the Plaintiffs and Nationwide Class members are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

**SEVENTH CAUSE OF ACTION**

**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Prado, and the California Class**

519.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

520.    Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

521.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices." Wells Fargo engaged in unlawful and unfair business acts and practices in violation of the UCL as follows.

522.    Wells Fargo's nonconsensual forbearance program is unlawful under the UCL because it violates Sections 4022 and 4023 of the CARES Act, which require that a borrower affirmatively request that their mortgage be placed in forbearance and affirmatively acknowledge they are experiencing a hardship due to COVID-19, and that loan servicers only extend forbearance upon a borrower's request. Additionally, by failing to comply with federal guidance regarding the CARES Act, Wells Fargo's forbearance program violated Cal. Civ. Code § 3273.11(a).

523.    Additionally, Wells Fargo's practices are unlawful because they violate Regulation N, "Mortgage Acts and Practices—Advertising," which forbids "any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product[.]" 12 C.F.R. § 1014.3. Wells Fargo violated Regulation N by failing to inform borrowers that they were placing their mortgages in forbearance without their consent, and by sending notices with inaccurate information regarding the impact of forbearances.

98                                    **THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

524.    Additionally, Wells Fargo violated Regulations X and Z, as alleged *supra*, by failing to timely credit loan payments and by failing to provide adequate notice to borrowers associated with the unilateral forbearance plans.

525.    Wells Fargo's conduct described herein threatens an incipient violation of California's consumer protection laws, violates the policy or spirit of such laws, and/or otherwise significantly threatens or harms competition by avoiding procedures intended by the Legislature to protect California's consumers, including under the California Consumer Credit Reporting Act, Cal. Civ. Code § 1785. 25, *et seq*., and the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*

526.    Wells Fargo's practices were also unfair under the UCL because placing borrowers' mortgages in forbearance without their consent is contrary to established public policy; immoral, unethical, oppressive or unscrupulous; and causes injury to consumers that outweighs its benefits.

527.    The harm to Plaintiffs and Class members of being placed in a mortgage forbearance without their consent outweighs the utility, if any, of Wells Fargo's policies and practices.

528.    Plaintiffs and the Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misconduct.

529.    Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs and the Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices; any such orders or judgments as may be necessary to restore to Plaintiffs and the Class members any money acquired by unfair competition, including restitution, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345; public injunctive relief to prohibit future violations as alleged herein in the interest of protecting the California public; and any other just and proper relief available under the California UCL. To the extent these remedies are equitable, Plaintiffs seek them in the alternative to any adequate remedy at law they may have.

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

## EIGHTH CAUSE OF ACTION

**California Consumer Credit Reporting Act, Cal. Civ. Code § 1785. 25 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Prado, and the California Class**

530.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

531.    Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

532.    The California Consumer Credit Reporting Act (CCRA) provides that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

533.    Wells Fargo, a "person" under the CCRA, furnished information on Plaintiffs' and Class member's mortgage forbearances that it knew or should have known was incomplete or inaccurate to consumer credit reporting agencies.

534.    Chiefly, Wells Fargo reported borrowers as in forbearances, with the attendant implications of financial hardship, when the borrowers had not requested that relief and were not unable to make payments. One clear example is Ms. Delpapa, who was prepaid for the duration of her forbearance.

535.    For borrowers who *did* continue to make payments while on unrequested forbearances, those payments were not properly reported. For instance, Wells Fargo reported Mr. Healy as "Account in Forbearance," and also falsely claimed he had not made any recent payments during the forbearance even though he had, in fact, made every single monthly payment in full and on time even during the time period that his account had been placed into forbearance.

536.     The forbearance information reported by Wells Fargo was incomplete, inaccurate, or materially misleading because the Plaintiffs did not request that their account would be placed in forbearance, or for that forbearance to be extended, and the false information was negative to the Plaintiffs and Class members.

537.     Plaintiffs suffered actual damage as a result of this violation because they were not able to pursue a refinancing or other forms of credit while in forbearance and for months after exiting those plans.

538.     Wells Fargo's violation was willful under Cal. Civ. Code § 1785.31 because Wells Fargo acted with reckless disregard for the rights of the Plaintiffs and the Class in exploiting a statutory scheme meant to help, not further harm, borrowers.

539.     As a result of Wells Fargo's negligent and willful violations of the CCRA, Plaintiffs seek all available remedies under the CCRA, including actual damages, court costs, loss of wages, attorney's fees, pain and suffering, and punitive damages.

## NINTH CAUSE OF ACTION

**Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Prado, and the California Class**

540.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

541.     Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

542.     The Rosenthal Fair Debt Collection Practices Act ("Rosenthal FDCPA") prohibits debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code § 1788.

543.     Wells Fargo is a "debt collector" because it "regularly . . . engages in debt collection" as a mortgage servicer. *See* Cal. Civ. Code § 1788.2(c). Plaintiffs and Class members are "person[s]", and their mortgage loans are "consumer debts" under the Rosenthal FDCPA. *Id*. § 1788.2(f), (g).

544.     The Rosenthal FDCPA incorporates by reference and prohibits violations of the federal Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17. That includes the Federal Act's prohibition of "false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" including the false representation of the status of any debt, "communicating or threatening to communicate to any person credit information which is known or which should be known to be false," and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(2), (8), (10).

545.     Wells Fargo violated the Rosenthal FDCPA through its violations of Section 1692e of the Federal Act, when it provided false, deceptive, or misleading information about the mortgage debt of Plaintiffs and the Class.

546.     As a result of Wells Fargo's violation of the State and Federal Acts, Plaintiffs are entitled to actual and statutory damages, fees, and costs available under those Acts. *See* Cal. Civ. Code § 1788.17; 15 U.S.C. § 1692k.

## TENTH CAUSE OF ACTION

**Georgia Fair Business Practices Act O.C.G.A. §§ 10-1-390, *et seq*.**
**Asserted on behalf of Plaintiff Green & the Georgia Class**

547.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

548.     Wells Fargo committed unfair business acts and practices in violation of The Georgia Fair Business Practices Act, O.C.G.A §§ 10-1-390, et seq. ("GFBA"), by inaccurately reporting to credit reporting agencies that Plaintiff Green's and the purported Class members' mortgages were "in

forbearance" when Plaintiff and the putative Georgia Class members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

549.    Wells Fargo failed to disclose the consequences of the forbearance option, and moreover, involuntarily enrolled Plaintiff Green and the Georgia Class Members into this program.

550.    Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Green and the Georgia Class members who were unaware that their mortgages had been placed in forbearance without their knowledge or consent.

551.    Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

552.    As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Green and the Georgia Class members suffered and will continue to suffer actual damages.

553.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Green and the Georgia Class members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

554.    In addition, Plaintiff Green and the Georgia Class members seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION

### New York Deceptive Trade Practices Act., N.Y. Gen. Bus Law § 340
### Asserted on behalf of Plaintiff Jacob & the New York Class

555.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

556.    Wells Fargo committed unfair business acts and practices in violation of NY Gen. Bus. §349, *et seq.*, by inaccurately reporting to credit reporting agencies that Plaintiff Jacob's and the New York Class members' mortgages were "in forbearance" when Plaintiff Jacob and the New York Class members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

557.    Wells Fargo failed to disclose the consequences of the forbearance option, and moreover, involuntarily opted Plaintiff Jacob and the New York Class members class into this program.

558.    Wells Fargo's practices were consumer oriented because they essentially placed unwilling consumers, who wished to continue making payments on their loans and preserve their credit history, into forbearance, without even notifying such consumers or obtaining their permission.

559.    Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Jacob and the New York Class members who were unaware that their mortgages had been place "in forbearance" without their knowledge or consent.

560.    Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

561.    As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Jacob and the New York Class members suffered and will continue to suffer actual damages.

562.    Defendants' practice was misleading in a material respect because it caused Plaintiff and the New York Class members damages.

563.    Plaintiff Jacob and the New York Class members did not wish to opt into forbearance, and yet, that was not an option for them.

564.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Jacob and the New York Class members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

565.    In addition, Plaintiff Jacob and the New York Class members seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable and appropriate, as well as reasonable attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION

### Texas Debt Collection Practices Act, Tex. Fin. Code § 392
### Asserted on behalf of the Castros, the Robinsons and the Texas Class

566.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

567.    Wells Fargo committed unfair business acts and practices in violation of the Texas Debt Collection Practice Act, ("TDCPA") Tex. Fin. Code § 342, *et seq*., by inaccurately reporting to credit reporting agencies that the Robinsons and the Texas class members' mortgages were "in forbearance" when the Robinsons and the Texas Class members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

568.    Jose and Maria Castro, and Renrick and Vivian Robinson, are "consumers" as that term is defined by the TDCPA.

569.    The Robinsons' and Castros' relationships with Wells Fargo arose out of a "consumer debt" as that term is defined under the TCPA.

570.    Wells Fargo Bank NA regularly collects consumer debt and is a "debt collector" as that term is defined in the TCPA.

571.    Wells Fargo violated the TCPA by misleadingly reporting to the credit agencies that the Robinsons, the Castros, and the Texas Class members were in "forbearance," when those individuals had never requested or consented to forbearance.

572.    Moreover, Wells Fargo failed to provide adequate disclosures to the Texas Class members about the negative consequences of being placed into a forbearance before placing them into

that program. Wells Fargo's communications with borrowers were false and misleading in that they omitted known negative consequences of being placed into a forbearance, and inaccurately described the consequences that Wells Fargo did disclose.

573.    Wells Fargo also made misrepresentations to the credit reporting agencies, reporting that the Castros, the Robinsons, and the Texas Class members were in forbearances, despite those borrowers never having request that relief. Since a loan servicer cannot unilaterally place a borrower into a forbearance, being reported as in such a program directly imputes that the borrower requested that relief and is experiencing financial hardship.

574.    The Robinsons and the Texas Class members have suffered actual damage, as alleged above, as a result of Wells Fargo's misleading reporting of their loan status.

575.    The Texas Class members are entitled to their actual damages, attorneys' fees, and injunctive relief under § 392.403 of the TDCPA.

## THIRTEENTH CAUSE OF ACTION

### Florida Consumer Collections Practices Act., N.Y. Gen. Bus Law § 340
### Asserted on behalf of Plaintiff Doctor and the Florida Class.

576.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

577.    Plaintiff Jenna Doctor is a "consumer," as she is a natural person obligated to pay a debt on her homestead property.

578.    The debt which Defendants attempted to collect was a "consumer debt" within the meaning of § 559.55(6) of the Florida Consumer Collection Practices Act ("FCCPA"), as Ms. Doctor's mortgage debt in question arises out of debt incurred for family or household purposes.

579.    Defendants violated § 559.72(5) of the FCCPA when Defendants represented to the credit reporting agencies that Ms. Doctor's mortgage loan account was in forbearance, when Ms. Doctor

THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

did not, in fact, consent to the placement of her account into forbearance status. Defendants knew that the information they reported to the credit reporting agencies was false because Defendants knew Ms. Doctor did not consent to the placement of her account in forbearance when it made each representation to the credit reporting agencies.

580.    As alleged above, Defendants made representations to the credit reporting agencies that the mortgage loan accounts of the members of the Florida Class were in forbearance when the members of the Florida Class did not request or consent to the forbearance, and Defendants knew that the information it reported to the credit reporting agencies regarding the Florida Class members' mortgage loan accounts was false.

581.    Defendants' representations to the credit reporting agencies regarding Ms. Doctor and the members of the Florida Class harmed Ms. Doctor's and the Florida Class members' reputations. Specifically, due to Defendants' representations to the credit reporting agencies that Ms. Doctor's mortgage loan account was in forbearance, Ms. Doctor's application for credit was denied.

582.    Pursuant to § 559.77(2) of the FCCPA, Ms. Doctor is entitled to her actual damages, statutory damages of $1,000.00, and her reasonable attorneys' fees and costs. The members of the Florida Class are entitled to statutory damages in the amount of $500,000 or 1% of the Defendants' net worth, whichever is less.

## FOURTEENTH CAUSE OF ACTION

### Gross Negligence on Behalf of Plaintiffs and the Nationwide Class

583.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

584.    In a mortgagor-mortgagee relationship, a lender owes a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower. *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012) (citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585,

598-97 (Bankr. N.D. Tex. 2010). *See also Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2008, no pet.)(citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)(Every person has a duty to exercise reasonable care to avoid foreseeable risk of injury to others.)); *Trevino v. HSBC Mortgage Services, Inc. (In re Trevino)*, 535 B.R. 110, 150-151 (Bankr. S.D. Tex. 2015).

585.    By knowingly placing borrowers' loans into forbearance status without their consent, Defendants demonstrated an utter disregard of prudence amounting to complete neglect of the safety and financial welfare of the Plaintiffs and the other Class representatives. Wells Fargo's misconduct is such a degree of negligence as would shock any fair-minded person. *Ferguson v. Ferguson*, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971) (emphasis omitted).

586.    Alternatively, or additionally, Wells Fargo acted with willful and wanton negligence, with conscious disregard or reckless indifference, to Plaintiffs' and the other Class members' rights by placing Plaintiffs' and other Class members' mortgage loans into forbearance status without their knowledge or consent. Wells Fargo knew from its knowledge of existing circumstances and conditions, as reflected by its own website and published materials and its own institutional knowledge regarding how the credit markets would function and the effect a forbearance notation would have on consumers' credit, that its conduct probably would cause injury to Plaintiffs and the other Class members. *Woods v. Mendez*, 265 Va. 68, 76-77 (2003).

587.    As a result of Wells Fargo's conduct as described herein, Plaintiffs have been damaged, including the cancellation mortgage modifications, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

## VIII.   REQUEST FOR RELIEF

588.    Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment against Defendants, and for Plaintiffs, as follows:

A.    Certify the Classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4), and appoint Plaintiffs as representatives of the Classes and appoint Plaintiffs' counsel as Class counsel;

B.    Award declaratory relief, including but not limited to a declaration that Wells Fargo's actions and business practices are unlawful and that Wells Fargo must comply with state and federal lending laws;

C.    Award injunctive relief, including public injunctive relief permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged;

D.    Award all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Classes, including penalties, and all other relief allowed under applicable law;

E.    Grant Plaintiffs and the Class awards of restitutionary and nonrestitutionary disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.    Award all costs of prosecuting this action, including attorneys' fees and expert fees as may be allowable under applicable law;

G.    Award both pre-judgment and post-judgment interest on any amounts awarded;

H.    Award treble or punitive damages insofar as they are allowed by applicable laws;

I.    Award appropriate individual relief as requested above; and

J.    Grant such other and further relief, including declaratory, injunctive, and equitable relief, as the Court may deem proper.

**THIRD AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 28th day of September, 2022.

KELLER ROHRBACK L.L.P.

By *s/ Zachary W. Gussin*
Derek W. Loeser (*Pro Hac Vice*)
Gretchen Freeman Cappio (*Pro Hac Vice*)
Zachary W. Gussin (*Pro Hac Vice*)
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com
zgussin@kellerrohrback.com

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497
mpreusch@kellerrohrback.com

Abbas Kazerounian (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
(800) 400-6808, Fax (800) 520-5523
ak@kazlg.com

Jason A. Ibey (SBN: 284607)
KAZEROUNI LAW GROUP, APC
321 N Mall Drive, Suite R108
St. George, UT 84790
(800) 400-6808, Fax (800) 520-5523
jason@kazlg.com

Theodore O. Bartholow III ("Thad")
Texas State Bar No. 24062602
Karen L. Kellett
Texas State Bar No. 11199520
O Max. Gardner III
N.C. State Bar No. 6164
KELLETT & BARTHOLOW PLLC

11300 N. Central Expressway, Suite 301
Dallas, TX 75243
(214) 696-9000, Fax (214) 696-9001
thad@kblawtx.com
kkellet@kblawtx.com
maxgardner@maxgardner.com

Malissa L. Giles
TRACY GILES
PO Box 2780
Roanoke, VA 2401
(540) 981-9000
mgiles@gileslambert.com

Abelardo Limon, Jr.
Texas State Bar No. 1235770
LIMON LAW OFFICE P.C.
890 W. Price Road
Brownsville, TX 78520
(956) 544-7770, Fax (956) 544-4949
alimon@limonlaw.com

Babak Semnar (SBN: 224890)
Jared M. Hartman (SBN 254860)
SEMNAR & HARTMAN, LLP
41707 Winchester Road, Suite 201
Temecula, CA 92590
(951) 293-4187, Fax (888) 819-8230
bob@sandiegoconsumerattorneys.com
jared@sandiegoconsumerattorneys.com

Ahren A. Tiller, Esq. (SBN: 250608)
BLC LAW CENTER, APC
1230 Columbia St., Ste. 1100
San Diego, CA 92101
(619) 894-8831, Fax (866) 444-7026
ahren.tiller@blc-sd.com

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

## CERTIFICATION OF SERVICE

I, Zachary W. Gussin, hereby certify that on September 28, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record who have appeared in this action.

*s/ Zachary W. Gussin*
Zachary W. Gussin

**THIRD AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**